UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| JASON RICHER, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | C.A. No. 15-162-L-PAS |
| JASON PARMELEE as the Finance Director of | : | |
| THE TOWN OF NORTH SMITHFIELD, | : | |
| TOWN OF NORTH SMITHFIELD, and | : | |
| STEVEN E. REYNOLDS in his official | : | |
| capacity as Chief of the NORTH SMITHFIELD | : | |
| POLICE DEPARTMENT | : | |
| Defendants | : | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT
OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT**

**INTRODUCTION**

Pursuant to Federal Rule of Civil Procedure 56(d), Plaintiff moves for summary judgment on liability against Defendants Town of North Smithfield and Steven E. Reynolds in his official capacity as Chief of the North Smithfield Police Department.  Plaintiff alleges Defendants' initial seizure of his three guns was unconstitutional because it violated his rights as a gun owner under the Rhode Island Firearms Act and the United States and Rhode Island Constitutions, and because the seizure occurred without first giving Plaintiff proper notice and a meaningful opportunity to be heard as required by the Second and Fourteenth Amendments to the United States Constitution and Article 1, Sections 2 and 22 of the Rhode Island Constitution. Further, Defendants failed to provide Plaintiff with any post-deprivation hearing.  Plaintiff challenges Defendants' apparently unwritten policy of requiring all gun owners whose guns have been seized, regardless of the circumstances, to obtain an order in state district court mandating the return of the guns before Defendants will return the guns.

1

# FACTUAL HISTORY[1]

1. Plaintiff Jason A. Richer is a natural person and citizen of the United States and of the State of Rhode Island, residing in North Smithfield, Rhode Island. He is an Air Force veteran who received an honorable discharge in August of 1986. He is the father of three sons. (Complaint ¶ 1).  He is not under guardianship or treatment or confinement by virtue of being a mental incompetent.  Plaintiff is not a felon, a fugitive from justice, a drug addict, or a habitual drunkard.  (Id.).

2. Defendant Town of North Smithfield ("the Town") is a town chartered by the State of Rhode Island. Defendant Steven E. Reynolds is the Chief of the North Smithfield Police Department ("NSPD"). As such, he is responsible for formulating, executing and administering with the Town the laws, customs, practices, and policies at issue in this lawsuit. Through its Police Department, the Town has enforced the challenged laws, customs and practices against Plaintiff. (Complaint ¶ 2).

3. Defendant Jason Parmelee is the Finance Director of the Town of North Smithfield. As such, he is responsible for directing and coordinating the operations of the various divisions of the Finance Department and serves as Treasurer/Collector for the Town of North Smithfield. (Complaint ¶ 3).

4. The Second Amendment to the United States Constitution provides: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." (Complaint, ¶ 6).

---

[1]Plaintiff relies upon the averments of his Amended Verified Complaint ("Complaint ¶ ___") in support of this Motion including the Exhibits attached to the Complaint, designated Exhibits A-F.

5.  The Second Amendment is incorporated as against the states through the Fourteenth Amendment, such that Defendants cannot, under color of law, deprive Plaintiff of his right to keep and bear arms. (Complaint ¶ 7).

6.  Article 1, Section 22 of the Rhode Island Constitution provides: "The right of the people to keep and bear arms shall not be infringed." (Complaint ¶ 8).

7.  Plaintiff legally obtained and possessed three guns: a Remington 1100 shotgun which was purchased in 1979 from Edgar's Sporting Goods located in Woonsocket, R.I., a Thompson Center .50 caliber black powder muzzleloader which was purchased in 1993 from Bullseye Shooting Supplies located in Woonsocket, R.I., and a .22 caliber bolt action rifle obtained in 1982 which previously belonged to his father who died in 1974. He has completed a hunter safety course and received weapons training while in the military and gained the classification of marksman. He is well trained in gun safety and maintenance. (Complaint ¶9).

8.  On or about September 28, 2008, Plaintiff and his now-former wife Tracy Richer had an argument about Ms. Richer wanting a divorce.  (Complaint ¶10).

9.  On or about September 28, 2008, North Smithfield police officers and North Smithfield Rescue paramedics went to Plaintiff's residence at 7 Mattity Road, North Smithfield, RI in response to a call from Ms. Richer, who said she was concerned Plaintiff had tried to harm himself. (Complaint ¶ 11).

10. The officers informed Plaintiff they were there to check on his well-being. (Complaint ¶ 12).

11. Plaintiff informed the officers that he was not suicidal and his wife had misconstrued his earlier actions and conversation. (Complaint ¶ 13).

12. The North Smithfield police insisted that Plaintiff submit to a mental health evaluation and he was transported to Landmark Medical Center in Woonsocket, Rhode Island for evaluation. The doctor at the hospital who examined him discharged him within a few minutes of arrival without further evaluation.  (Complaint ¶ 14).

13. The police officers removed from Plaintiff's garage/workshop the three guns which had been secured in a locked room, within a locked case, and transported them to headquarters for "safe keeping."  (Complaint ¶ 15).

14. On or about November 24, 2008, Plaintiff obtained from the NSPD a copy of its "Incident Report" with respect to the September 28, 2008 incident.   A true and accurate copy of the Incident Report that was given to him by the NSPD is attached to the Complaint as Exhibit A.  (Complaint ¶ 16).

15. The Incident Report states, in part:

"On the reported date and time, Lt. Riccitelli, Ptlm. Amato, Ptlm. Lamoureux, Ptlm. Bergeron and I ["Patrol Gregory Landry"] were dispatched to 7 Mattity Road for a report of a suicidal male by means of pills.  Upon arrival, I met with the caller Tracy Richer while Ptlm Bergeron met with Jason Richer.  Tracy stated that she and her husband Jason Richer, had engaged in a verbal argument about her wanting a divorce from Jason…NS Rescue responded to the scene to transport Jason to LMC [Landmark Medical Center] for evaluation.  While on scene, Officers learned that Jason had three guns located upstairs in his workshop.  Officers then followed Tracy into the workshop where a 22 caliber rifle, a 12 gauge Remington shotgun and a Thompson Center 50 caliber black powder rifle were seized and held for safekeeping at NSPD."  (Complaint ¶ 17).

16. The police officers did not seize any of Plaintiff's medication.  (Complaint ¶ 18).

17. On information and belief, the NSPD took no steps to prevent Plaintiff from obtaining any firearms after the September 28, 2008 incident.  (Complaint ¶ 19).

18. On information and belief, the NSPD researched all of the firearms seized through the National Crime Information Center (NCIC) and with all being found negative for any criminal activity.  (Complaint ¶ 20).

19. On information and belief, Defendants' officers logged all of the items seized and then forwarded them to the NSPD Bureau of Criminal Investigation (BCI) Division for "safe keeping."  (Complaint ¶ 21).

