UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND


JASON A. RICHER,
                    Plaintiff


v.                                                        C.A. No. 15-162-M-PAS


JASON PARMELEE, as the Finance
Director of THE TOWN OF NORTH
SMITHFIELD, THE TOWN OF NORTH
SMITHFIELD, and STEVEN E.
REYNOLDS in his official capacity
as Chief of the NORTH SMITHFIELD
POLICE DEPARTMENT,
                    Defendants.


## DEFENDANTS' SUPPLEMENT MEMORANDUM IN RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### I. Background

Plaintiff's first amended complaint included four counts: Count I ("Violation of the

Rhode Island Firearms Act"); Count II ("Violation of Plaintiff's Right to Keep Arms"); Count III

("Violation of Plaintiff's Due Process"); and Count IV ("Violation of Plaintiff's Right to Equal

Protection").  See Amended Complaint; Docket #4.  Plaintiff moved for partial summary

judgment on liability on Counts I-III of his first amended complaint.  See Plaintiff's

Memorandum in Support of Motion for Partial Summary Judgment; Docket #12-1.  Among other

things, Defendants argued that the Rhode Island Firearms Act, R.I. Gen. Laws § 11-47-1 et seq.,

did not provide Plaintiff with a private right of action.  See  Defendants' Memorandum in

Response to Plaintiff's Motion for Partial Summary Judgment at 5; Docket #18.  In his *reply*

brief, Plaintiff argued that he had a private right of action for a violation of the Rhode Island

Firearms Act pursuant to Rhode Island Gen. Laws § 9-1-2.  See Plaintiff's Reply Memorandum

at 4; Docket #23.  Plaintiff, however, acknowledged that his "complaint [did] not expressly reference [Rhode Island Gen. Laws] § 9-1-2" but if the Court determined that "such a pleading [was] necessary the Court should permit Plaintiff to amend his complaint."  Id. at 5 n.4.

In Defendants' original response to Plaintiff's motion for partial summary judgment Defendants argued that the initial seizure was consistent with the Fourth Amendment.  See Defendants' Response to Plaintiff's Motion for Partial Summary Judgment at 9-12; Docket #18. Plaintiff did not specifically reply to Defendants' Fourth Amendment argument.  See Plaintiff's Reply Memorandum; Docket #23.  Defendants then petitioned the Court to file a brief sur-reply memorandum to respond to Plaintiff's citation to Razzano v. County of Nassau, 765 F. Supp. 2d 176 (E.D.N.Y. 2011) in Plaintiff's reply memorandum and to address the post-deprivation remedy provided by R.I. Gen. Laws § 12-5-7.  See Defendants' Motion for Leave to File; Docket #24.  The Court graciously granted Defendants' request and Defendants filed a short sur-reply memorandum.  See Defendants' Sur-Reply Memorandum; Docket #26.  In his rebuttal to Defendants' sur-reply, Plaintiff argued the Fourth Amendment issue in response to Defendants' § 12-5-7 argument.  See id.

After the motion for summary judgment was fully briefed, Plaintiff moved to amend his complaint again.  See Plaintiff's Motion to Amend/Correct; Docket #29.  Defendants did not oppose the motion to amend and the Court subsequently granted Plaintiff's motion.  The Second Amended Complaint now includes five counts: Count I ("Violation of the Rhode Island Firearms Act"); Count II ("Violation of Plaintiff's Right To Keep Arms"); Count III ("Violation of Plaintiff's Right Under the Fourth Amendment and Art. I, Sec. 6 of the Rhode Island Constitution"); Count IV ("Violation of Plaintiff's Due Process"); and Count V ("Violation of Plaintiff's Right to Equal Protection").  See Second Amended Complaint; Docket #29-2.  In

2

essence, the significant changes in Plaintiff's Second Amended Complaint are that Plaintiff has added a claim under the Fourth Amendment and Art. I, Sec. 6 of the Rhode Island Constitution and has amended Count I, the claim under the Rhode Island Firearms Act.  With respect to Count I, the second amended complaint now includes an allegation that Plaintiff has a private right of action for a violation of the Rhode Island Firearms Act pursuant to R.I. Gen. Laws § 9-1-2.  Id.  ¶ 55.

During a telephone conference on January 25, 2016, the Court inquired if the second amended complaint impacted the pending motion for summary judgment.  Because Plaintiff has moved for summary judgment on Count I of the amended complaint and the second amended complaint adds a new theory of recovery under Count I, a supplemental memorandum is warranted.

Plaintiff has *not* moved for summary judgment on the Fourth Amendment or the Article I, Section 6 claim since it was not a count in his complaint when he moved for summary judgment.  See Second Amended Complaint; New Count III; Docket #29-2.  Consequently, because Plaintiff has not filed any motion to amend/correct the motion for summary judgment, the Fourth Amendment/Article I, Section 6 claim is not before the Court in so far as it pertains to the new Count III of the second amended complaint.  However, in so far as the Fourth Amendment argument directly impacts Defendants' § 12-5-7 argument, and Plaintiff has extensively briefed the issue in his reply brief, Defendants will also supplement their Fourth Amendment/Article I, Section 6 argument.

## II.  Analysis

### A.  Count I of the First Amended Complaint; The Rhode Island Firearms Act

### 1.  Summary Judgment Must be Denied on Count I Because A Municipality Cannot Commit a Crime

Plaintiff now contends that he has a private right of action for a violation of the Rhode Island Firearms Act pursuant to R.I. Gen. Laws § 9-1-2.  Specifically, Plaintiff argues that R.I. Gen. Laws § 9-1-2 creates a private cause of action for persons injured by the commission of a crime, and further, that Defendants have violated R.I. Gen. Laws § 11-47-22(b).