20. Plaintiff was not charged with any crime nor has he ever been charged with any crime. (Complaint ¶ 22).

21. On information and belief, the NSPD has never been notified by a justice of the superior court or the attorney general that Plaintiff's firearms are necessary as evidence in a criminal or civil matter. (Complaint ¶ 23).

22. On or about November 21, 2008, Plaintiff went to the NSPD to retrieve his guns. The police refused to return them to Plaintiff insisting that he hire a lawyer and obtain a court order for the return of his firearms. The police officer Plaintiff spoke to informed him that he would have to prove that he is fit to have his weapons returned. He was told by the police officer that they did not care about his civil rights. (Complaint ¶ 24).

23. On or about November 24, 2008, Plaintiff's psychologist, John Murphy, Psy.D., wrote a letter to the NSPD attesting that Plaintiff was not a danger to himself nor others and that there is no reason why returning his guns to him would pose a risk. A true and accurate copy of the letter is attached to the Complaint as Exhibit B.  (Complaint ¶ 25).

5

24. On or about November 25, 2008, Ms. Richer wrote a letter to the NSPD detailing the misunderstanding which led to the confiscation of Plaintiff's firearms and attesting that the telephone call that she had placed to the police department on September 28, 2008, had been a "false alarm," that the incident was unfortunate incident, that it is not necessary for the police to continue to hold the firearms, that she does not believe Plaintiff to be a danger to himself or to others, and that she was comfortable with his being in possession of his firearms at their home. A true and accurate copy of the letter is attached to the Complaint as Exhibit C.  (Complaint ¶ 26).

25. On or about December 16, 2009, Plaintiff delivered a letter to the NSPD officially requesting the release of his firearms and enclosed the above-mentioned letters attached to the Complaint as Exhibits B and C. Plaintiff's letter detailed that he was not charged with a crime, there have been no related incidents, requested a date and time to retrieve his firearms, and requesting a response in writing within thirty days if they did not agree to release his firearms. A true and accurate copy of the letter is attached to the Complaint as Exhibit D. (Complaint ¶ 27).

26. Plaintiff did not receive any response from the NSPD to the letter attached to the Complaint as Exhibit D.  (Complaint ¶ 28).

27. On or about July 24, 2013, Plaintiff returned to the NSPD and presented to the Executive Officer Captain Tim Lafferty the letters attached as Exhibits A and B and detailed the facts listed above to which Capt. Lafferty responded that Plaintiff's firearms were still being held for "public safety." Mr. Richer presented Capt. Lafferty with a newspaper clipping regarding "Robert Machado v. City of Cranston", et al. (C.A. 12-445S) to which Capt. Lafferty responded that Plaintiff's guns could not be returned due to the liability on

the police department if Plaintiff were to hurt himself or someone else upon return of the weapons. (Complaint ¶ 29). A true and accurate copy of the newspaper clipping is attached to the Complaint as Exhibit E.

28. On or about August 9, 2013, Plaintiff spoke on the telephone with Capt. Lafferty.  Capt. Lafferty indicated he was waiting for a response from the Attorney General's Office and that he needed another week to review the matter with the Chief of Police as he would not be available for the next week.  (Complaint ¶ 30).

29. On or about October 3, 2013, Capt. Lafferty indicated that the town solicitor, Assistant Attorney General Paul Karns, and he intended to get a release and/or waiver and a date and time for Plaintiff to retrieve his firearms. (Complaint ¶ 31).

30. On or about December 20, 2013, Plaintiff again emailed Capt. Lafferty inquiring about the status of the return of his firearms to which Plaintiff received no response. (Complaint ¶ 32).

31. On or about January 21, 2015, Plaintiff again emailed Capt. Lafferty inquiring about the status of the return of his firearms to which Capt. Lafferty responded that he would be having a meeting with the new town solicitor that week, that he would discuss the issue with the new solicitor, and he would "get back to" Plaintiff. (Complaint ¶ 33).

32. Plaintiff did hear from Capt. Lafferty or the Town about this matter after January 21, 2015.  (Complaint ¶ 34).

33. On or about March 20, 2015, Steven Brown, Executive Director of the American Civil Liberties Union of Rhode Island, sent a letter to Defendant Reynolds, detailing the above-stated facts and requesting arrangements be made to return the firearms by April 3, 2015

to which Mr. Brown received no response. A true and accurate copy of the letter is

attached to the Complaint as Exhibit F. (Complaint ¶ 35).

34. On April 21, 2015, Plaintiff filed a verified complaint against Defendants seeking

injunctive, declaratory and monetary relief.

35. On April 28, 2015, Plaintiff filed an amended verified complaint.

36. On May 1, 2015, Plaintiff filed a motion for preliminary injunction based on the amended

verified complaint.

37. On May 5, 2015, after Richer filed his complaint and motion for preliminary injunction,

Defendants returned his guns to him.

38. On May 11, 2015, Defendants filed an answer to the first verified complaint denying,

*inter alia*, that they have violated Plaintiff's rights.

**STANDARDS OF REVIEW**

There are two relevant standards of review:  (1) the standard for summary judgment,

which includes (2) the standard to review of the constitutionality of a government restriction on

Plaintiff's Second Amendment rights.

As this Court has said in <u>URI Cogeneration Partners, L.P. v Board of Governors for

Higher Education</u>, 915 F.Supp. 1267 (D.R.I. 1996):

> The standard for ruling on a Rule 56(d) motion is identical to that deployed when
> considering a summary judgment motion under Rule 56(c). [citations omitted].
> Rule 56(c) dictates that summary judgment shall be granted if "the pleadings,
> depositions, answers to interrogatories, and admissions on file, together with the
> affidavits, if any, show that there is no genuine issue as to any material fact and
> that the moving party is entitled to judgment as a matter of law."  The Court must
> view the facts and all inferences therefrom in the light most favorable to the non-
> moving party. [citation omitted].  In determining whether a factual dispute is
> genuine, the Court must decide whether "the evidence is such that a reasonable
> jury could return a verdict for the nonmoving party." [citation omitted].  A fact is
> material if it might affect the outcome of the suit under the applicable law.
> [citation omitted].  In order to win summary judgment, the moving party must

8

show that "there is an absence of evidence to support" the nonmoving party's position. [citation omitted]. The non-moving party, of course, may not rest in its trenches but must "set forth specific facts demonstrating that there is a genuine issue for trial." [citation omitted].

Id. at 1279,

Here, the legal analysis includes the appropriate constitutional standard of review of Defendants' apparently unwritten policy of seizing a person's firearms from his home for "safekeeping" and not releasing them unless the person obtains an order from state district court. Plaintiff submits the applicable standard is strict scrutiny. When the United States Supreme Court held that the Second Amendment provided for an individual right to bear arms, it expressly left undecided the level of scrutiny that would apply to the constitutionality of restrictions on that right. District of Columbia v. Heller, 554 U.S. 570, 626 (2008). However, the Court indicated that a "rational basis" review would be insufficient to justify laws burdening Second Amendment rights. Id. at 628, n. 27. Moreover, the "core" Second Amendment right vindicated in Heller was the "right of law-abiding responsible citizens to use arms in the defense of hearth and home." Id. at 635.