R.I. General Laws § 9-1-2 provides that when a person suffers "any injury to his person, reputation, or estate by reason of the commission of any crime or offense, he or she may recover his or her damages for the injury in a civil action against the offender."  R.I. Gen. Laws § 9-1-2 (emphasis added).  Section 9-1-2 is an enabling act that allows a person allegedly injured as a result of a crime "a right of action where none existed at common law." Mello v. DaLomba, 798 A.2d 405, 411 (R.I. 2002).  The burden of proof relates to the civil action; thus, Plaintiff must prove "by a preponderance of the evidence that [D]efendants violated" § 11-47-22(b).  Cady v. IMC Mortgage Co., 862 A.2d 202, 215 (R.I. 2004).  "Section 9-1-2 creates a new right of action in that a victim can bring an action for damages for injuries even if no criminal complaint for the crime or offense has been filed." Lyons v. Scituate, 554 A.2d 1034, 1036 (R.I. 1989).  To establish liability under § 9-1-2, Plaintiff must "first establish that [D]efendant engaged in criminal activity." Zarrella v. Minn. Mut. Life Ins. Co., 824 A.2d 1249, 1261 (R.I. 2003) (emphasis added); see also Willis v. Omar, 954 A.2d 126, 131 (R.I. 2008) (Section 9-1-2 "imposes civil liability for injuries resulting from a criminal act").

Plaintiff brings this action against the Town, Defendant Jason Parmelee in his capacity as Finance Director for the Town and Defendant Steven Reynolds in his capacity as chief of police

of the North Smithfield Police Department.  A suit against an individual in his or her official capacity is a suit against the official's office.  Capital Properties, Inc. v. State, 749 A.2d 1069 (R.I. 1999).  Because Plaintiff has named the individual Defendants in their official capacities only, "the suit . . . is for all practical purposes solely against the [m]unicipality."  Andino-Pastrana v. Municipio de San Juan, 215 F.3d 179, 180 (1st Cir. 2000).

"[M]unicipal corporations can not . . . do a criminal act or a willful and malicious wrong . . . ."  City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 261 (1981).  "[T]he criminal intent of an agent of a municipal corporation cannot be imputed to the municipal corporation itself because the retribution for such a wrong should not be visited upon the shoulders of blameless or unknowing taxpayers."  Bonsall Village, Inc. v. Patterson, No. 90-0457, 1990 U.S. Dist. LEXIS 12530, at *19 (E.D. Pa. Sept. 19, 1990) (internal quotation marks omitted); see also Ball v. City of Indianapolis, 760 F.3d 636, 646 (7th Cir. 2014) ("[b]ecause a crime is an offense against the sovereign, it is axiomatic that the sovereign cannot commit a crime"); Nu-Life Construction Corp. v. Board of Education, 779 F. Supp. 248, 251 (E.D.N.Y. 1991) (the "criminal intent of municipal agents cannot be imputed to the municipality itself by reason of respondeat superior").

In State v. Ziliak, 464 N.E.2d 929 (Ind. Ct. App. 1984), employees of the state of Indiana removed certain Indian artifacts from the plaintiffs' land without consent.  Id. at 930.  The acts of the state employees violated three Indiana criminal statutes.  Id.  The plaintiffs sued the state for damages and sought certain remedies provided for in Ind. Code § 34-4-30-1.  Id.  Ind. Code. § 34-4-30-1 is a "statute enacted to provide additional civil remedies to crime victims . . . ."  Id. (emphasis added.)  Consistent with R.I. Gen. Laws § 9-1-2, in order to recover under Ind. Code § 34-4-30 it is not necessary for a plaintiff to show a conviction, rather "recovery may be had so long as the actions of the perpetrator amounted to a violation of the prescribed Indiana Code

sections." Id.  Furthermore, also consistent with R.I. Gen. Laws § 9-1-2, in order to recover

under Ind. Code § 34-4-30-1 a plaintiff must prove a violation of the Indiana criminal code by a

preponderance of the evidence.  Id.  Last, again like § 9-1-2, "although it is not necessary to

show a conviction, the party seeking recovery under Ind. Code. Sec. 34-4-30-1 must prove

commission of the crime."  Id.

In Ziliak the plaintiffs did not seek recovery against the individual state employees, rather

the plaintiffs sought recovery from the State of Indiana.  Id.  The Ziliak court held that because a

crime is an offense against the sovereign, it was self-evident that the sovereign could not commit

a crime.  Id. at 930.  The Ziliak court concluded that the state could not commit the "criminal act

prerequisite to bringing the case within the terms of Ind. Code § 34-4-30-1. . . ." Id. at 931.

Plaintiff brings this action solely against the Town.  Consequently, in order to recover

pursuant to § 9-1-2 he must show that the Town committed a criminal act.  Zarrella, 824 A.2d

1249; Willis, 954 A.2d 126.  A municipality, however, cannot commit a criminal act.  City of

Newport, 453 U.S. 247; Ball, 760 F.3d 636; Bonsall Village, 1990 U.S. Dist. LEXIS 12530; Nu-

Life Construction Corp., 779 F. Supp. 248.  Plaintiff's motion for summary judgment on Count I

fails as a matter of law because Plaintiff cannot show that the Town committed the criminal act

prerequisite to bring this matter within the terms of R.I. Gen. Laws § 9-1-2.

## 2.  Summary Judgment Must Be Denied On Count I Because a Municipality is Not an "Offender" under § 9-1-2

Even if a municipality could commit a crime, § 9-1-2 does not grant Plaintiff any right or

action against the *Town*.  As noted above, § 9-1-2 provides

> [w]henever any person shall suffer any injury to his or her person, reputation, or
> estate by reason of the commission of any crime or offense, he or she may recover
> his or her damages for the injury in a civil action against the offender, and it shall
> not be any defense to such action that no criminal complaint for the crime or
> offense has been made; and whenever any person shall be guilty of larceny, he or

she shall be liable to the owner of the money or articles taken for twice the value thereof, unless the money or articles are restored, and for the value thereof in case of restoration.

R.I. Gen. Laws § 9-1-2 (emphasis added).  "[W]hen the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings."  Shine v. Moreau, 119 A.3d 1, 9 (R.I. 2015) (internal quotation marks omitted).  In the event that the Court "find[s] the statute to be unambiguous, [the Court] appl[ies] the plain meaning and [the] interpretive task is done."  Id. (internal quotation marks omitted).  Plain statutory language is the best indicator of legislative intent.  Id.