Whether intermediate or strict scrutiny applies depends on (1) how close the law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on the right. Jackson v. City & County of San Francisco, 746 F.3d 953, 960 (9th Cir. 2014); United States v. Masciandaro, 638 F.3d 458, 479 (4th Cir. 2011). In similar circumstances, other courts have applied strict scrutiny. See, Tyler v. Hillsdale County Sheriff's Dept., 775 F.3d 308, 328-29 (6th Cir. 2014) ("In choosing strict scrutiny, we join a significant, increasingly emergent though, as yet, minority view that concludes that as between intermediate scrutiny and strict scrutiny...the latter is more appropriate for assessing a challenge to an enumerated constitutional right..."); Mance v. Holder, C.A. 4:14-cv-539, 2015 WL 567302 at *8 (N.D.Tex. Feb. 11, 2015) (strict

scrutiny applies to federal statute that bars "all legally responsible and qualified individuals from directly acquiring handguns from federally licensed dealers in every state other than their own and the District of Columbia).

Nonetheless, the First Circuit has held that where a federal statute imposed "a categorical ban on gun ownership by a class of individuals" the government must make a "'strong showing' necessitating a substantial relationship between the restriction and an important governmental objective," i.e., intermediate scrutiny.  United States v. Booker, 644 F.3d 12, 25 (1st Cir. 2011). In Booker, the statute at issue was the so-called "Lautenberg Amendment" to the Gun Control Act of 1968, 18 U.S.C. §922(g)(9), which makes it a felony for any person who has been convicted in any court of a misdemeanor crime of domestic violence to possess any firearm. Plaintiff submits that because Defendants' unwritten policy strikes at the core value of his Second Amendment rights, and because he has not been shown to be part of any class that would support denial of his Second Amendment rights, strict scrutiny applies here.  However, Defendants' unwritten policy cannot survive even intermediate level scrutiny.

### ARGUMENT

Plaintiff is entitled to partial summary judgment for four reasons:  (1) Defendants' actions violate the Rhode Island Firearms Act, (2) Defendants' actions violate the Due Process Clauses of the United States and Rhode Island Constitution, (3) Defendants' actions violate Plaintiff's right to keep arms as set forth in the Second Amendment of the United States Constitution and Art. 1, Sec. 22 of the Rhode Island Constitution, and (4) Plaintiff's injuries are capable of repetition yet evade review.

### I.      Defendants' actions violate the Rhode Island Firearms Act

Defendants' actions violate the Rhode Island Firearms Act, R.I.Gen.L. § 11-47-1, et seq., which specifically governs this situation.  R.I.Gen.L. § 11-47-58.  ("The control of firearms…regarding their ownership, possession…shall rest solely with the state, except as otherwise provided in this chapter.").  Thus, Defendants cannot maintain a gun policy that is inconsistent with the Firearms Act.  Moreover, as the Rhode Island Supreme Court has said, the Act "…is generally nonrestrictive as to the rights of persons generally to purchase, own, carry, transport or have in their possession or control most kinds of firearms…"  State v. Storms, 112 R.I. 121, 125, 308 A.2d 463, 465 (1973).  While the General Assembly may delegate to public bodies the determination of facts upon which the Act is intended to operate, id. at 126, 308 A.2d at 466, the legislature must provide standards or principles to confine and guide the interpretation of the law by those bodies.  In re Advisory Opinion to the the House of Representatives (Casino II), 885 A.2d 698, 707-08(R.I. 2005).  The purpose of the "non-delegation" doctrine is to protect the citizens from discriminatory and arbitrary actions of public officials and it provides assurance that duly authorized, publically accountable officials make fundamental policy decisions.  Marran v. Baird, 635 A.2d 1174, 1179 (R.I. 1994).  Moreover, those public bodies may not enact policies, rules or regulations that contravene the legislative intent as expressed through its legislation, i.e., *ultra vires* policies.  See, Arnold v. Mayor of Pawtucket, 21 R.I. 15, 41 A. 576 (1898).

Defendants' continued retention of Plaintiff's guns directly contravenes the Firearms Act.  Section 22(b) of the Act states:  "If the police department in the city or town in which the firearm was seized or confiscated has not been notified by a justice of the superior court or the attorney general that the firearm is necessary as evidence in a criminal or civil matter, it shall be returned

to the rightful owner." R.I.Gen.L. § 11-47-22(b) (emphasis added). Here, Plaintiff is not aware

of any civil or criminal matter involving the guns nor have Defendants claimed there is any.

Accordingly, Defendants' unwritten policy of requiring persons whose guns they have seized to

obtain an order in state court before they return them violates the Firearms Act. Even if

Defendants argue some interpretation of the Act that permitted this policy, it would either be

*ultra vires* or would violate the non-delegation doctrine.

Moreover, to the extent Defendants argue Plaintiff's mental state justified their seizure

and retention of his guns, the General Assembly has set forth in the Firearms Act what mental

conditions disqualify a person from possessing a firearm. "No person who is under guardianship

or treatment or confinement by virtue of being a mental incompetent, or who has been

adjudicated or is under treatment or confinement as a drug addict, shall purchase, own, carry,

transport, or have in his or her possession or under his or her control any firearm." R.I.Gen.L. §

11-47-6. This restriction does not apply to Plaintiff, nor do the other statutory restrictions on

which persons cannot possess a firearm. R.I.Gen.L. §§ 11-47-5 (felons and fugitives from

justice), 11-47-7 (illegal aliens).

Further, a narrow construction of the Firearms Act is appropriate so as to avoid

constitutional issues. With respect to the issue of whether a federal statute violated the Tenth

Amendment, Chief Justice Roberts recently wrote: "[I]t is 'a well-established principle governing

the prudent exercise of the Court's jurisdiction that normally the Court will not decide a

constitutional question if there is some other ground upon which to dispose of the case." Bond v.

United States, 134 S.Ct. 2077, 2087-88 (2014), quoting, Escambia County v. McMillan, 466 U.S.

48, 51 (1984), and citing, Ashwander v. TVA, 297 U.S. 288, 347 (1936) (Brandeis, J.,

concurring).[2]   The Court interpreted the federal statute so as to avoid the constitutional issue.  134

S.Ct. at 2093.   The Rhode Island Supreme Court applies the same rule of statutory construction.