R.I. Gen. Laws § 9-1-2 provides that a victim of a crime may recover damages for an injury in a civil action against an "offender."  Id. (emphasis added).  The statue is clear and unambiguous.  An "offender" is a "person who has committed a crime."  Black's Law Dictionary 1108 (7th ed. 1999) (emphasis added).  It is abundantly clear that the term offender in the statue applies to a "person."  R.I. Gen. Laws § 9-1-2.  A municipality is not a person; consequently a municipality cannot be held liable for damages pursuant to § 9-1-2.  Consequently, Plaintiff's motion for summary judgment on Count I fails as a matter of law because the Town is not an "offender" under R.I. Gen. Laws § 9-1-2.

### 3.  Even if R.I. Gen. Laws § 9-1-2 Provides Plaintiff With  Private Right of Action Against the Town, Summary Judgment Must Be Denied Because Count I Is Out of Time

Section 9-1-2 does not create a distinct cause of action for purposes of determining the applicable statute of limitations.  Lyons v. Scituate, 554 A.2d 1034 (R.I. 1989).  The Rhode Island Supreme Court has held that in order to determine whether Rhode Island's three year (R.I. Gen. Laws § 9-1-14(b)) or ten year (R.I. Gen. Laws § 9-1-13(a)) statute of limitations applies to a § 9-1-2 claim, the Court must look to the "nature" of Plaintiff's claim.  Id. at 1036.  The nature of Plaintiff's civil claim under § 9-1-2 lies in conversion.  The statute of limitations for a

conversion action is ten years. <u>Waters v. Walt Disney World Co.</u>, 237 F. Supp. 2d 162 (D.R.I. 2002) (conversion claims subject to limitations period in R.I. Gen. Laws § 9-1-13(a)).

Rhode Island General Laws § 9-1-13(a) provides that <u>"[e]xcept as otherwise specially provided</u>, all civil actions shall be commenced within ten . . . years next after the cause of action shall accrue, and not after." R.I. Gen. Laws § 9-1-13(a) (emphasis added). This "catch all" statute of limitations applies only when a different statutory period is not "otherwise provided." <u>Shire Corp. v. R.I. Department of Transportation</u>, C.A. No. PB 09-5686, 2012 R.I. Super. LEXIS 32, at*33 (R.I. Super. Ct. March 2, 2012) (internal quotation marks omitted). As discussed above, because Plaintiff has named the individual Defendants in their official capacities only, "the suit . . . is for all practical purposes solely against the [m]unicipality." <u>Andino-Pastrana</u>, 215 F.3d at 180. R.I. Gen. Laws § 9-1-25 "otherwise provides" that in "cases involving actions or claims in tort against . . . any city or <u>town</u>, the action shall be instituted . . <u>. within three</u> . . . <u>years</u> of the accrual of any claim of tort. Failure to institute suit within the three . . . year period shall constitute a bar to the bringing of the legal action." R.I. Gen. Laws § 9-1-25 (emphasis added). Thus, because Plaintiff's claim is against the Town any statute of limitations applicable to Plaintiff's § 9-1-2 cause of action that is longer than three years is "trumped" by § 9-1-25's limitation. <u>Shire Corp.</u>, 2012 R.I. Super. LEXIS 32; <u>see also</u> R.I. Gen. Laws § 43-3-26 (in statutory construction a special provision shall prevail as an exception to a general provision).

A cause of action in conversion accrues at the time a defendant takes possession and exercises dominion over the property. <u>Fuscerallo v. Industrial National Corporation,</u> 117 R.I. 558, 368 A.2d 1227 (1977); <u>Bartlett v. Fitts</u>, C.A. No. PC-00-2002, 2007 R.I. Super. LEXIS 73 (R.I. Super. Ct. May 17, 2007). Defendants took possession and exercised dominion and control over Plaintiff's firearms on September 28, 2008. Thus, because Plaintiff's claim is against the

Town, the statute of limitation applicable to Plaintiff's claim expired on September 28, 2011.

See R.I. Gen. Laws § 9-1-25.  Plaintiff filed this action in April 2015.  Plaintiff's claim is almost

four years out of time.  Consequently, Plaintiff's motion for summary judgment on Count I fails

as a matter of law because the statute of limitations expired in September 2011.

### 4.  Even if a Municipality Can Be Held Criminally Liable Summary Judgment Must be Denied Because There is A Disputed Issue of Material Fact Concerning A Policy

In order to hold a municipality liable for the  intentional *tortious* conduct of an employee,

the employee's behavior must be legally imputed to the City.  Generally, an employer is not

liable for an employee's intentional tort.  See Drake v. Star Market Co., 526 A.2d 517 (R.I.

1987); Algarin v. Central Falls Detention Facility Corp., C.A. No. 10-370-S, 2011 U.S. Dist.

LEXIS 66077 (D.R.I. June 20, 2011).  Liability may, however, attach if the employee's tort is

"committed while performing a duty in the course of his employment and by express or implied

authority from the employer."  Drake, 526 A.2d at 519 (emphasis added).

> Typically, an employer held liable under this exception to the general rule was
> aware or should have been aware, that the nature of the employee's official tasks
> involved a substantial risk that the employee might inflict upon a third party an
> intentional tort in the course of furthering the employer's business.

Liu v. Striuli, 36 F. Supp. 2d 452, 470 (D.R.I. 1999) (emphasis added); see also Cruz v. North

Providence, 833 A.2d 1237 (R.I. 2003) (per curiam) (a municipality can be held liable for an

employee's intentional tort *only* if the misconduct falls within the scope of employment.)

Furthermore, to "proceed against a government agency . . . for the [tortious] acts of an

employee on a state law claim based on respondeat superior, the plaintiff must show the alleged

[tortious] activity was in furtherance of a practice or policy that was promulgated or ratified by

the agency . . . ."  Francisco v. United States Marshalls Service, C.A. No. 11-231 L, 2013 U.S.