State v. Russell, 890 A.2d 453, 459 (R.I. 2006) ("When a limiting construction can be placed on a

statute to save its constitutionality an overbreadth analysis should be avoided."); Hometown

Properties, Inc. v. Fleming, 680 A.2d 56, 60 (R.I. 1996).  Accordingly, to the extent Defendants

argue a broad interpretation of the Firearms Act that supports their actions, Plaintiff suggests this

Court narrowly interpret the Firearms Act so as to avoid any conflict with his due process or gun

rights.  Nonetheless, as a matter of law, Defendants violated Plaintiff's rights under the Rhode

Island Firearms Act, R.I.Gen.L. § 11-47-1, et seq.

II.     **Defendants did not accord Plaintiff his due process of law before or after
        seizing and retaining Plaintiff's constitutionally kept guns, which are
        property.**

Defendants violated Plaintiff's due process rights under the federal and Rhode Island

constitutions.  "Procedural due process imposes constraints on governmental decisions which

deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process

Clause of the Fifth or Fourteenth Amendment."  Mathews v. Eldridge, 424 U.S. 319, 332 (1976).

The Fourteenth Amendment speaks of "property" generally.  Fuentes v. Shevin, 407 U.S. 67, 90

(1972).  Additionally, "a temporary, nonfinal deprivation of property is nonetheless a

'deprivation' in the terms of the Fourteenth Amendment."  Id. at 84-85.

At the very least, Defendants have deprived Plaintiff of his property.  Walters v. Wolf,

660 F.3d 307, 311 (8th Cir. 2011). In Walters, the defendant police department stopped Walter's

car because he lacked a front license plate required under Missouri.  A computerized records

check revealed an outstanding warrant for Walters' arrest.  The defendants seized a handgun and

---

[2] See also, United States v. Jin Fuey Moy, 241 U.S. 394, 401 (1916) (Holmes, J.) ("A statute must
be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional,
but also grave doubts upon that score.").

ammunition that Walters had in his car despite the fact that he had legally purchased the gun

from a licensed firearm dealer, the handgun was properly registered in his name under Missouri

law, and he held a valid permit to conceal and carry the handgun.  The defendants refused

several requests to return the handgun and ammunition stating they maintained a policy

"require[ing] a Court Order before returning a lawfully confiscated firearm."  Walters filed suit

alleging defendants had deprived him of his property without due process of law.  The district

court dismissed his suit finding that his ability to pursue an action in replevin in state court

provided an adequate post-deprivation remedy and that Walters had failed to use this remedy.

Walters v. City of Hazelwood, Mo., No. 4:09-CV-1473 (CEJ), 2010 WL 429015, at 4 (E.D.Mo.

Oct. 22, 2010).  Walters appealed.

     The Eighth Circuit began its analysis by confirming that Walters had a property right at

issue.  "All parties concede that Walter's interest in his handgun and associated ammunition

constitute a valid, constitutionally protected property interest."  Id. at 311.   The Circuit Court

then went on to consider what due process defendants must provide.  It rejected the district

court's decision that Walters' ability to file a replevin action in state court was an adequate

remedy.  Id. at 313-314, citing, Zinerman v. Burch, 494 U.S. 113, 127 (1990); Hudson v. Palmer,

468 U.S. 517 (1984); Parratt v. Taylor, 451 U.S. 527 (1981), overruled on other grounds, Daniels

v. Williams, 474 U.S. 327, 330-31 (1986).  The Eighth Circuit quoted Zinerman "[i]n situations

where the State feasibly can provide a predeprivation hearing before taking property it generally

must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the

taking."  660 F.3d at 313, quoting, Zinerman, 494 U.S. at 132.

> In any event, the Court's decisions suggest that absent "the necessity of quick
> action by the State or the impracticality of providing any predeprivation process,"
> a post-deprivation hearing here would be constitutionally inadequate.  This is
> particularly true where, as here, the State's only post-termination process comes

in the form of an independent tort action.  Seeking redress through a tort action is apt to be a lengthy and speculative process, which in a situation such as this one [(involving employment discrimination0] will never make the complainant entirely whole…

Id. at 313-14, quoting, Logan v. Zimmerman, 455 U.S. 422, 436-37 (1982).

The Circuit Court noted that the case involved two deprivations, the first being when defendants seized plaintiff's gun and ammunition and the second being the "subsequent and continued refusal surrender the weapons" after the dismissal of charges against plaintiff.  The court said the first seizure, which was incident to an arrest, was a valid deprivation. "When seizing property for criminal investigation purposes, compliance with the Fourth Amendment satisfies pre-deprivation procedural due process as well."  Id. at 314, quoting, PPS, Inc. v. Faulkner Cnty, Ark., 630 F.3d 1098, 1107 (8th Cir. 2011).  However, that valid seizure end with the dismissal of charges against plaintiff.

The Eighth Circuit said the second deprivation required "a new due process analysis when the defendants, with no legal grounds, refused to return Walter's property.  This second deprivation had no attendant exigencies prohibiting or making impractical a reasonable predeprivation process."  Id. at 314, citing Lathon v. City of St. Louis, 242 F.3d 841, 843 (8th Cir. 2001) ("The pivotal deprivation in this case was not the initial seizure of the ammunition and weapons, but the refusal to return them without a court order after it was determined that these items were not contraband or required as evidence in a court proceeding.").  The Eighth Circuit said "under Lathon, relegation to a post-hoc state court tort action to address the deprivation is inherently insufficient."  Id. at 315.

Here, Plaintiff also suffered two deprivations:  the first when the NSPD seized his guns for "safekeeping" and the second when it refused to return them without a court order.  The first seizure was unjustified because Plaintiff's guns were not related to the reason Defendants were

called to Plaintiff's residence, i.e., a purported suicide attempt "by means of pills."  The hospital

to which Defendants sent Plaintiff for evaluation released him immediately.  There was no crime

or criminal investigation.  The guns were not illegal.  They were locked in a cabinet.  Defendants

had no warrant or any probable cause to believe crime had been committed.[3]  When Plaintiff

made numerous attempts to obtain his guns, supported by letters from his psychologist and his

then-wife, Defendants told him he had to get a court order so as to protect them from liability.

Neither deprivation was justified, nor have Defendants provided any due process for either

deprivation.

One of the fundamental requirements of due process is notice that is "reasonably

calculated, under all circumstances, to apprise interested parties of the pendency of the action

and afford them an opportunity to present their objections."  Mullane v. Central Hanover Bank &

Trust Co., 339 U.S. 309, 314 (1950).  Due process requires that notice and a hearing must be

granted at a time when the deprivation of property can still be prevented.  Fuentes, 407 U.S. at

82.  An opportunity for a hearing "must be provided before the deprivation at issue takes effect."

Id.  See Ford v. Turner, 531 A.2d 233 (D.C. 1987) (Court ruled that the government's failure to

give Ford at minimum notice that her property, in this case guns, had been seized, that the

District sought to retain the weapons pursuant to specified authority, and that Ford could take

particular steps to challenge the District's action was a violation of Ford's due process rights).