Dist. LEXIS 185205 (D.R.I. May 31, 2013) (emphasis added) (citing Cruz v. North Providence,

833 A.2d 1237 (R.I. 2003) (per curiam)), <u>report and recommendation adopted</u>, 2014 U.S. Dist.

LEXIS 22099 (D.R.I. Feb. 19, 2014).  In <u>Cruz</u>, the Rhode Island Supreme Court held that a

municipality was not liable under state law for an intentional tort committed by a police officer

because the "evidence introduced at trial failed to show that the officer's alleged misconduct was

<u>the product of a municipal practice or policy</u> . . . ."  <u>Cruz</u>, 833 A.2d at 1238.

It is submitted that if Plaintiff does not meet the standard for holding a municipality liable

for an intentional tort; he certainly cannot meet the standard, if there were one, for holding a

municipality liable for a *criminal* act.  As noted in Defendants' response to Plaintiff's motion for

summary judgment, Plaintiff has failed to demonstrate an absence of genuine issues of material

fact concerning whether Defendants acted pursuant to a policy.  <u>See</u> Defendants' Response to

Plaintiff's Motion for Summary Judgment at 14; Docket at 18.  Furthermore, it is submitted that

Plaintiff has not established an absence of a genuine issue of material fact concerning whether

Defendants' alleged criminal act occurred during the scope of employment.  Because there are

outstanding issues of disputed facts, Defendants motion for summary judgment must be denied.

### B.  The Seizure of Plaintiff's Firearms Was Consistent With the Fourth Amendment and Article I, Section 6 of the Rhode Island Constitution

### 1.  Clarification of the Summary Judgment Record

In Plaintiff's rebuttal memorandum, Plaintiff argues that Defendants did not receive

Plaintiff or Plaintiff's wife's consent to seize the weapons.  <u>See</u> Plaintiff's Rebuttal Memorandum

at 2, 6-7; Docket #27.  The summary judgment record, however, is absent *any* facts relating to

consent.  <u>See</u> Plaintiff's Statement of Undisputed Facts; Docket #16.  Furthermore, Plaintiff

contends that North Smithfield Police ("NSP") told Plaintiff's wife they "had to remove [the]

guns . . . ."  Plaintiff's Rebuttal Memorandum at 8; Docket #27.  Furthermore, Plaintiff also

contends that the Plaintiff's wife informed NSP that Plaintiff kept his guns in "a locked cabinet in

a closet in a detached garage.  The closet door was screwed shut.  There was no basis to assume consent to enter the detached garage, unscrew the closet, open the locked gun cabinet and seize the guns."  Plaintiff's Rebuttal Memorandum at 8; Docket #27.  The summary judgment record, however, is also absent any facts relating to NSP informing Plaintiff's wife that they had to remove the weapons or an fact concerning a closet or a closet door being screwed shut or NSP "unscrew[ing]" the closet.  See Plaintiff's Statement of Undisputed Facts at #8; Docket #16 (noting that NSP removed three guns from Plaintiff's garage/workshop from within a locked room within a locked case).[1]

The First Circuit has recently emphasized the impact of this District's Local Rules.  See Schiffmann v. United States, No. 14-2179 (1st Cir. Jan. 29, 2016).  "Valid local rules are an important vehicle by which courts operate and carry the force of law."  Id. at 11 (internal quotation marks omitted).  In this District, summary judgment practice is governed by Local Rule 56.  Local Rule 56 requires the moving party to submit a statement of undisputed facts.  See D.R.I. LR Civ. 56.  The non moving party is then required to submit a statement of disputed facts and/or a statement of undisputed facts.  See id.  Local Rule 56 aids the Court in indentifying genuine issues of material fact.  Marano v. RBS Citizens Financial Group Inc., C.A. No. 12-639 ML, 2014 U.S. Dist. LEXIS 53397 (D.R.I. Apr. 17, 2014); see also Klunder v. Trustees and Fellows of the College or University in the English Colony, C.A. No. 10-410-ML, 2013 U.S. Dist. LEXIS 66200 (D.R.I. May 9, 2013) (a party may not add or dispute facts by incorporating them in a memorandum), aff'd, 778 F.3d 24 (1st Cir. 2015).  The summary judgment record does

---

[1] The record reflects that while at the residence NSP "learned" that Plaintiff had weapons in the home and NSP *followed* Tracy Richer to the weapons' location; inside a *locked* room in a *locked*  case.  See Plaintiff's Statement of Undisputed Facts at ##8, 14; Docket #16.  Thus, taking all reasonable inferences in the light most favorable to Defendants, as the Court must, if anything, a fact dispute exists concerning consent.

not include any specific fact concerning consent, a lack of consent, a closet, or a closet door being screwed or unscrewed.

### 2.  The Seizure of Plaintiff's Firearms Was Consistent With The Fourth Amendment and Article I, Section 6 of the Rhode Island Constitution[2]

NSP seized Plaintiff's weapons pursuant to the NSP's community caretaking function.  It is indisputable that the breadth of the community caretaking function has been the subject of much discussion in the legal community.  The community caretaking function was first recognized by the United States Supreme Court in Cady v. Dombrowski, 413 U.S. 433 (1973). In Cady, the Court sustained a warrantless search of an automobile that was conducted "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Id. at 441.  State and federal courts have divided over the scope of the doctrine.  See generally Sutterfield v. City of Milwaukee, 751 F.3d 542, 556-557 (7th Cir 2014). Some courts have interpreted the doctrine narrowly, limiting its application to the automobile context, while others have expanded it beyond the automobile realm and into the home.  See generally id.