In this case, at no time did Defendants give Plaintiff any notice whatsoever that his

lawfully obtained weapons were seized pursuant to any relevant statute, regulation or justifiable

policy (other than "safekeeping"), nor was he informed why they were seized, nor was he

---

[3] See, United States v. Newsome, 504 Fed.Appx. 463, 466 (6th Cir. 2012) (police lacked warrant to seize gun not in plain view); United States v. Wilhere, No. 14-19-DLB-EBA, 2015 WL 428077 at *2 (E.D.Ky. Jan. 31, 2015) (police lacked probable cause to search gun safe and seize guns).

informed of a meaningful process to object to the continued retention of his property, nor was he given an opportunity for a hearing to object to the seizure and retention of his property.  To the contrary, Defendants' continued retention of the weapons directly contravenes the Rhode Island Firearms Act.  Section 22(b) of the Firearms Act states:  "If the police department in the city or town in which the firearm was seized or confiscated has not been notified by a justice of the superior court or the attorney general that the firearm is necessary as evidence in a criminal or civil matter, it <u>shall</u> be returned to the rightful owner."  R.I.Gen.L. § 11-47-22(b) (emphasis added).  Plaintiff was effectively denied the opportunity to be heard by the NSPD which told him he would have to get a court order to get back his weapons.[4]

The Rhode Island Supreme Court has recently re-emphasized the purpose of the Firearms Act was to "prevent criminals and certain other person from acquiring firearms generally and handguns in particular without at the same time making unduly difficult such acquisition for other members of society."  <u>Gadomski v. Tavares</u>, No. 2014-72-M.P., 2015 WL 1844454, at *3 (R.I. Apr. 22, 2015), quoting, <u>State v. Storms</u>, 112 R.I. at 127, 308 A.2d at 466.  The Court also reiterated that a person's rights under the Firearms Act are not "committed to the unfettered discretion of an executive agency."  <u>Id.</u> at *4, quoting <u>Mosby v. Devine</u>, 851 A.2d 1031, 1050 (R.I. 2004).  In <u>Gadomski</u>, the Supreme Court held that the City of East Providence must provide "certain procedural steps" when a person applied for a concealed weapon permit.  <u>Id.</u>  Moreover, "[a] rejected applicant is entitled to know the evidence upon which the department based its decision and the rationale for the denial."  <u>Id.</u> quoting <u>Mosby</u>, 851 A.2d at 1051.  The Court held

---

[4] Because there never was a court action related to this incident, Plaintiff would have had to file a miscellaneous petition in state district court, pay a filing fee ($104.02), pay a constable to effect service on defendants (approximately $45 per defendant), and, perhaps, retain an attorney to assist him.  Thus, the cost to regain possession of his wrongfully seized and retained guns would be approximately $150-200, exclusive of legal fees.

that the repondents' letter denying petitioner's application was inadequate as a matter of law where it was "nothing more than the recital of a litany." Id. at *5, quoting Bernuth v. Zoning Board of Review of New Shoreham, 770 A.2d 396, 401 (R.I. 2001).

Here, Defendants provided no written explanation of the denial of Plaintiff's requests for the return of his guns. The oral explanation-that they want a court order that protects them from liability-matches no criteria set forth in the Firearms Act or any other statute. Defendants denied Plaintiff his due process rights through the "unfettered discretion of an executive agency." Gadomski, supra.

### III.    Defendants deprived Plaintiff of his Second Amendment right to keep arms.

"[T]he Second Amendment conferred an individual right to keep and bear arms." District of Columbia v. Heller, 554 U.S. 570, 595 (2008).[5] In Heller, the Court said the language of the Amendment supports this interpretation. The Court relied in part on Samuel Johnson's dictionary: "Johnson defined 'keep' as, most relevantly, '[t]o retain, not to lose,' and '[t]o have in custody.'" Id. at 582, quoting 1 Dictionary of the English Language 1095 (4th ed. 1773). Similarly, "Webster defined it as '[t]o hold, to retain in one's power or possession.'" Id., quoting N. Webster, American Dictionary of the English Language (1828).

English and American history also support the argument that the right to keep arms was an individual right. The Court said at the time of the founding the right to "keep arms" was considered an individual right unconnected with military service. Id. "William Blackstone, for example, wrote that Catholics convicted of not attending service in the Church of England suffered certain penalties, one of which was that they were not permitted to 'keep arms in their

---

[5]This case involves weapons that Plaintiff had secured in his home and which the Defendants removed from his home. Accordingly, it involves only the right to "keep arms" and not the right to "bear arms." Heller, at 582, Mosby v. Devine, 851 A.2d at 1042.

houses.'"  Id., quoting, Blackstone, 4 Commentaries on the Laws of England 55 (1769).

Moreover,

> Between the Restoration and the Glorious Revolution, the Stuart Kings Charles II
> and James II succeeded in using select militias loyal to them to suppress political
> dissidents in party by disarming their opponents.  [citations omitted].  Under the
> auspices of the 1671 Game Act, for example, the Catholic James II had ordered
> general disarmaments of regions home to his Protestant enemies.  [citation
> omitted].  These experiences caused Englishmen to be extremely wary of
> concentrated military forces run by the state and to be jealous of their arms.  They
> accordingly obtained an assurance from William and Mary, in the Declaration of
> Rights (which was codified as the English Bill of Rights), that Protestants would
> never be disarmed:  "That the subjects which are Protestants may have arms for
> their defense suitable to their conditions and as allowed by law."  [citation
> omitted].  This right has long been understood to be the predecessor to our Second
> Amendment.

Id. at 592-93.

The right of self-defense is an inherent right and is central to the Second Amendment.  Id.

at 628.  "St. George Tucker's version of the Blackstone's Commentaries…conceived of the

Blackstonian arms right as necessary for self-defense.  He equated that right, absent the religious

and class-based restrictions, with the Second Amendment."  Id. at 606.

Admittedly, the Supreme Court has said:

> [T]he right secured by the Second Amendment is not unlimited…nothing in our
> opinion should be taken to cast doubt on longstanding prohibitions on the
> possession of firearms by felons and the mentally ill, or laws forbidding the
> carrying of firearms in sensitive places such as schools and government buildings,
> or laws imposing conditions and qualifications on the commercial sales of
> arms…We also recognize another important limitation on the right to keep and
> carry arms.  Miller[6] said, as we have explained, that the sorts of weapons
> protected were those "in common use at the time."  [citation omitted].  We think
> that limitation is fairly supported by the historical tradition of prohibiting the
> carrying of "dangerous and unusual weapons."

Heller, 554 U.S. at 627.

---

[6] United States v. Miller, 307 U.S.174, 179 (1939).