It is black letter law that the Fourth Amendment only prohibits *unreasonable* searches and seizures.  See generally  Vargas v. City of Philadelphia 783 F.3d 962 (3d Cir. 2015).  The community caretaking doctrine "is an exception to the warrant requirement of the Fourth Amendment and allows police with a non-law enforcement purpose to seize or search a person or property in order to ensure the safety of the public and/or the individual regardless of any suspected criminal activity." Id. at 971 (internal quotation marks omitted).  Federal circuit courts and state courts are split on the question of whether the community caretaking doctrine applies to

---

[2] In addition to the argument made in this supplemental memorandum, Defendants adopt and incorporate their Fourth Amendment argument as summarized in their response to Plaintiff's motion for partial summary judgment. See Defendants' Response to Plaintiff's Motion for Summary Judgment at 9-12; Docket #18.

the search of a home.  <u>See</u> <u>generally</u> <u>Sutterfield</u>, 751 F.3d at 556 (noting that Third, Ninth, and

Tenth circuits have confined the doctrine to the automobile context while the Fifth, Sixth, and

Eighth circuits have applied the doctrine to justify warrantless searches of homes); <u>see</u> <u>also</u>

<u>MacDonald v. Town of Eastham</u>, 745 F.3d 8 (1st Cir. 2014) (noting split).

     The First Circuit has held that the "ultimate inquiry [in community caretaking situations]

is whether, under the circumstances, <u>the officer acted within the realm of reason</u>."  <u>Lockhart-</u>

<u>Bembery v. Sauro</u>, 498 F.3d 69, 75 (1st Cir. 2007) (emphasis added) (internal quotation marks

and citation omitted).  Reasonableness does not depend upon any particular factor; "the court

must take into account the various facts of the case at hand."  <u>Id.</u>  In community caretaking

situations, reasonableness has a "protean quality" and involves a "concept, not a constant" –

thus, what may be "reasonable in one type of situation may not be reasonable in another."

<u>United States v. Rodriguez-Morales</u>, 929 F.2d 780, 785 (1st Cir. 1991) (internal quotation marks

omitted).  Furthermore, there is no requirement that police must "select the least intrusive means

of fulfilling community caretaking responsibilities."  <u>Lockhard-Bemberry</u>, 498 F.3d at 76.  Until

very recently the First Circuit had not specifically addressed the subject of whether the

community caretaking doctrine applies to the search of a home.  <u>See</u>  <u>MacDonald</u>, 745 F.3d 8.

The First Circuit has, however, recently commented on the application of the doctrine to the

search of a home.

     In <u>Matalon v. Hynnes</u>, 806 F.3d 627 (1st Cir. 2015), the First Circuit addressed the

question of whether the community caretaking function applied to a warrantless search of a

home.  In <u>Matalon</u>, the Boston Police Department ("BPD") received a report of a robbery from

the manager of a restaurant located in the city.  <u>Id.</u> at 631.  BPD responded and learned that the

owner of the restaurant had discovered a male removing money from a safe in the basement of

the restaurant.  Id.  The manager reported that he had chased the thief out of the restaurant and

onto several different streets in the city.  Id.  The suspect was seen in the area of Farrington

Avenue and the BPD took chase.  Id.  The BPD was then directed to 16 Farrington Avenue.  Id.

The BPD subsequently rang the doorbell, knocked on the door, and called out -- all to no avail.

Id.  A police officer at the scene thought he heard footsteps inside the dwelling and a search of

the residence ensued.  Id. at 632.  The plaintiff was the only person inside the residence and was

not pleased with the intrusion.  Id.  The plaintiff had an argument with the BPD and was

eventually arrested.  Id.

After the plaintiff was acquitted on criminal charges he brought suit against the officers

and the City of Boston for violating his civil rights.  Id.  At the close of evidence, the police

officer who searched the residence moved for judgment as a matter of law based on qualified

immunity and the community caretaking doctrine.  Id.  The trial court denied the motion.  Id.

The jury found that the search of the dwelling was not justified by exigent circumstances nor any

other "constitutionally accepted rationale."  Id. at 631.  The jury awarded the plaintiff $50,000

and an appeal ensued.  Id.

The police officer appealed the trial court's denial of his motion for judgment as a matter

of law.  Id. at 632.  The officer sought "refuge" in the community caretaking doctrine.  Id. at 633.

The Matalon court noted the genesis of the doctrine in Cady and acknowledged that it had

"evolved into a catchall for the wide range of responsibilities that police officers must discharge

aside from their criminal enforcement activities."  Id. at 634 (internal quotation marks omitted)

(emphasis added).  The court stated that the community caretaking doctrine has most often been

applied with respect to automobiles and acknowledged that its applicability "has been far less

clear" in cases involving searches of homes.  Id.  The court stated, however, that "[a]lthough we

do not decide the question [of whether the community caretaking doctrine applies to searches of homes], we assume, favorably to [appellant] that the community caretaking exception <u>may</u> apply to warrantless residential searches."  <u>Id.</u> (emphasis added).

The court found that while the "parameters of the community caretaking exception are nebulous in some respects (such as whether the exception applies to <u>all</u> residential searches), the heartland of the exception" is well defined.  <u>Id.</u> (emphasis added).  The doctrine requires a court to "look at the <u>function</u> performed by the police officer when the officer engages in a warrantless search or seizure."  <u>Id.</u> (emphasis in original) (internal quotation marks omitted).  <u>Matalon</u> stressed that the <u>Cady</u> Court took "pains to define the community caretaking functions as being <u>totally divorced</u> from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."  <u>Id.</u> (internal quotation marks omitted) (emphasis added).  Cases that do not satisfy this requirement fall outside the heartland of the doctrine; "it is therefore not surprising that the courts that have addressed the exception have stressed the separation between the police's community caretaking functions and the normal work of criminal investigation."  <u>Id.</u> at 635 (citing, among other cases, <u>United States v. Quezada</u>, 448 F.3d 1005 (8th Cir. 2006) (relying upon the doctrine in upholding warrantless search of a home); <u>People v. Ray</u>, 981 P.2d 928 (Cal. 1999) (plurality opinion) (relying upon the doctrine in warrantless entry into a home); <u>State v. Deneui</u>, 775 N.W.2d 221 (S.D. 2009) (concluding that the entry into the home was reasonable because the officers entered a home "not as part of a criminal investigation, but in pursuance of their community caretaking function").