Here, Plaintiff is neither a felon nor mentally ill.  The Supreme Court did not explain what it meant by "mentally ill" nor did cite to any legal authority defining its use of that term. However, the Rhode Island General Assembly has set forth in the Firearms Act what mental conditions disqualify a person from possessing a firearm.  "No person who is under guardianship or treatment or confinement by virtue of being a mental incompetent, or who has been adjudicated or is under treatment or confinement as a drug addict, shall purchase, own, carry, transport, or have in his or her possession or under his or her control any firearm."  R.I.Gen.L. § 11-47-6.  This restriction does not apply to Plaintiff. [7]

Further, Plaintiff was not trying to carry his firearms in schools or government buildings nor was he involved in the commercial sales of arms (except when he acquired the guns decades ago).  Moreover, these guns, especially the black powder muzzle loader and the shotgun, are certainly similar to those "in common use at the time."[8]  They are clearly not "dangerous and unusual weapons."

In McDonald v. Chicago, 561 U.S. 742, 130 S.Ct. 3020, 3037 (2010), the Court considered whether the Second Amendment was binding on the States.   "The right to keep and bear arms was considered no less fundamental by those who drafted and ratified the Bill of Rights."  Id. at 768.  The Framers of our Constitution and those who ratified it regarded the right

---

[7] See also, Tyler v. Hillsdale County Sheriff's Dept., 775 F.3d 308 (6th Cir. 2014), considering when a mental illness justifies deprivation of Second Amendment rights and reversing the dismissal of a constitutional challenge to a federal statute, 18 U.S.C. § 922(g)(4), which prohibits possession of firearms to a person "who has been committed to a mental institution."

[8] According to Wikipedia, "A shotgun is generally a smoothbore firearm, which means that the inside of the barrel is not rifled. Preceding smoothbore firearms, such as the musket, were widely used by armies in the 18th century. The direct ancestor to the shotgun, the blunderbuss, was also used in a similar variety of roles from self defence to riot control. It was often used by cavalry troops due to its generally shorter length and ease of use, as well as by coachmen for its substantial power. However, in the 19th century, these weapons were largely replaced on the battlefield with breechloading rifled firearms, which were more accurate over longer ranges." http://en.wikipedia.org/wiki/Shotgun.

to keep and bear arms as fundamental to our system of ordered liberty.  Id. at 3042.  Therefore, the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right to keep and bear arms for self-defense to the States.  Id. at 3050.  In Heller, the Court held that the District of Columbia's prohibition on possession of handguns in the home unless they were rendered inoperable at all times violated the Second Amendment.  Id. at 636.

The Rhode Island Supreme Court has interpreted the Rhode Island Constitution to provide a similar right to keep arms.  Mosby v. Devine, 851 A.2d at 1043.  Article 1, Section 22 of the Rhode Island Constitution states: "The right of the people to keep and bear arms shall not be infringed."  The Rhode Island Supreme Court has interpreted this section to provide "an absolute right to keep firearms in one's home or place of business."  Mosby, 851 A.2d at 1043 n.7 (R.I. 2004).  This is an individual right, unrelated to military service:  "Thus, like the right to be free from unreasonable searches and seizures and other rights provided to 'the people,' we believe that the right provided in art. 1, sec. 22 flows to the people individually."  Id. at 1040-1041.  Admittedly, the Rhode Island Supreme Court found that the use of "bear arms" had a military purpose, however:  "This implied relationship between the bearing or arms and military service, however, does not  undermine the individual right to 'keep' arms in one's home or in his or her place of business.  It is the keeping of arms that is the *sine qua non* of the individual right under art. 1, sec. 22."  Id. at 1042.

Rhode Island's history supports this interpretation of the individual right.

History reveals that the policy of Rhode Island called for individuals to keep arms to defend the state "when the alarm sounds."  [citation omitted].  Indeed, the Militia Act of 1798 provided that a member of the militia must "provide himself with a good musket or firelock," powder and ammunition…To deny people their individual right to keep arms could transform the militia into a toothless tiger.  In the absence of an individual right to keep arms, the government could, by legislative act, deprive the people of their right to defend the state.

Id.  Plaintiff has been denied his absolute constitutional right to keep arms for the purpose of

self-defense as required by Heller, McDonald, and Mosby as his weapons were taken from his

home and have yet to be returned.

Two recent decisions further support Plaintiff's claims,  Taylor v. City of Baton Rouge,

39 F.Supp.3d 807 (M.D.La. 2014); State v. DeCiccio, 315 Conn. 79, 105 A.3d 165 (2014).  In

Taylor, plaintiff alleged that he was pulled over in his car after exiting the parking lot of a liquor

store, allegedly because his headlights were not on.  Taylor informed the police officer he had

two rifles inside his car and the documents establishing that he possessed the guns legally were

in the glove compartment of his car.  The police officer arrested Taylor and seized the guns

because he was allegedly in violation of a city ordinance that barred any person from having

possession of a firearm in any premises that where alcoholic beverages were sold or consumed

even though Taylor had not brought the guns inside the liquor store.

Taylor filed a Section 1983 action alleging the ordinance was unconstitutional as applied

to his circumstances.  The district court said:

> Taylor's pleadings seek a viable claim for relief under the Second Amendment.
> As written, the clear language of [the ordinance] prohibits the possession of
> firearms in any parking lot of an establishment that sells alcohol.  Thus, any law-
> abiding citizen who exercises his or her right to keep and bear arms within the
> confines of his or her personal vehicle will violate [the ordinance] anytime he or
> she, for example, stops to refuel a vehicle at a service station that sells alcohol, or
> stops to purchase groceries at a grocery store that sells alcohol.

39 F.Supp.3d at 817.  The court entered declaratory judgment that the ordinance "unlawfully

infringes upon the right of Plaintiff and other citizens to keep and bear firearms, in violation of

the Second Amendment."  Id. at 819.  Similarly, here, Defendants' unwritten town policy of

seizing guns for "safekeeping" and refusing to return them without a court order violates

Plaintiff's right to keep arms in his home.

In DeCiccio, plaintiff was charged and convicted of a Connecticut statute, Gen. Statutes (Rev. to 2009) §29-38(a), that forbids a person from having in his car certain weapons, including a dirk knife and a police baton.  DeCiccio was transporting the weapons from his former home in Connecticut to his new home in Massachusetts.  He appealed the conviction, raising a number of arguments, including that the statute violated his Second Amendment right to keep and bear arms.  The Connecticut Supreme Court said that Heller had adopted a "two-pronged approach" to Second Amendment challenges:  (1) does the challenged law impose a burden on conduct falling within the scope of the Second Amendment's guarantee; (2) if so, the court evaluates the burden under some form of means-end scrutiny. 315 Conn. at 111, 105 A.3d at 187.[9]  "The appropriate degree of means-end scrutiny, generally some form of intermediate scrutiny, depends on the extent to which the challenged law burdens conduct protected under the second amendment." Id.  The court added:  "This second amendment analysis has its origins in the United States Supreme Court's first amendment jurisprudence, pursuant to which certain speech is unprotected, and varying degrees of judicial scrutiny are applied to speech depending on the nature of the speech at issue." Id., n. 22.