"[H]omes cannot be arbitrarily isolated from the community caretaking equation.  The need to protect and preserve life or avoid serious injury cannot be limited to automobiles."  <u>Deneui</u>, 775 N.W.2d 221, 239 (S.D. 2009).  "[P]olice officers may, without reasonable suspicion

of criminal activity, intrude on a person's privacy to carry out community-caretaking functions to enhance public safety." State v. Stanley, No. 13 MA 159, 2014 WL 7275341, at *4 (Ohio Ct. App. Dec. 19, 2014).  The key to such permissible action is the reasonableness required by the Fourth Amendment.  Id.  The "community-caretaking function may initially explain why police enter a home, and depending on what occurs there, may further justify exploration of other parts of the home."  Id.

Community caretaking activities are varied and are performed for different reasons. Ray, 981 P.2d at 934.  Courts that have expanded the community caretaking doctrine outside of the automobile context analyze the application of the doctrine under a general reasonableness standard.  "Each variant must be assessed according to its own rationale on a case-by-case basis. Although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which a search takes place."  Id. at 934 (internal quotation marks omitted).

In People v. Hand, 946 N.E.2d 537 (Ill. App. Ct. 2011), the defendant challenged a police officer's warrantless entry into her apartment.  Id.  Police were called to the apartment by the defendant's husband who was concerned about the defendant and his children who were also in the apartment.  Id. at 540. The defendant's husband asked police for assistance in retrieving some personal items from the apartment.  Id.  Police attempted to gain consensual entry into the apartment but the defendant resisted and a scuffle between the defendant and police ensued.  Id. Police eventually placed defendant under arrest.  Id.  The defendant moved to quash the arrest and suppress evidence arguing that there was no justification for the warrantless entry into her apartment.  Id. at 542.

In <u>Hand</u>, the court held that "two general criteria must be present for a valid community caretaking exception to a prohibition against a warrantless search." <u>Id.</u> at 543-44.  The court determined that in order for the community caretaking exception to apply, (1) the police must be performing some function other than investigation of a crime, and (2) the scope of the search must be reasonable because it was done to protect the safety of the public.  <u>Id.</u> at 544.  The objective circumstances of the situation (not the subjective motivation of the police) must be scrutinized when ruling on the validity of the search.  <u>Id</u>   The question of reasonableness is measured in objective terms and is determined by evaluating the totality of the circumstances: the "court must balance a citizen's interest in going about his or her business free from police interference against the public's interest in having police officers perform services in addition to strictly law enforcement."  <u>Id.</u>  at 544.  The court concluded that the community caretaking function justified the police officer's warrantless entry into the defendant's apartment.  <u>Id.</u> at 545.

"Whether a given community caretaker function will pass must under the Fourth Amendment so as to permit a warrantless home entry depends upon whether the community caretaker function was <u>reasonably exercised under the totality of the circumstances of the incident under review</u>."  <u>State v. Pinkard</u>, 785 N.W.2d 592, 598-99 (Wis. 2010) (emphasis added) (concluding that a reasonably exercised community caretaking function may permit a warrantless entry into a home).  In order to determine whether the community caretaking function may justify a warrantless entry into a home, the <u>Pinkard</u> court applied a three part test. <u>Id.</u> at 601.  <u>Pinkard</u>'s test examined (1) whether a search or seizure under the Fourth Amendment had occurred; (2) if it had, whether the police were exercising a bona fide caretaking function; and, (3) if so, whether the public interest outweighs the intrusion upon the privacy of the

individual such that the community caretaker function was reasonably exercised within the context of the home. Id.

In State v. Navarro, 708 A.2d 416 (N.J. 1998), the defendant's landlady went to the police department and informed the police that she had discovered a gun in the defendant's bedroom, which was within her apartment. Id. at 417. The landlady informed police that there were several small children living in the apartment and she wanted to determine whether the gun was real or was a toy. Id. When she discussed the matter with police, however, the landlady did not have the gun with her but had left it in the defendant's bedroom. Id. When police arrived at the apartment, the landlady took the officers to the defendant's bedroom, opened defendant's closet, pulled out a metal box, placed it on the bed and opened it. Id. The landlady pointed police to a sock in the box which appeared to have something inside it; an officer picked up the sock and discovered a handgun and ammunition. Id. The defendant filed a motion to suppress the gun and ammunition on the ground that the evidence had been obtained as a result of an illegal search. Id. The trial court denied the motion and the defendant appealed. Id.

The Navarro court held that when the police accompanied the landlady to the defendant's bedroom they did not have probable cause to believe that the defendant had committed a crime. Id. at 418. Thus, the court concluded that the police could not have obtained a warrant to search the defendant's bedroom at that time. Id. The police were in a position to accompany the landlady to the apartment or do nothing and take the risk that the "agitated" landlady or the other children in the apartment may gain access to the gun. Id. "A danger that children or other persons who are inexperienced in the use of firearms may obtain access to a gun is one circumstance which may justify the police entering private property in the performance of their community caretaking function." Id. at 418 (emphasis added). The court concluded that "the

action of the police in accompanying [the defendant's landlady] to her apartment constituted a reasonable exercise of their community caretaking responsibilities." Id. at 419 (emphasis added).

In United States v. Taylor, No. 3:09CR249, 2009 U.S. Dist. LEXIS 95555 (E.D. Va. Oct. 14, 2009), a police officer was on routine patrol when he received a call to respond to a four year old girl wandering alone. Id. at *1.  The officer responded, found the girl and the girl took the officer to her home.  Id.  The door to the home was open and the officer followed the girl into the home. Id. at *2.  The officer discovered the defendant in a bedroom and the defendant informed the officer that the child was his daughter.  Id.  While specking to the defendant, the officer noticed several bullets in a plastic bag in plain view on a bedside table.  Id.  The defendant could not produce any form of identification but informed the officer that he his name was Anthony Jackson  and that he did not know his social security number nor the address of the home.  Id. at *3.  The police investigated the name Anthony Jackson through several record systems but found no such person.  Id.  The police officer then performed a protective sweep of the area and located a firearm beneath the mattress where the defendant had been lying.  Id. at *4.   The police subsequently spoke to the child's grandmother and mother, uncovered the defendant's identity, and discovered that he had two felony convictions.  Id. at *4-5.  The police arrested the defendant for being a felon in possession of a firearm.  Id. at *5.