The court then engaged in an extensive and detailed analysis of whether DeCiccio's weapons were protected as "arms" under the Second Amendment and concluded that both the dirk knife and the police baton were protected.  Id. at 112-134, 105 A.2d at 187-202.  Having reached that conclusion, the court then went on to consider what level of constitutional scrutiny applied, noting that Heller did not decide that issue.  Id. at 137, 105 A.3d at 202.  It cited the Second Circuit for the proposition that "heightened scrutiny is triggered only by those

---

[9] But see, Tyler v. Hillsdale County Sheriff's Dept., 775 F.3d at 318. ("There may be a number of reasons to question the soundness of this two-step approach…There is significant language in Heller itself, however, that would indicate that lower courts should not conduct interest balancing or apply levels of scrutiny."

restrictions that…operate as a substantial burden on the ability of law-abiding citizens to possess and use a fire-arm for self-defense (or for other lawful purposes)." Id. at 137, 105 A.3d at 202, quoting, United States v. Decastro, 682 F.3d 160, 166 (2nd Cir. 2012), cert. denied, 133 S.Ct. 838 (2013). The Connecticut Supreme Court said that a categorical ban on transporting the weapons was a significant infringement on the defendant's right to keep and bear arms that warranted heightened judicial scrutiny. Id. at 140, 105 A.3d at 204. The court decided that intermediate-level scrutiny applied. Id. at 143-44, 105 A.3d 205-06.[10]

The Connecticut Supreme Court said to survive intermediate-level scrutiny, the state had to demonstrate that the absolute statutory ban on transporting the weapons was "substantially related to an important government objective." Id. at 143, 105 A.3d at 206. The court acknowledged that in determining whether there was an important government objective, courts have given deference to "legislative findings regarding matters that are beyond the competence of courts." Id. at 143-44, 105 A.3d at 206. "To survive intermediate scrutiny, the fit between [the legislative findings and] the challenged regulation need only be substantial, not perfect." Id. at 144, 105 A.3d at 206, quoting, Kachalsky v. Winchester, 701 F.3d 81, 97 (2nd Cir. 2012), cert. denied, 133 S.Ct. 1086 (2013).

> Nevertheless, to establish the requisite substantial relationship between the purpose to be served by the statutory provision and the means employed to achieve that end, the explanation that the state proffers in support of the provision must be "exceedingly persuasive." [citation omitted]. Moreover, "[t]he justification must be genuine, not hypothesized or invented post hoc in response to litigation. And it must not rely on overbroad generalizations…" [citation omitted]. The reason for this requirement is to ensure "that the validity of the [the challenged statute] is determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate assumptions." [citation omitted]. "[I]n judging the closeness of the relationship between the means chosen…and the government's interest, three interrelated concepts must be

---

[10] The court noted a federal district court decision applying strict scrutiny to a similar case. Bateman v. Perdue, 881 F.Supp.2d 709 (E.D.N.C. 2012).

> considered:  the factual premises [that] prompted the legislative enactment, the logical connection between the remedy and those factual premises, and the breadth of the remedy chosen."  [citation omitted].

315 Conn. at 146, 105 A.3d at 208.  The court said the state had not provided "sufficient reason" to ban the transportation of defendant's weapons from his former home to his new one, especially since the ban effectively barred him from continuing to possess the weapons.  Id. at 147, 105 A.3d at 208.

Here, again, Defendants' initial seizure was not reasonably related to any genuine public safety concern.  The police were told Plaintiff had attempted a drug overdose.  Yet, they did nothing about his medications.  Instead, they seized his three long-barrel guns (none of which would be particularly suitable for a suicide attempt).  Moreover, they did nothing to prevent him from obtaining other guns (such as a handgun that might be more suitable).  Further, Defendants' unwritten town policy of requiring Plaintiff to obtain a court order for the return of his guns has no reasonable public policy basis.  The only justification Defendants have provided is that requiring Plaintiff to obtain a state court order protects them from potential liability.  Essentially, Defendants seek to shirk their responsibilities to enforce the laws in a legitimate, reasoned manner by hiding behind the proverbial skirts of the courts.  This is not an appropriate justification for the violation of Plaintiff's constitutional rights.

Curiously, in Walters v. Wolf, 660 F.3d 307, 311 (8th Cir. 2011), the Eighth Circuit held that there had been no violation of plaintiff's Second Amendment rights because "defendants' policy and action affected *one* of Walter's firearms, which was lawfully seized.  The defendants did not prohibit Walters from retaining or acquiring other firearms."  (emphasis original).  Id. at 318, citing, Bane v. City of Philadelphia, C.A. No. 09-2798, 2009 WL 6614992 at *10 (E.D.Pa. June 18, 2010); see also, Rodgers v. Knight, 781 F.3d 932 (8th Cir. 2015), citing, Walters, supra.

As an initial matter, <u>Bane</u> would seem to be a pretty weak reed upon which to base the apparent and extraordinary holding that the government does not violate the Second Amendment unless it completely deprives a person of all access to all firearms.  It is an unpublished, pre-<u>Heller</u> and pre-<u>McDonald</u> decision.  In <u>Bane</u>, plaintiff had an altercation with his neighbors during which he pointed a handgun at them.  They called the police who came to Bane's home.  After questioning him, they seized his handgun.  While in custody, Bane signed a consent form allowing the police to search his home and seize other weapons.  After dismissal of the charges, the police declined to return his weapons.  Pennsylvania had a rule of criminal procedure that a person aggrieved by the seizure of property may move for the return of the property.  Pa.Ru.Crim.P. 588.  Plaintiff did not attempt to use this remedy.  Instead, he filed a *pro se* complaint raising a variety of claims, including violation of his Second Amendment rights.

First, the <u>Bane</u> court said that the defendants' seizure of Bane's first weapon was as an instrumentality of a crime and that he gave defendants permission to seize the second weapon.  2009 WL 66614992 at *10.  Moreover, state law permitted Bane to apply for the return of the seized items.  The <u>Bane</u> court said Rule 588 was an "adequate post-deprivation remed[y]."  <u>Id</u>. at *8, citing, <u>Welsch v. Twp. Of Upper Darby</u>, 2008 WL 3919354, *5 (E.D.Pa. Aug. 26, 2008).  (Notably, this was a holding that the Eighth Circuit implicitly rejects in <u>Walters</u>).  The <u>Bane</u> court then held:

> No government official is barring Plaintiff from obtaining a firearm and none is preventing Plaintiff from availing himself of the procedure for the return of the firearms.  Moreover, no law has been cited that infringes upon Plaintiff's right to obtain a firearm.  The Second Amendment does not bar police from seizing the items taken in this case.