The government defended the warrantless entry into the home by arguing that police were performing a community caretaking function.  Id. at *7-8.  The court stated that the community caretaking exception to the warrant requirement requires the court to look at the function performed by the police officer.  Id. at *8.  After summarizing several cases analyzing the community caretaking doctrine, the court held that the police officer entered the residence as

a result of a "routine police procedure to attempt to locate the parent or guardian of a lost child." Id. at *18. The court concluded that the police officer's entry into the house was unrelated to the detection, investigation, or attempt to acquire evidence of a crime. Id. at *19. "'Life-or-death' circumstances did not exist, but they are not required. An officer is not expected to leave his common sense at home." Id. The court concluded that the officer's entry into the home was pursuant to the officer's community caretaking function and was reasonable under the Fourth Amendment. Id. at *17-22.

In State v. Logan, No. 18 CR 02 0108012 (Conn. Super. Ct. Oct. 6. 2003), the defendant filed a motion to suppress weapons that were seized from his residence. Id. In Logan, the police responded to a restaurant on the report of an assault. Id. A verbal dispute had erupted between two males and both had been asked to leave the restaurant. Id. While at the restaurant, the police were informed that three individuals that were involved in the altercation were at the local hospital. Id. The three individuals gave statements to the police. Id. As a result of the information that the police obtained from the interviews, the police proceeded to the defendant's home to arrest him for domestic violence. Id. The police arrested the defendant on the deck of his home and placed him in handcuffs. Id. After securing the defendant, the police inquired if the defendant owned any weapons or if anyone else was present in the home. Id. The defendant informed the police that nobody else was present in the home and that he had two guns in the house. Id. The defendant accompanied the police while they searched the residence. Id. The police located a rifle under the defendant's bed and a shotgun in a closed cabinet in the basement. Id. A police officer testified that he would not have looked into the cabinet if the defendant had not led officers to the shotgun. Id. The police seized both guns. Id.

The state argued that the community caretaking function permitted the warrantless search of the home and seizure of the weapons.  Id.  The court rejected the states' argument and determined that the seizure of the guns did not fall within the community caretaking doctrine.  Id.  The court noted, however that it would have accepted the state's community caretaking argument "if the guns had been found in a multi-family dwelling in a large city or in an apartment building with children living inside, where there is a danger that a gun could fall into the wrong hands." Id. at 3 (emphasis added).  The court, noted, however, that the weapons were found in an empty single family residence in a rural town.  Id.

The community caretaking function "has [an] expansive temporal reach, in that its primary focus is on the purpose of police action rather than on its urgency." Sutterfield, 751 F.3d at 561 (emphasis added); see generally Matalon, 863 F.3d at 635 (the court must look to the function performed by the police).  Moreover, because the community caretaking doctrine "presumes that the police are not acting for any law enforcement purpose, whether or not there is time to seek a traditional criminal warrant is immaterial . . . ." Sutterfield, 751 F.3d at 561 (emphasis added); see also Hand, 946 N.E.2d at 544 (probable cause is not a factor when police are engaging in a community caretaking function).

In Sutterfield, the Seventh Circuit struggled with the question of whether the community caretaking doctrine allowed police to forcibly enter the home of a suicidal individual and open a locked container and seize a gun that was found inside the container.  Id. at 751 F.3d 542.  In Sutterfield, a psychiatrist placed a 911 telephone call to report that the plaintiff had left an appointment with her and had expressed suicidal thoughts.  Id. at 545.  The psychiatrist informed police that the plaintiff, after receiving some bad news, had remarked "I guess I'll go home and blow my brains out." Id.  The psychiatrist told the police that the plaintiff wore an empty gun

holster to her appointment; thus she surmised that the plaintiff owned a gun.  Id.  Police eventually located the plaintiff at her home but the plaintiff would not engage with the police except to inform them that she had "'called off' the police."  Id. at 546.  Police, however, forcibly entered the house and the plaintiff was handcuffed and placed into custody.  Id.[3] at 544.  Once the plaintiff was secured, police performed a protective sweep of the house; one officer observed a compact disc carrying case in plain view.  Id.  The officer forced the case open and discovered a handgun.  Id.  The police seized the weapon for "safekeeping" and to keep it out of the hands of the plaintiff's son.  Id. at 547.  Another officer testified that he thought it was appropriate to seize the weapon so that the plaintiff, when released from the hospital, would not be able to use the gun to commit suicide.  Id.

Sutterfield held that community caretaking cases cannot be viewed through the standard "lens" of criminal law enforcement.  Id. at 551; see also Matalon, 806 F.3d at 635 (noting that courts stress the separation between the community caretaking function and "normal work of criminal investigation").  Courts have "long recognized the important role that police play in safeguarding individuals from dangers posed to themselves and others – a role that will, in appropriate circumstances, permit searches and seizures made without the judicial sanction of a warrant."  Sutterfield, 751 F.3d at 551.

The Sutterfield court, however, was frustratingly forestalled from finding that the community caretaking doctrine justified the warrantless entry into the plaintiff's home and the seizure of the weapon.  In dicta, the court stated that "as a matter of doctrine" the community caretaker function would

> potentially be the best fit for this case, in that it captures the beneficent purpose
> for which police entered [the plaintiff's] home . . . .And because there is no

_____

[3] Police placed the plaintiff in custody pursuant to a state statute that allowed law enforcement to take a mentally ill individual into custody.  Sutterfield, 751 F.3d 542.

> suggestion that police had any law enforcement motive in entering the home, there would be a ready basis on which to distinguish criminal cases . . . which demand a search warrant when there is, in fact, time in which to seek one.

Id.  The court however noted that an earlier circuit decision precluded extending the community caretaking doctrine beyond the automobile context and specifically emphasized that not only had the defendant *not* asked the court to review that decision but the defendant also failed to argue the community caretaking doctrine on appeal.  Id. at 561; see generally Corrigan v. District of Columbia, Civil Action No. 12-173; 2015 U.S. Dist. LEXIS 112017, at *26 (D.D.C. Aug. 25, 2015) (noting Sutterfield's "thorough and scholarly opinion").