<u>Id</u>.  Thus, the <u>Bane</u> court did not hold that there was no Second Amendment violation unless defendants prohibited the plaintiff from retaining or acquiring other firearms.  Notably, no other

court besides the Eighth Circuit has cited <u>Bane</u> for this purported proposition.  The Eighth

Circuit's purported reliance on <u>Bane</u> for its extraordinary holding that there is no Second

Amendment violation unless the government completely prohibits a person from all access to all

guns is seriously misplaced, at best.

Moreover, the <u>Walters</u> and <u>Bane</u> holdings would appear to be at least implicitly abrogated

by <u>Heller</u> in which the Supreme Court said a major purpose of the Second Amendment was to

prevent the government from <u>disarming</u> citizens without constitutionally permissible reasons.

<u>Heller</u>, <u>passim</u>.  Plainly, when the government seizes all a person's firearms it disarms him

regardless of whether he can obtain new weapons.[11]  Nothing in <u>Heller</u> or <u>McDonald</u> remotely

suggests that government violates the Second Amendment only when it completely prevents a

person from gaining access to all weapons all the time.  The Eighth Circuit made no attempt to

consider whether <u>Bane</u> was still "good" law in the aftermath of <u>Heller</u> and <u>McDonald</u>.

Finally, the <u>Walters</u> holding is simply illogical.  Essentially, it stands for the proposition

that even if the government seizes and holds a person's gun for no good reason, there is no

Second Amendment violation if he can obtain another one.  Conceivably, the government could

seize that one, too, without committing a constitutional wrong if the person could obtain a third

gun, etc.  In other words, the <u>Walters</u> holding would seem to be that the government could seize

a hundred guns from a person, one at a time, and, so long as he can get one hundred and one, the

person's Second Amendment rights are preserved.

Plaintiff is aware of one other court which has held that a person's Second Amendment

right is not infringed if the police prevent him from possessing one particular gun.  <u>Vaher v.

Town of Orangetown, N.Y.</u>, 916 F.Supp.2d 404, 429-30 (S.D.N.Y. 2013), citing, <u>Garcha v. City</u>

---

[11] Webster's defines "disarm" as "1. to take away weapons from."  <u>Webster's New World
Dictionary, College Ed.</u>, 415 (World Pub. Co. 1968).

of Beacon, 315 F.Supp.2d 213, 217 (S.D.N.Y. 2005).  Notably, again, <u>Garcha</u> is a pre-<u>Heller</u> and

pre-<u>McDonald</u> decision.  And, again, the district court cites no authority for this proposition of

law.

Consider if Mr. Richer tried to make a speech in front of the North Smithfield Police

Department about how it had violated his Second Amendment rights but the Police Department

prevented him from doing so.  Would any court hold that his First Amendment rights were

preserved because he could make the speech elsewhere or he could come back the next day and

try again?  No.  Similarly, Plaintiff's Second Amendment rights were violated when Defendants

disarmed him by seizing and retaining his three guns.

### IV.      Plaintiff's injuries are capable of repetition yet evade review

Although Defendants returned Plaintiff's guns after he filed suit and moved for a

preliminary injunction, the Court should address the merits of his claims because his injuries are

capable of repetition yet evade review.  <u>Weinstein v. Bradford</u>, 423 U.S. 147, 149 (1975); <u>Gulf

of Maine Fisherman's Alliance v. Daley</u>, 292 F.3d 84, 89 (1st Cir. 2002); <u>Wilson v. Holder</u>, 7

F.Supp.3d 1104, 1114 (D.Nev. 2014).  Moreover, Plaintiff seeks monetary relief, pursuant to 42

U.S.C. § 1983 and <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978), and attorney's

fees, pursuant to 42 U.S.C. § 1988.

The Supreme Court has said a challenged action is capable of repetition yet evade review

when "(1) the challenged action was in its duration too short to be fully litigated prior to its

cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining

party would be subjected to the same action again."  <u>Weinstein</u>, 423 U.S. at 149.

This situation matches that test.  Here, Plaintiff's counsel had previously represented a

similarly-situated plaintiff in a case in this court, "Machado v. City of Cranston," C.A. No. 12-

445S.  In that case, Cranston Police Department had seized Machado's weapons when someone called the police and reported that they were concerned that Machado might harm himself. Machado obtained a letter from his doctor that he was not a threat and he presented that to the Cranston police with a request for his weapons.  Defendants refused to return his guns because they had a policy of not doing so unless the gun owner got a court order.  Only after Machado filed suit in this court did Cranston agree to settle Mr. Machado's claims by returning his weapons and paying him some damages and attorney's fees.  Here, Mr. Richer showed Defendants a newspaper article about that settlement.  Nonetheless, it did not deter Defendants from requiring Plaintiff to file suit.[12]  Moreover, although Defendants have returned Plaintiff's guns, they have filed an answer denying that they violated Plaintiffs rights.  (ECF #10, ¶¶ 13, 15, 17).  Finally, there no ordinance, regulation or policy in place that would stop Defendants from seizing Plaintiff's weapons again.

Finally, the Court should rule on the merits of Plaintiff's claim because he seeks monetary relief, including compensatory damages and attorney's fees.

Accordingly, because Defendants have denied violating Plaintiff's rights and have not adopted a policy that would prevent repetition of Plaintiff's injuries, and Plaintiff seeks monetary relief including attorney's fees, the Court should rule on the merits of Plaintiff's claims.

## CONCLUSION

For the reasons stated above, Plaintiff is entitled to partial summary judgment on liability, including a declaration that Defendants' actions violated Plaintiff's statutory rights under the

---

[12] In addition, during the pendency of this lawsuit, a third person whose guns had been seized and held by a different municipal police department contacted Plaintiff's counsel about representation.  Plaintiff's counsel referred him to the Rhode Island affiliate of the American Civil Liberties Union which wrote a letter to that municipality on his behalf threatening a lawsuit similar to this one.  That municipality returned the weapons after receiving that letter.

Rhode Island Firearms Act and his constitutional rights under the United States and Rhode Island

Constitutions.

*/s/ Thomas W. Lyons*
Thomas W. Lyons          #2946
Rhiannon S. Huffman, Esq.     #8642
 RHODE ISLAND AFFILIATE,
 AMERICAN CIVIL LIBERTIES UNION
Strauss, Factor, Laing & Lyons
One Davol Square, Suite 305
Providence, RI  02903
(401) 456-0700

Date:  July 3, 2015

## CERTIFICATION

I hereby certify that on July 3, 2015, a copy of the foregoing was filed and served electronically on all registered CM/ECF users through the Court's electronic filing system and served by email on David Igliozzi, Esq., solicitor for the Town of North Smithfield. Parties may access this filing through the Court's CM/ECF system.

*/s/  Thomas W. Lyons*

S:\TWL\ACLU\Richer\Drafts\Richer's MSJ Memo.docx