The courts that have extended the community caretaking function beyond the automobile context have done so pursuant to the Fourth Amendment's reasonableness decree.  See generally Ray, 981 P.2d 928; Deneui, 775 N.W.2d 221; Hand, 946 N.E. 2d 537; Pinkard, 785 N.W.2d 592; Navarro, 708 A.2d 416; Stanley, 2014 WL 7275341; Taylor, 2009 U.S. Dist. LEXIS 95555.  It is submitted that the reasoning of these courts is consistent with the First Circuit's view of the community caretaking doctrine.

In this Circuit, in order to apply the community caretaking doctrine, a court must first determine whether the function performed by the officer falls within the heartland of the community caretaking function.  Matalon, 806 F.3d 627.  It is incontrovertible that the NSP arrived at the Richer residence as a result of a call to assist a suicidal individual and *not* to investigate any type of crime.  A police officer's response to an attempted suicide call is certainly part of that officer's community caretaking function.  It is abundantly clear that the function the NSP performed at the Richer residence was within the heartland of the community caretaking function and did not involved any type of criminal investigation.  Id.  Thus, the ultimate inquiry for the court is to determine whether, under the circumstances, NSP "acted

23

within the realm of reason." <u>Lockhart-Bembery</u>, 498 F.3d at 75 (internal quotation marks omitted).  In community caretaking circumstances reasonableness can take on many forms and is flexible; thus what may be "reasonable in one type of situation may not be reasonable in another." <u>Rodriguez-Morales</u>, 929 F.2d at 785 (internal quotation marks omitted).  Courts must evaluate the totality of the circumstances.  <u>Id.</u>

North Smithfield police officers were called to Plaintiff's residence as a result of a report from Plaintiff's wife that Plaintiff had attempted suicide.  Upon entering the home for the second time in a week, the officers learned that Plaintiff and his wife were again arguing over Plaintiff's wife's desire to obtain a divorce.  Plaintiff believe that his wife was having an affair and he and his wife had argued about divorce in the past and Plaintiff "beg[ged]" his wife not to file for divorce and to "work it out."  Defendants' Statement of Undisputed Facts at ¶ 31; Docket #20.  During the argument with his wife, Plaintiff looked at his six-year-old son and said, "I'm going to bed and I won't get up."  <u>Id.</u>  Plaintiff's six-year-old son overheard the argument and saw Plaintiff put pills into his mouth.  <u>Id.</u> Plaintiff's two other children were also present during the argument.  <u>Id.</u>  Plaintiff was subsequently transported to Landmark Medical Center, evaluated, released and directed by medical personnel to "follow up [in] 2 [d]ays."  <u>See</u> Defendants' Statement of Disputed Facts, ¶ 7.

North Smithfield police officers were presented with a situation where an individual (1) had threatened to harm himself, (2) had ingested pills in front of his wife his six-year-old child and made a suicidal threat, (3) was in a potentially volatile state of mind as a result of continuing arguments concerning a divorce that he did not want that threatened his family unit, and (4) had ready access to multiple firearms.  Following protocol, North Smithfield rescue personnel transported Plaintiff to the hospital for a mental health evaluation.  <u>Id.</u> at ¶ 7.  Defendants could

not have known when Plaintiff would return to the residence, or whether he would use the guns to harm himself, a member of his family, or whether another family member would gain access to the guns and harm him/herself or another individual.  See generally Sutterfield, 751 F.3d at 570.  Under these *particular* circumstances, it is objectively reasonable and "arguably prudent" to *temporarily* remove the firearms from the house for safekeeping purposes pursuant to the "flexible" community caretaking function.  See generally Lockhart-Bembery, 498 F.3d at 75; Rodriguez-Morales, 929 F.3d 780;  Sutterfield, 751 F.3d at 570.

> [R]emoving and securing the firearm[s] was an obvious and reasonable measure. One need only imagine the public outcry that would have taken place had the police left the gun where it was and had [Plaintiff] returned home and then used the gun to take [his] own life [or his wife's], or had [one of Plaintiff's sons] taken the gun in [his] absence and used it to harm himself or others, to see the wisdom in what police did.

Sutterfield, 751 F.3d at 570 (emphasis added); see also Mora v. City of Gaithersburg, 519 F.3d 216, 227 (4th Cir. 2008) ("[t]here are no shortage of precedents approving preventive seizures for the sake of public safety"); Rodriguez-Morales, 929 F.2d at 784 (NSP seized the guns to "prevent potential hazards from materializing").  The seizure of Plaintiff's firearms was pursuant to the NSP's community caretaking function and was consistent with the Fourth Amendment.[4]

---

[4] Because Article I, Section 6 of the Rhode Island Constitution is "congruent with the Fourth Amendment in both its requirements and protections," the above analysis also applies to Plaintiff's Article 1, Section 6 claim.  Walden v. City of Providence, 495 F. Supp. 2d 245, 253 n.11 (D.R.I. 2007); see also State v. Foster, 842 A.2d 1047 (R.I. 2004) (the Fourth Amendment is substantively the same as article 1, section 6); see also State v. Russell, 770 A.2d 858 (R.I. 2001) (recognizing the community caretaking doctrine).

### III.  Conclusion

For these reasons, and the reasons noted in Defendants' prior memoranda filed in this matter, Plaintiff's motion for partial summary judgment should be denied in all respects.

<div style="margin-left:40%">

Defendants,
By their attorneys,


*/s/ Patrick K. Cunningham*
Patrick K. Cunningham, Esq. (#4749)
DESISTO LAW
211 Angell Street
Providence, RI 02906
(401) 272-4442
(401) 272-9937 fax
patrick@desistolaw.com

</div>

### CERTIFICATION OF SERVICE

I hereby certify that the within document has been electronically filed with the Court on this 8th day of February, 2016, and is available for viewing and downloading from the ECF system. Service on the counsel of record will be effectuated by electronic means.

<div style="margin-left:40%">

*/s/ Patrick K. Cunningham*
Patrick K. Cunningham

</div>