UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

JASON A. RICHER,
        Plaintiff,

    v.                                     C.A. No. 15-162-M-PAS

JASON PARMELEE as the Finance Director
of THE TOWN OF NORTH SMITHFIELD, TOWN
OF NORTH SMITHFIELD, and STEVEN E. REYNOLDS,
Individually and in his Official Capacity as Chief of the
NORTH SMITHFIELD POLICE DEPARTMENT, TIM
LAFFERTY, Individually and in his Official Capacity as
Captain of the North Smithfield Police Department, and
OFFICERS STEPHEN RICCITELLI, RUSSELL AMATO,
GLENN LAMOREUX, MARK BERGERON, and
GREGORY LANDRY, individually and in their Official
Capacities as Members of the North Smithfield Police
Department, John and Jane Doe,
              Defendants.

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

### I. Procedural Background

Plaintiff filed his original complaint on April 23, 2015.  On April 28, 2015, Plaintiff filed

a first amended complaint that included four counts: Count I ("Violation of the Rhode Island

Firearms Act"); Count II ("Violation of Plaintiff's Right to Keep Arms"); Count III ("Violation of

Plaintiff's Due Process"); and Count IV ("Violation of Plaintiff's Right to Equal Protection").

See Amended Complaint; Docket #4.  In July of 2015, Plaintiff moved for partial summary

judgment on liability on Counts I-III of his first amended complaint.  See Plaintiff's

Memorandum in Support of Motion for Partial Summary Judgment; Docket #12-1.

After the motion for summary judgment was fully briefed, Plaintiff amended  his

complaint again.  See Plaintiff's Motion to Amend/Correct; Docket #29.  In the Second Amended

Complaint, inter alia, Plaintiff added a claim under the Fourth Amendment and Art. I, Sec. 6 of

1

the Rhode Island Constitution and amended his claim under the Rhode Island Firearms Act.  See ECF No. 33.  Because these issues were fully briefed, the Court considered the additional claims in the Second Amended Complaint in the motion for summary judgment.  On June 1, 2016, the Court granted Plaintiff's motion in part and denied it in part.  See  Richer v. Parmelee, 189 F. Supp. 3d 334 (D.R.I. 2016).  The Court granted Plaintiff's motion with respect to his Due Process claim and denied the motion with respect to the other counts.  Id.

In August of 2016, Plaintiff filed a Third Amended Complaint ("Complaint").  In the Complaint, among other things, Plaintiff added six additional North Smithfield Police Officers as Defendants in their official and individual capacities.  See Docket at #50.  Plaintiff also added a claim for a violation of the Rhode Island Mental Health Law, R.I. Gen. Laws § 40.1-5-1 et seq., and a common law claim for conversion.  Id.

Subsequent to the filing of the Complaint, the Court, in essence, stayed the matter to allow the parties to attempt to settle the matter.  Unfortunately, that attempt failed and the parties engaged in discovery.  Discovery has closed.  Defendants now move for summary judgment on counts I, II, III, V, VI and VII.

## II.  Factual Background

Plaintiff is a resident of North Smithfield, Rhode Island.  Statement of Undisputed Facts at ¶ 1.  Plaintiff owns three firearms.  Id. at ¶ 10.  On September 19, 2008, the North Smithfield Police Department ("NSPD") responded to Plaintiff's home as a result of a report of a domestic dispute.  Id. at 11.  Plaintiff and his wife at the time, Tracy Richer ("Mrs. Richer"), were involved in an argument about Mrs. Richer having an alleged affair.  Id. at ¶ 11.  Plaintiff dialed 911 but hung up.  Id.  NSPD, however, responded to Plaintiff's residence and investigated the incident.  Id.  During the investigation Plaintiff lied to the NSPD concerning whether Mrs.

Richer attempted to grab the telephone out of his hand during his telephone call to 911.  Id. at 12.  The NSPD concluded that neither Plaintiff or Mrs. Richer committed a crime with respect to the September 19, 2008 domestic incident.  Id.

Approximately a week and a half later, on September 28, 2008, Plaintiff and Ms. Richer had an argument about divorce.  Id. at ¶ 13.  The argument was "very tense" and "heated."  Id. at ¶ 14.  Mrs. Richer contacted 911 and informed the 911 operator that she was concerned that Plaintiff had tried to harm himself.  Id. at ¶ 13.  Mrs. Richer contacted 911 because, during the argument, Plaintiff "threw" a "handful" of pills into his mouth and looked at his son and said "say goodbye to Daddy" and "I'm going to bed and I won't get up."  Id. at ¶ 15.  Mrs. Richer informed the 911 operator that Plaintiff "just swallowed a handful of pills.  I didn't know what he had taken.  I'm not sure if I mentioned we were arguing, and I needed them to come right away because I thought he was attempting to take his life."  Id at ¶ 17.  Mrs. Richer implored Plaintiff to tell her what he had taken, but he refused to tell her.  Id. at ¶ 18.  Plaintiff admitted that, during the argument with Mrs. Richer, he put pills in his mouth and said "I'm going to bed and I won't get up."  Id. at ¶ 16.  All three of the Richer children heard the argument between their parents.  Id at ¶ 19.

NSPD officers, Stephen Riccitelli ("Riccitelli"), Russell Amato ("Amato"), Mark Bergeron ("Bergeron"), Gregory Landry ("Landry") and Michael Lamoureux and North Smithfield Rescue were dispatched to the residence for a possible suicidal male who had ingested pills.  Id. at ¶¶ 13, 20.  Upon arriving at that the residence, NSPD officers informed Plaintiff that they were there to check on his well-being.  Id. at ¶ 21.  While at the scene, Officer Landry spoke to Mrs. Richer and "A.R," one of the Richer's sons.  Id. at ¶ 24.  Officer Bergeron spoke to Plaintiff.  Id. at ¶ 25.

Ms. Richer informed NSPD officers that Plaintiff had swallowed a handful of pills and that Plaintiff would not tell her what type of pills he had taken and that she was concerned that Plaintiff tried to harm himself.  Id. at ¶ 22.  Mrs. Richer informed Officer Landry that she and Plaintiff were having marital problems; that she had asked Plaintiff for a divorce; that Plaintiff did not want a divorce; and that Plaintiff had ingested a handful of pills.  Id. at 26.  Mrs. Richer also informed Officer Landry that Plaintiff became upset and looked at "A.R." and said "I'm going to bed and I won't get up."  Id. at ¶ 27.  "A.R." informed Officer Landry that Plaintiff put pills in his mouth and said he was "going to bed and not wake up." Id.   Landry concluded that Plaintiff's actions suggested that he wanted to harm himself.  Id.

At or about the time NSPD arrived at the residence, Plaintiff told Mrs. Richer that he had taken his "regular normal meds."  Id. at ¶ 28.  Mrs. Richer, however, believed that Plaintiff had taken a "handful" of pills that did not look like his "regular pills."  Id. at ¶ 29.  According to Mrs. Richer, Plaintiff "made like he swallowed" the pills.  Id. at ¶ 23.

Mrs. Richer also informed NSPD officers that there were guns on the property and that she wanted the guns removed from the property.  Id. at ¶ 30-31.  She led NSPD to an area above the garage where the guns were stored.  Id. at ¶¶ 32-33.  Mrs. Richer had "free access" to the area where the guns were stored.  Id. at ¶ 34.  Other household items were stored with the guns. Id. at ¶ 35.  NSPD seized Plaintiff's guns for safekeeping.  Id. at ¶ 36.

Riccitelli was the senior office at the scene.  Id. at ¶ 37.  Riccitelli would have been the officer on scene to make the decision to seize Plaintiff's firearms.  Id.  He determined that Plaintiff had the potential of being a threat to the safety of himself and/or the members of Plaintiff's family.  Id. at ¶ 38.  Riccitelli stated that NSPD was dealing with

> a domestic situation in reference to our, I'm answering specific to this
> incident that we're talking about here today.  So we're dealing with a verbal

> domestic.  We're on scene, there's clearly marital problems, because that's the information being relayed to us.  <u>[Plaintiff] took action on scene in regard to the pills, . . . going into his mouth and him not waking up</u>.  So, yes, there was – I acted based upon that he could have very well been pissed that police were called in the first place.  He was pissed that a rescue was responding to his house, and if and when he got released from the hospital or came back to the house, yeah, there was the potential for something to either happen to him or somebody else in his family.  It's not a very clear cut answer, but I look at it as if I'm going to take whatever action I can on scene to limit the potential threat . . . .

<u>Id.</u> at ¶ 40 (emphasis added).  Officer Riccitelli testified that if Plaintiff had denied that he was suicidal he would have taken that into consideration.  <u>Id.</u> at ¶ 41.  Officer Riccitelli explained that he would have gotten Plaintiff's version of events and compared that to

> what did all of the other circumstances say in this particular case, it's being reported as somebody wants to hurt themselves, <u>they've taken the steps to actually put the pills in their mouth in front of their child</u>, and then if we ask them, do you want to hurt themselves and they say no, I am going to give more weight to the information that the act was initially reported to us, it was witnessed by a child who in my opinion at this point had no reason to lie, I'm going to give that information more weight than somebody saying to me, no, I'm not going to kill myself.

<u>Id.</u> at ¶ 42 (emphasis added).  According to Riccitelli, the "key" to NPSD's response to the situation was that Officer Landry spoke to Plaintiff's son, "A.R.," and he confirmed the information that Mrs. Richer reported to NSPD officers.  <u>Id.</u> at ¶ 39.

North Smithfield Rescue ("NSR") personnel informed Mrs. Richer that they were going to transport Plaintiff to the hospital to "have him looked at and <u>evaluated and treated if need be</u> . . . ."  <u>Id.</u> at ¶ 43 (emphasis added).  Mrs. Richer wanted Plaintiff medically evaluated because she was concerned that Plaintiff had taken medication that could harm him.  <u>Id.</u> at ¶ 44.  Mrs. Richer informed NSPD officers or personnel associated with the NSR that Plaintiff

> took medication <u>and needs to be checked</u>.  I told them he wouldn't tell me what he took.  And they came back and told me he's just taken his regular meds.  <u>I said, I don't know what he took, he could of taken a lot more than he says he took or took something else, I really don't know.  He needed to be checked.</u>

Id. at ¶ 45 (emphasis added).  Mrs. Ricer assumed that Plaintiff would undergo a psychological evaluation.  Id. at ¶ 46.  Plaintiff did not sign the NSR Ambulance Run Report refusing treatment.  Id. at ¶ 47.

NSR personnel transported Plaintiff to Landmark Medical Center in Woonsocket, Rhode Island for evaluation.  Id. at ¶ 48.  The physician who examined Plaintiff did not admit Plaintiff to the hospital but directed Plaintiff to follow up with his regular physician.  Id.  Plaintiff was discharged from Landmark "within a few minutes of arrival."  Id. at ¶ 49.

Plaintiff surreptitiously tape recorded the September 28, 2008, domestic dispute between Plaintiff and Mrs. Richer.  Id. at ¶ 51.  The recording reflects that Plaintiff made, inter alia, the following statements:

- "I've lost my will to live."

- "They would be better off without me."

- "I'm leaving you with everything, I'm getting out of your life."

- "Buddy boy, I'm going to sleep tonight and not wake up in the morning."

Id. at ¶ 52.

Plaintiff was not charged with any crime with respect to the September 28, 2008 incident.  Id. at ¶ 53.  The seized firearms were held in custody at the NSPD.  Id. at ¶ 54.  The NSPD did not prevent Plaintiff from obtaining any other firearms after the September 28, 2008 incident.  Id. at ¶ 55.  At various times after the incident, Plaintiff contacted Captain Lafferty and Chief Reynolds and requested the return of his firearms.  Id. at ¶ 56.  NSPD returned Plaintiff's weapons to him in May 2015.  Id. at ¶ 57.  Neither Chief Steven Reynolds ("Reynolds") nor Captain Tim Lafferty ("Lafferty") were at the scene of the Richer residence nor were they

consulted by officers at the scene.  Id. at ¶ 58.  At his deposition, Plaintiff testified that he would

never harm himself because he "like[s] his life very much."  Id. at ¶ 50.[1]

### III.  The Third Amended Complaint

The Complaint includes seven counts against the Town of North Smithfield and seven of

its police officers, in both their individual and official capacities.[2]  See Plaintiffs Third Amended

Verified Complaint, ECF No. 50.  Plaintiff claims violations of his rights pursuant to the Second,

Fourth, and Fourteenth amendments to the United States Constitution and the Rhode Island

Constitution corollaries.  See generally id. at 12-13.  In addition, Plaintiff brings claims alleging

violations of the Rhode Island Firearms Act, R.I. Gen. Laws § 11-47-1, et seq., and the Rhode

Island Mental Health Law, R.I. Gen. Laws § 40.1-5-1 et seq.  Id. at 11, 13-14.  Plaintiff also

brings a claim of trover and conversion.  Id. at 15.  Plaintiff brings each claim against *all*

Defendants.  Plaintiff also requests declaratory and injunctive relief.  Id. at 15-16.

### IV.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). An issue is "genuine" if the pertinent evidence is such that a rational factfinder could

resolve the issue in favor of either party, and a fact is "material" if it "has the capacity to sway

the outcome of the litigation under the applicable law." National Amusements, Inc. v. Town of

Dedham, 43 F.3d 731, 735 (1st Cir. 1995).  The moving party bears the initial burden of showing

the Court that no genuine issue of material fact exists. Id. Once the moving party makes this

---

[1] Chief Steven Reynolds and Captain Tim Lafferty were not at the scene nor were they consulted by officers at the scene.  SUF at ¶ 58.  Consequently, Defendants motion for summary judgment should be granted as to Chief Reynolds and Captain Lafferty.

[2] A suit against an individual in his or her official capacity is a suit against the municipality.  Andino-Pastrana v. Municipio de San Juan, 215 F.3d 179 (1st Cir. 2000).  Thus, the claims against the individual Defendants in their official capacities should be dismissed as duplicative of the claims against the Town.

showing, the non-moving party must point to specific facts demonstrating a trialworthy issue. Id. The Court views all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. Continental Casualty Co. v. Canadian Universal Insurance Co., 924 F.2d 370 (1st Cir. 1995).

## V.  Analysis

### A.  Count I – Rhode Island Firearms Act

#### 1.  The Rhode Island Firearms Act Does Not Apply To This Claim

In Count I of the Complaint Plaintiff alleges that Defendants violated the Rhode Island Firearms Act ("RIFA"), R.I Gen. Laws § 11-47-1 et seq.  Plaintiff alleges that "Defendants unwritten policy of requiring persons whose guns they have seized to obtain an order in state court before they return them violates" RIFA.  ECF No. 50 at ¶ 65.  Plaintiff, however, recognizes that RIFA does not provide for a private right of action and therefore attempts to bring a claim pursuant to R.I. Gen. Laws § 9-1-2. ECF No. 50 at ¶ 67.

In its decision on Plaintiff's motion for partial summary judgment, this Court held that the RIFA "only contemplates injunctive relief, and not damages." Richer, 189 F. Supp. 3d at 343. Consequently, because Defendants returned Plaintiff's guns to him, the Court held that RIFA was "no longer any help to" Plaintiff.  Id.  Moreover, the Court also held that Plaintiff could not "circumvent" the limited relief contemplated by RIFA by "recasting his claim as arising under [R.I. Gen. Laws] § 9-1-2." Id. at 343 at n.14.  No fact uncovered during discovery impacts the Court's holding with regard to RIFA.  As a result, because RIFA is not applicable in this matter, it is respectfully submitted that the Court grant Defendants' motion for summary judgment on Count I of the Complaint. [3]

---

[3]In their supplement memorandum in response to Plaintiff's motion for partial summary judgment, Defendants also argued that even if RIFA applied any claim against the Town would fail because: (1) the Town could not commit a

### B.  Count II – Right to Keep Arms

In Count II of the Complaint Plaintiff alleges that Defendants violated his Right to Keep Arms.  Plaintiff alleges that Defendants violated his rights pursuant to the Second and Fourteenth Amendment to the United States Constitution and Art. 1 Sec. 22[4] of the Rhode Island Constitution.  Plaintiff alleges that by refusing to return his weapons, and by maintaining and enforcing a set of customs, practices and polices depriving him of his weapons, Defendants have violated his right to keep and bear arms.  ECF No. 50 at ¶¶ 57, 69-70.

### 1.  Count II Is Out of Time

It is undisputed that Defendants seized Plaintiff's guns on September 28, 2008.  SUF at ¶ 36.  Likewise, it is undisputed that NSPD did not prevent Plaintiff from obtaining other firearms after September 28, 2008.  Id. at ¶ 65.  Section 1983 claims are subject to the state statute of limitations governing personal injury actions – which is 3 years pursuant to R.I. Gen. Laws § 9-1-14(b).  Adams v. Town of Burrillville, 249 F. Supp. 2d 151 (D.R.I. 2003).  Plaintiff did not file this claim until 2015.  Count II is some 4 years out of time and it must be dismissed as a matter of law.  See generally id.

### 2.  Even if Count II Was Not Out Of Time The Claim Would Fail As a Matter of Law Because the Second Amendment Is Not Implicated in This Matter

The Second Amendment provides that a "well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  Although the Second Amendment confers on an individual a right to keep and bear arms, that right is not unlimited.  District of Columbia v. Heller, 554 U.S. 570,

---

crime; (2) the Town could not be an offender under R.I. Gen. Laws § 9-1-2, and (3) a cause of action under § 9-1-2 against the Town was out of time.  See Defendants' Supplemental Memorandum in Response to Plaintiff's Motion for Partial Summary Judgment, ECF No. 32 at 1-8.  Defendants incorporate those arguments by reference. Defendants also argue that they should be granted summary judgment on this Count as a result of state law immunity.  See Section V C 4 below.

[4] In his complaint, Plaintiff alleges a violation of Art 1. Sec. 2 of the Rhode Island Constitution.  ECF No. 50 at ¶ 70. Defendants assume this is a typographical error.

595 (2008).  The right granted by the Second Amendment does not include the right to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  Id. at 626.

"Whether and to what extent the Second Amendment protects an individual's right to possess a particular gun . . . is an issue just beginning to receive judicial attention."  Sutterfield v. City of Milwaukee, 751 F.3d 542, 571 (7th Cir. 2014).  Courts have generally held that the Second Amendment is not implicated by the seizure of a particular individual firearm.  Hopkins v. Claroni, Civil No. 1:13-CV-229-DBH, 2015 U.S. Dist. LEXIS 64530 (D. Me. May 18, 2015) ("there is no Second Amendment right presented by the seizure of a particular firearm"); see also Fairbanks v. O'Hagan, 255 F. Supp. 3d 239, 245 (D. Mass. 2017) (the "Second Amendment is not implicated by the seizure of individual firearms").  The right to bear arms is not a right to "hold some particular gun."  Vaher v. Town of Orangetown, 916 F. Supp. 2d 404 (S.D.N.Y. 2013) (internal quotation marks omitted); Garcha v. City of Beacon, 351 F. Supp. 2d 213, 217 (S.D.N.Y. 2005) (the right to bear arms is not a right to some particular gun).  "[W]here a plaintiff's ability to acquire other firearms has not been abridged, a Second Amendment violation has not occurred even despite a seizure of a plaintiff's particular firearm."  Doutel v. City of Norwalk, No. 3:11-CV-01164, 2013 U.S. Dist. Lexis 93436, at *79 (D. Conn. July 3, 2013) (emphasis in original); see also Vaher, 916 F. Supp. 2d 404; Tirado v. Cruz, Civil No. 10-2248, 2012 U.S. Dist. LEXIS 19978, at *17 (D.P.R. Feb. 16, 2012) (finding that Heller held that in order to show a Second Amendment violation, a plaintiff must do more than show he was deprived from possessing one particular firearm, rather "plaintiff must show that he has been kept from acquiring any other legal firearm").  "In order to establish a violation of the Second Amendment [P]laintiff must show that he has been kept from acquiring any other legal firearms."  Fairbanks, 255 F. Supp. 3d at 245.

It is undisputed that the NSPD did not prevent Plaintiff from obtaining other firearms. SUF at ¶56.  In its decision on Plaintiff's motion for partial summary judgment, this Court held that "[w]hat prevents the Town [and its officers] from confiscating [Plaintiff's] hypothetical new guns and what makes the Town's conduct allegedly objectionable in this case, is [Plaintiff's] Fourth and Fourteenth Amendment rights to be secure in his home and possessions, not the Second Amendment."  Richer, 189 F. Supp. 3d at 343 (emphasis added).  The Court concluded that the Town did not violate Plaintiff's "Second Amendment rights, which remain intact."  Id. (emphasis added).  No fact uncovered during discovery impacts the Court's holding with respect to Second Amendment.  Defendants are entitled to summary judgment on Count II because Plaintiff's claim is out of time and because the Second Amendment is not implicated in this matter.[5]

## C.  Count III -- Fourth Amendment

### 1.  The Fourth Amendment Claim is Out of Time

In Count III of the Complaint, Plaintiff alleges that Defendants violated his rights under the Fourth Amendment and Article 1, Section 6 of the Rhode Island Constitution when they seized the guns from his house without a warrant.[6]  ECF No. 50 at ¶ 74.  As noted above, it is undisputed that the NSPD seized Plaintiff's guns in 2008.  Plaintiff filed suit in 2015.  It is clear

---

[5]  Article 1, Section 22 of the Rhode Island Constitution provides that "[t]he right of the people to keep and bear arms shall not be infringed."  R.I. Const. Art. I, § 22.  The "right to keep arms" language in the Rhode Island Constitution mirrors the language contained in the Second Amendment.  The Rhode Island Supreme Court has interpreted Article 1, Section 22 to provide a similar right to keep arms as the right to keep arms recognized by the Second Amendment.  See generally Mosby v. Devine, 851 A.2d 1031 (R.I. 2004).  It is therefore submitted that Defendants' Second Amendment argument would be equally dispositive of Plaintiff's claim pursuant to Article 1, Section 22.  See generally Pelland v. Rhode Island, 317 F. Supp. 2d 86 (D.R.I. 2004); Jones v. Rhode Island, 724 F. Supp. 25 (D.R.I. 1989) (since the due process and equal protection clauses of the Rhode Island Constitution were intended by the drafters to parallel the language of the Fourteenth Amendment, a determination of a litigant's federal due process and equal protection claims is equally dispositive of his state due process and equal protection claims).

[6] It is submitted that an analysis under the Fourth Amendment also disposes of the state constitutional claim under Article 1, Section 6.  See State v. Foster, 842 A.2d 1047, 1050 n.3 (R.I. 2004) (noting that the Fourth Amendment is "substantively the same as article 1, section 6 of the Rhode Island Constitution").

that Plaintiff's Fourth Amendment claim is out of time.  See generally Adams, 249 F. Supp. 2d (§ 1983 claims are governed by 3 year statute of limitations).  Moreover, in its decision on Plaintiff's motion for partial summary judgment, the Court held that Plaintiff's Fourth Amendment and Article 1 Section 6 claims against the Town were barred by the applicable statute of limitation.  See Richer, 189 F. Supp. 3d at 343 and 343 n.12.  No fact uncovered during discovery impacts the Court's holding with respect to the statute of limitations.  Plaintiff's Fourth Amendment claim fails as a matter of law.

## 2.  Even if the Claim Was Not Out of Time, the Seizure of Plaintiff's Guns Was Consistent With the Fourth Amendment

Even if the claim was not out of time, however, the seizure of Plaintiff's firearms was consistent with the community caretaking function.  In fact, in its decision on Plaintiff's motion for partial summary judgment, the Court held that the NSPD's "actions were likely a valid exercise of their community caretaking functions."  Richer, 189 F. Supp. 3d at 343 n.13.

The touchstone under a Fourth Amendment analysis is reasonableness, United States v. Chaney, 647 F.3d 401 (1st Cir. 2011), and courts approach the Fourth Amendment with "pragmatism."  Mora v. City of Gaithersburg, 519 F.3d 216, 222 (4th Cir. 2008).  The community caretaking exception to the warrant requirement recognizes that police officers perform a wide array of community functions in addition to investigating crimes.  United States v. Rodriguez-Morales, 929 F.2d 780 (1st Cir. R.I. 1991).  In performing this caretaking role, a police officer is a "jack-of-all emergencies . . . expected to aid those in distress, combat actual hazards, prevent potential hazards from materializing and provide an infinite variety of services to preserve and protect community safety."  Id. at 784-85 (emphasis added) (citations omitted).  The community caretaking doctrine "is a catchall for [a] wide range of [police] responsibilities . . . ."  Lockhart-Bembery v. Sauro, 498 F.3d 69, 75 (1st Cir. 2007).  The doctrine gives police

officers a "great deal of flexibility" in how they carry out their community caretaking function. Id.

While the First Circuit has recognized the community caretaking function in motor vehicle cases, it has acknowledged that the reach of the doctrine is "poorly defined outside that milieu." MacDonald v. Town of Eastham, 745 F.3d 8, 13 (1st Cir. 2014).   The First Circuit has held, however, that the "ultimate inquiry [in community caretaking situations] is whether, under the circumstances, the officer acted within the realm of reason." Lockhard-Bembery, 498 F.3d at 75 (internal quotation marks and citation omitted).   In community caretaking situations, reasonableness has a "protean quality" and involves a "concept, not a constant" – thus what may be "reasonable in one type of situation may not be reasonable in another." Rodriguez-Morales, 929 F.2d at 785.

The Seventh Circuit has recognized "powerful arguments in favor of the temporary seizure [of a gun] as a prudential measure" in situations where officers remove a *suspected* suicidal individual from a home where guns are stored.  See generally Sutterfield v. Milwaukee, 751 F.3d 542, 571 (7th Cir. 2014).  In Sutterfield, the court assumed without deciding that the seizure of the suicidal individual's gun violated the Fourth Amendment but determined that the individual defendants were entitled to qualified immunity.  See id.   Sutterfield acknowledged the "lack of clarity in Fourth Amendment case law as to the appropriate legal framework that should be applied to warrantless intrusions motivated by purposes other than law enforcement evidence-gathering."  Id. at 551.  In discussing the competing interests implicated by the seizure, however, Sutterfield recognized that it "was natural, logical, and prudent for [the police] to believe that [the] firearm should be seized for safekeeping until such time as [the suspected suicidal individual] was evaluated and it was clear that [the individual] no longer posed a danger to

herself."  Id. at 570 (emphasis added); see also Arden v. McIntosh, No. 14-1517, 2015 U.S. App. LEXIS 12725, at *10 n.2 (10th Cir. July 23, 2015) (noting in its qualified immunity analysis that a "reasonable police officer might have thought, upon discovery of [a] gun [in a residence during a welfare check] that he was authorized by his community caretaking function to seize the gun for safekeeping").  Sutterfield also suggested that an "equally persuasive" justification for seizing the gun was that the gun might be accessible to a minor residing in the home during the individual's absence.  Sutterfield, 751 F.3d at 570.  "It was arguably prudent to remove the gun from the home as a prophylactic measure during [the suicidal individual's] absence."  Id.

In Matalon v. Hynnes¸ 806 F.3d 627 (1st Cir. 2015), the First Circuit addressed the question of whether the community caretaking function applied to a warrantless search of a home.  In Matalon, the Boston Police Department ("BPD") received a report of a robbery from the manager of a restaurant located in the city.  Id. at 631.  BPD responded and learned that the owner of the restaurant had discovered a male removing money from a safe in the basement of the restaurant.  Id.  The manager reported that he had chased the thief out of the restaurant and onto several different streets in the city.  Id.  The suspect was seen in the area of Farrington Avenue and the BPD took chase.  Id.  The BPD was then directed to 16 Farrington Avenue.  Id. The BPD subsequently rang the doorbell, knocked on the door, and called out -- all to no avail. Id.  A police officer at the scene thought he heard footsteps inside the dwelling and a search of the residence ensued.  Id. at 632.  The plaintiff was the only person inside the residence and was not pleased with the intrusion.  Id.  The plaintiff had an argument with the BPD and was eventually arrested.  Id.

After the plaintiff was acquitted on criminal charges he brought suit against the officers and the City of Boston for violating his civil rights.  Id.  At the close of evidence, the police

officer who searched the residence moved for judgment as a matter of law based on qualified immunity and the community caretaking doctrine.  Id.  The trial court denied the motion.  Id.  The jury found that the search of the dwelling was not justified by exigent circumstances nor any other "constitutionally accepted rationale."  Id. at 631.  The jury awarded the plaintiff $50,000 and an appeal ensued.  Id.

The police officer appealed the trial court's denial of his motion for judgment as a matter of law.  Id. at 632.  The officer sought "refuge" in the community caretaking doctrine.  Id. at 633.  The Matalon court noted the genesis of the doctrine and acknowledged that it had "evolved into a catchall for the wide range of responsibilities that police officers must discharge aside from their criminal enforcement activities."  Id. at 634 (internal quotation marks omitted) (emphasis added).  The court stated that the community caretaking doctrine has most often been applied with respect to automobiles and acknowledged that its applicability "has been far less clear" in cases involving searches of homes.  Id.  The court stated, however, that "[a]lthough we do not decide the question [of whether the community caretaking doctrine applies to searches of homes], we assume, favorably to [appellant] that the community caretaking exception may apply to warrantless residential searches."  Id. (emphasis added).

The court found that while the "parameters of the community caretaking exception are nebulous in some respects (such as whether the exception applies to all residential searches), the heartland of the exception" is well defined.  Id. (emphasis added).  The doctrine requires a court to "look at the function performed by the police officer when the officer engages in a warrantless search or seizure."  Id. (emphasis in original) (internal quotation marks omitted).  Matalon stressed that "the community caretaking functions as being totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."  Id.

(internal quotation marks omitted) (emphasis added).  Cases that do not satisfy this requirement fall outside the heartland of the doctrine; "it is therefore not surprising that the courts that have addressed the exception have stressed the separation between the police's community caretaking functions and the normal work of criminal investigation."  Id. at 635 (citing, among other cases, United States v. Quezada, 448 F.3d 1005 (8th Cir. 2006) (relying upon the doctrine in upholding warrantless search of a home); People v. Ray, 981 P.2d 928 (Cal. 1999) (plurality opinion) (relying upon the doctrine in warrantless entry into a home); State v. Deneui, 775 N.W.2d 221 (S.D. 2009) (concluding that the entry into the home was reasonable because the officers entered a home "not as part of a criminal investigation, but in pursuance of their community caretaking function").

"[H]omes cannot be arbitrarily isolated from the community caretaking equation.  The need to protect and preserve life or avoid serious injury cannot be limited to automobiles."  Deneui, 775 N.W.2d 221, 239 (S.D. 2009).  "[P]olice officers may, without reasonable suspicion of criminal activity, intrude on a person's privacy to carry out community-caretaking functions to enhance public safety."  State v. Stanley, No. 13 MA 159, 2014 WL 7275341, at *4 (Ohio Ct. App. Dec. 19, 2014).  The key to such permissible action is the reasonableness required by the Fourth Amendment.  Id.  The "community-caretaking function may initially explain why police enter a home, and depending on what occurs there, may further justify exploration of other parts of the home."  Id.

Community caretaking activities are varied and are performed for different reasons.  Ray, 981 P.2d at 934.  Courts that have expanded the community caretaking doctrine outside of the automobile context analyze the application of the doctrine under a general reasonableness standard.  "Each variant must be assessed according to its own rationale on a case-by-case basis.

Although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which a search takes place." Id. at 934 (internal quotation marks omitted).

In People v. Hand, 946 N.E.2d 537 (Ill. App. Ct. 2011), the defendant challenged a police officer's warrantless entry into her apartment. Id. Police were called to the apartment by the defendant's husband who was concerned about the defendant and his children who were also in the apartment. Id. at 540. The defendant's husband asked police for assistance in retrieving some personal items from the apartment. Id. Police attempted to gain consensual entry into the apartment but the defendant resisted and a scuffle between the defendant and police ensued. Id. Police eventually placed defendant under arrest. Id. The defendant moved to quash the arrest and suppress evidence arguing that there was no justification for the warrantless entry into her apartment. Id. at 542.

In Hand, the court held that "two general criteria must be present for a valid community caretaking exception to a prohibition against a warrantless search." Id. at 543-44. The court determined that in order for the community caretaking exception to apply, (1) the police must be performing some function other than investigation of a crime, and (2) the scope of the search must be reasonable because it was done to protect the safety of the public. Id. at 544. The objective circumstances of the situation (not the subjective motivation of the police) must be scrutinized when ruling on the validity of the search. Id   The question of reasonableness is measured in objective terms and is determined by evaluating the totality of the circumstances: the "court must balance a citizen's interest in going about his or her business free from police interference against the public's interest in having police officers perform services in addition to

strictly law enforcement." Id. at 544.  The court concluded that the community caretaking function justified the police officer's warrantless entry into the defendant's apartment.  Id. at 545.

"Whether a given community caretaker function will pass must under the Fourth Amendment so as to permit a warrantless home entry depends upon whether the community caretaker function was reasonably exercised under the totality of the circumstances of the incident under review."  State v. Pinkard, 785 N.W.2d 592, 598-99 (Wis. 2010) (emphasis added) (concluding that a reasonably exercised community caretaking function may permit a warrantless entry into a home).  In order to determine whether the community caretaking function may justify a warrantless entry into a home, the Pinkard court applied a three part test.  Id. at 601.  Pinkard's test examined (1) whether a search or seizure under the Fourth Amendment had occurred; (2) if it had, whether the police were exercising a bona fide caretaking function; and, (3) if so, whether the public interest outweighs the intrusion upon the privacy of the individual such that the community caretaker function was reasonably exercised within the context of the home.  Id.

In State v. Navarro, 708 A.2d 416 (N.J. 1998), the defendant's landlady informed the police that she had discovered a gun in the defendant's bedroom.  Id. at 417.  The landlady informed police that there were several small children living in the apartment and she wanted to determine whether the gun was real or was a toy.  Id.  When she discussed the matter with police, however, the landlady did not have the gun with her but had left it in the defendant's bedroom.  Id.  When police arrived at the apartment, the landlady took the officers to the defendant's bedroom, opened defendant's closet, pulled out a metal box, placed it on the bed and opened it.  Id.  The landlady pointed police to a sock in the box which appeared to have something inside it; an officer picked up the sock and discovered a handgun and ammunition. Id.  The defendant filed

18

a motion to suppress the gun and ammunition on the ground that the evidence had been obtained as a result of an illegal search.  Id.   The trial court denied the motion and the defendant appealed.  Id.

The Navarro court held that when the police accompanied the landlady to the defendant's bedroom they did not have probable cause to believe that the defendant had committed a crime. Id. at 418.  Thus, the court concluded that the police could not have obtained a warrant to search the defendant's bedroom at that time.  Id.  The police were in a position to accompany the landlady to the apartment or do nothing and take the risk that the "agitated" landlady or the other children in the apartment may gain access to the gun.  Id.  "A danger that children or other persons who are inexperienced in the use of firearms may obtain access to a gun is one circumstance which may justify the police entering private property in the performance of their community caretaking function."  Id. at 418 (emphasis added).  The court concluded that "the action of the police in accompanying [the defendant's landlady] to her apartment constituted a reasonable exercise of their community caretaking responsibilities."  Id. at 419 (emphasis added).

In United States v. Taylor, No. 3:09CR249, 2009 U.S. Dist. LEXIS 95555 (E.D. Va. Oct. 14, 2009), a police officer was on routine patrol when he received a call to respond to a four year old girl wandering alone.  Id. at *1.  The officer responded, found the girl and the girl took the officer to her home.  Id.  The door to the home was open and the officer followed the girl into the home.  Id. at *2.  The officer discovered the defendant in a bedroom and the defendant informed the officer that the child was his daughter.  Id.  While speaking to the defendant, the officer noticed several bullets in a plastic bag in plain view on a bedside table.  Id.  The defendant could not produce any form of identification but informed the officer that he his name was Anthony

Jackson and that he did not know his social security number nor the address of the home.  Id. at *3.  The police investigated the name Anthony Jackson through several record systems but found no such person.  Id.  The police officer then performed a protective sweep of the area and located a firearm beneath the mattress where the defendant had been lying.  Id. at *4.   The police subsequently spoke to the child's grandmother and mother, uncovered the defendant's identity, and discovered that he had two felony convictions.  Id. at *4-5.  The police arrested the defendant for being a felon in possession of a firearm.  Id. at *5.

The government defended the warrantless entry into the home by arguing that police were performing a community caretaking function.  Id. at *7-8.  The court stated that the community caretaking exception to the warrant requirement requires the court to look at the function performed by the police officer.  Id. at *8.  After summarizing several cases analyzing the community caretaking doctrine, the court held that the police officer entered the residence as a result of a "routine police procedure to attempt to locate the parent or guardian of a lost child." Id. at *18.  The court concluded that the police officer's entry into the house was unrelated to the detection, investigation, or attempt to acquire evidence of a crime.  Id. at *19.  "'Life-or-death' circumstances did not exist, but they are not required.  An officer is not expected to leave his common sense at home."  Id.  The court concluded that the officer's entry into the home was pursuant to the officer's community caretaking function and was reasonable under the Fourth Amendment.  Id. at *17-22.

In State v. Logan, No. 18 CR 02 0108012 (Conn. Super. Ct. Oct. 6. 2003), the defendant filed a motion to suppress weapons that were seized from his residence.  Id.  In Logan, the police responded to a restaurant on the report of an assault.  Id.  A verbal dispute had erupted between two males and both had been asked to leave the restaurant.  Id.  While at the restaurant, the

police were informed that three individuals that were involved in the altercation were at the local hospital.  Id.  The three individuals gave statements to the police.  Id.   As a result of the information that the police obtained from the interviews, the police proceeded to the defendant's home to arrest him for domestic violence.  Id.  The police arrested the defendant on the deck of his home and placed him in handcuffs.  Id.   After securing the defendant, the police inquired if the defendant owned any weapons or if anyone else was present in the home.  Id.  The defendant informed the police that nobody else was present in the home and that he had two guns in the house.  Id.  The defendant accompanied the police while they searched the residence.  Id.  The police located a rifle under the defendant's bed and a shotgun in a closed cabinet in the basement.  Id.  A police officer testified that he would not have looked into the cabinet if the defendant had not led officers to the shotgun.  Id.   The police seized both guns.  Id.

The state argued that the community caretaking function permitted the warrantless search of the home and seizure of the weapons.  Id.  The court rejected the states' argument and determined that the seizure of the guns did not fall within the community caretaking doctrine.  Id. The court noted, however that it would have accepted the state's community caretaking argument "if the guns had been found in a multi-family dwelling in a large city or in an apartment building with children living inside, where there is a danger that a gun could fall into the wrong hands." Id. at 3 (emphasis added).  The court, noted, however, that the weapons were found in an empty single family residence in a rural town.  Id.

"Surely, a police officer may enter a residence to protect a suicidal person and secure the premises if firearms are believed to be present."  People v. Ovieda, 228 Cal. Rptr. 3d 67, 71 (Cal. Ct. App. 2018) (applying community caretaking function), petition for review granted, 231 Cal. Rptr. 731 (Ca. 2018).  The community caretaking function "has [an] expansive temporal reach,

in that its primary focus is on the <u>purpose</u> of police action rather than on its urgency."
<u>Sutterfield</u>, 751 F.3d at 561 (emphasis added); <u>see generally</u> <u>Matalon</u>, 863 F.3d at 635 (the court
must look to the function performed by the police).  Moreover, because the community
caretaking doctrine "presumes that the police are not acting for any law enforcement purpose,
<u>whether or not there is time to seek a traditional criminal warrant is immaterial</u> . . . ." <u>Sutterfield</u>,
751 F.3d at 561 (emphasis added); <u>see also</u> <u>Hand</u>, 946 N.E.2d at 544 (probable cause is not a
factor when police are engaging in a community caretaking function).

     In <u>Sutterfield</u>, the Seventh Circuit struggled with the question of whether the community
caretaking doctrine allowed police to forcibly enter the home of a suicidal individual and open a
locked container and seize a gun that was found inside the container.  <u>Id.</u> at 751 F.3d 542.  In
<u>Sutterfield</u>, a psychiatrist placed a 911 telephone call to report that the plaintiff had left an
appointment with her and had expressed suicidal thoughts.  <u>Id.</u> at 545.  The psychiatrist informed
police that the plaintiff, after receiving some bad news, had remarked "I guess I'll go home and
blow my brains out."  <u>Id.</u>  The psychiatrist told the police that the plaintiff wore an empty gun
holster to her appointment; thus she surmised that the plaintiff owned a gun.  <u>Id.</u>  Police
eventually located the plaintiff at her home but the plaintiff would not engage with the police
except to inform them that she had "'called off' the police."  <u>Id.</u> at 546.  Police, however, forcibly
entered the house and the plaintiff was handcuffed and placed into custody.  <u>Id.</u> at 544.  Once the
plaintiff was secured, police performed a protective sweep of the house; one officer observed a
compact disc carrying case in plain view.  <u>Id.</u>  The officer forced the case open and discovered a
handgun.  <u>Id.</u>  The police seized the weapon for "safekeeping" and to keep it out of the hands of
the plaintiff's son.  <u>Id.</u> at 547.  Another officer testified that he thought it was appropriate to seize

the weapon so that the plaintiff, when released from the hospital, would not be able to use the gun to commit suicide.  Id.

Sutterfield held that community caretaking cases cannot be viewed through the standard "lens" of criminal law enforcement.  Id. at 551; see also Matalon, 806 F.3d at 635 (noting that courts stress the separation between the community caretaking function and "normal work of criminal investigation").  Courts have "long recognized the important role that police play in safeguarding individuals from dangers posed to themselves and others – a role that will, in appropriate circumstances, permit searches and seizures made without the judicial sanction of a warrant."  Sutterfield, 751 F.3d at 551.

The Sutterfield court, however, was frustratingly forestalled from finding that the community caretaking doctrine justified the warrantless entry into the plaintiff's home and the seizure of the weapon.  In dicta, the court stated that "as a matter of doctrine" the community caretaker function would

> potentially be the best fit for this case, in that it captures the beneficent purpose for which police entered [the plaintiff's] home . . . .And because there is no suggestion that police had any law enforcement motive in entering the home, there would be a ready basis on which to distinguish criminal cases . . . which demand a search warrant when there is, in fact, time in which to seek one.

Id.  The court however noted that an earlier circuit decision precluded extending the community caretaking doctrine beyond the automobile context and specifically emphasized that not only had the defendant *not* asked the court to review that decision but the defendant also failed to argue the community caretaking doctrine on appeal.  Id. at 561 (emphasis added).

The courts that have extended the community caretaking function beyond the automobile context have done so pursuant to the Fourth Amendment's reasonableness decree.  See generally Ray, 981 P.2d 928; Deneui, 775 N.W.2d 221; Hand, 946 N.E. 2d 537; Pinkard, 785 N.W.2d 592;

Navarro, 708 A.2d 416; Stanley, 2014 WL 7275341; Taylor, 2009 U.S. Dist. LEXIS 95555;

Ovieda, 228 Cal. Rptr. 3d 67; see also Ferreira v. City of East Providence, 568 F. Supp. 2d 197

(D.R.I. 2008) (seizure of defendant was justified and reasonable under community caretaking

function).  It is submitted that the reasoning of these courts is consistent with the First Circuit's

view of the community caretaking doctrine.

 In this Circuit, in order to apply the community caretaking doctrine, a court must first

determine whether the function performed by the officer falls within the heartland of the

community caretaking function.  Matalon, 806 F.3d 627.  It is incontrovertible that the NSP

arrived at the Richer residence as a result of a "wellness check" – a call to assist a suicidal

individual and *not* to investigate any type of crime.  A police officer's response to an attempted

suicide call is certainly part of that officer's community caretaking function.  It is abundantly

clear that the function the NSP performed at the Richer residence was within the heartland of the

community caretaking function and did not involve any type of criminal investigation.  Id.  Thus,

the ultimate inquiry for the court is to determine whether, under the circumstances, NSP "acted

within the realm of reason."  Lockhart-Bembery, 498 F.3d at 75 (internal quotation marks

omitted).  In community caretaking circumstances reasonableness can take on many forms and is

flexible; thus what may be "reasonable in one type of situation may not be reasonable in

another."  Rodriguez-Morales, 929 F.2d at 785 (internal quotation marks omitted).  Courts must

evaluate the totality of the circumstances.  Id.

 Defendants seized the guns to "prevent potential hazards from materializing."

Rodriguez-Morales, 929 F.2d at 784.  North Smithfield police officers were called to Plaintiff's

residence as a result of a report that Plaintiff had attempted to harm himself.  Upon entering the

home for the second time in a week, the officers learned that Plaintiff and his wife were again

engaged in a domestic dispute.  Plaintiff readily admits that the domestic disturbance with Mrs. Richer on September 28, 2008, was "very tense" and "heated."  During the argument with his wife, NSPD were informed that Plaintiff threw a handful of pills in his mouth, looked at his six-year-old son and said "I'm going to bed and I won't get up."  Moreover, Plaintiff's recording of the incident corroborates what Mrs. Richer and A.R. informed Officer Landry and also gives the Court a lens into Mr. Richer's emotional status during the argument.

Mrs. Richer informed the 911 operator that she believed Plaintiff had attempted suicide. At the scene, Mrs. Richer informed Officer Landry that she and Plaintiff were having marital problems, that she had asked Plaintiff for a divorce, that Plaintiff did not want a divorce and that Plaintiff had ingested a handful of pills.  Officer Landry also spoke to Plaintiff's son who confirmed that Plaintiff put pills in his mouth and said he was going to bed and would not be getting up.

Defendants were presented with a situation (1) NSPD had recently visited the Richer residence as a result of another domestic argument about divorce; (2) Plaintiff had threatened to harm himself, (3) Plaintiff had ingested pills or appeared to ingest pills in front of his wife and at least one of his children and made at least *one* ominous statement about not getting up, (4) Plaintiff was in a potentially volatile state of mind as a result of continuing arguments with his spouse about divorce, and (5) Plaintiff had ready access to multiple firearms.  Defendants could not have known when Plaintiff would return to the residence, or whether he would use the guns to harm himself, a member of his family, or whether another family member would gain access to the guns and harm him/herself or another individual.  See generally Sutterfield, 751 F.3d at 570.

Landry believed that Plaintiff's actions suggested an attempt at suicide.  SUF at ¶ 27.

Riccitelli believed that Plaintiff had the potential of being a harm to himself or others.  Id. at ¶

38.  "Police officers providing assistance at the scene of a threatened suicide must concern

themselves with more than simply the safety of the suicidal person.  Protection of the physical

safety of the police officers and other third parties is paramount."  Ovieda, 228 Cal. Rptr. 3d at

71; see also United States v. Johnson, No. 4:18CR00151 ERW, 2018 U.S. Dist. LEXIS 190983

(E.D. Mo Nov. 8, 2018) (seizure of gun lawful under community caretaking function).  Under

these *particular* circumstances, it is reasonable to *temporarily* remove the firearms from the

house for safekeeping purposes pursuant to the "flexible" community caretaking function.  See

generally Lockhart-Bembery, 498 F.3d at 75; Rodriguez-Morales, 929 F.3d 780;  Sutterfield, 751

F.3d 542.

> There may have been alternatives, but removing and securing the firearm was an
> obvious and reasonable measure.  One need only imagine the public outcry that
> would have taken place had the police left the gun where it was and had [Plaintiff]
> returned home and then used the gun to take [his] own life, or had [one of
> Plaintiff's sons] taken the gun in [his] absence and used it to harm himself or
> others, to see the wisdom in what police did.

Sutterfield, 751 F.3d at 570 (emphasis added); see also Mora, 519 F.3d at 227 ("[t]here are no

shortage of precedents approving preventive seizures for the sake of public safety").  The seizure

of Plaintiff's firearms was pursuant to the NSPD's community caretaking function and consistent

with the Fourth Amendment.

### 3.  The Individual Defendants Are Entitled To Qualified Immunity

It is also submitted that the individual officers are entitled to qualified immunity.

"[G]overnment officials performing discretionary functions, generally are shielded from liability

for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald,

457 U.S. 800, 818 (1982).  The purpose behind granting officials such immunity is to allow them

to perform their duties and act in areas where clearly established rights are not implicated "with

independence and without fear of consequence."  Id. at 819.

   The First Circuit applies a two part test to analyze the application of qualified immunity.

Gonzalez v. Otero, 172 F. Supp. 3d 477 (D.P.R. 2016).  In order to determine whether an

individual police officer is entitled to qualified immunity the court must decide "(1) whether the

facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so,

whether the right was clearly established at the time of the defendant's alleged violation."  Id. at

507 (internal citation marks omitted).  A court is well within its authority "alter the choreography

in the interests of efficiency beginning --- and perhaps ending --- with the second prong."

Conlogue v. Hamilton, 906 F.3d 150, 155 (1st Cir. 2018) (internal quotation marks omitted).

   The Court applies a good faith test that allows questions of qualified immunity to be

decided as a matter of law in appropriate cases.  Malachowski v. City of Keene, 787 F.2d 704,

714 (1st Cir. 1986).  This test requires viewing the official's actions from an objectively

reasonable standpoint.  Id.  The decisive question becomes whether another police officer,

standing in the shoes of these Defendants, would have concluded that their actions violated a

clearly established statutory or constitutional right.  Ricci v. Urso, 974 F.2d 5, 7 (1st Cir. 1992).

A "reasonable, although mistaken, conclusion about the lawfulness of one's conduct does not

subject a government official to personal liability."  Cookish v. Powell, 945 F.2d 441, 443 (1st

Cir. 1991).

   The First Circuit has observed that the "qualified immunity standard gives ample room

for mistaken judgments by protecting all but the plainly incompetent or those who knowingly

violate the law."  Rivera v. Murphy, 979 F.2d 259, 263 (1st Cir. 1992) (internal quotation marks

and citation omitted).  When addressing claims for qualified immunity on summary judgment, the Court must grant summary judgment if the plaintiff fails to generate a trialworthy issue by undermining the evidence supporting the defendant's objectively reasonable belief that his actions were lawful.  Dean v. Worcester, 924 F.2d 364, 367 (1st Cir. 1991).  Qualified immunity "can protect officers from litigation based on misjudgments about where lies the sometimes hazy border between excessive and acceptable force."  Meijia v. Charette, No. 12-cv-449, 2014 U.S. Dist. LEXIS 17714, at *5 (D.R.I. Feb. 11, 2014).

Whether a right is clearly established is a question of law for the court.  Stamps v. Town of Framingham, 813 F.3d 27 (1st Cir. 2016).  This analysis requires that the court first consider whether the contours of the right were sufficiently clear so that "a reasonable official would understand what he [did] violate[d] that right."  Otero, 172 F. Supp. 3d at 507 (internal quotation marks omitted).  Second, the court must also analyze whether a reasonable defendant would "have understood that his conduct violated the plaintiffs' constitutional rights in the situation with which the defendant was confronted."  Id. (internal quotation marks omitted).  "[T]he salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional."  Id. (internal quotation marks omitted).  Courts concentrate on "whether the violative nature of particular conduct is clearly established."  Stamps, 813 F.3d at 39 (emphasis in original).  The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  Petrello v. City of Manchester, No. 16-cv-008-LM, 2017 U.S. Dist. LEXIS 40379, at *8 (D.N.H. March 21, 2017) (internal quotation marks omitted).

The second prong of the qualified immunity analysis in this matter revolves around whether Defendants' seizing firearms from a suspected suicidal individual violated "clearly

28

established statutory or constitutional rights of which a reasonable person would have known."

Harlow, 457 U.S. 800.  The "relevant, dispositive inquiry in determining whether a right is

clearly established is whether it would be clear to a reasonable [official] that his conduct was

unlawful in the situation he confronted." Rocket Learning, Inc. v. Rivera-Sánchez, 715 F.3d 1, 9

(1st Cir. 2013) (internal quotation marks and citation omitted) (emphasis in original and added).

The United States Supreme Court has instructed lower courts that an analysis on whether or not a

right is "clearly established" must be *very narrow*.

> We have repeatedly told courts . . . not to define clearly established law at a high
> level of generality.  The dispositive question is whether the violative nature of
> particular conduct is clearly established.  This inquiry must be undertaken in light
> of the specific context of the case, not as a broad general proposition.  Such
> specificity is especially important in the Fourth Amendment context, where the
> Court has recognized that it is sometimes difficult for an officer to determine how
> the relevant legal doctrine . . . will apply to the factual situation the officer
> confronts.

Mullenix v. Luna, ____ U.S. ____, ___136 S. Ct. 305, 308 (2015) (internal citations and

quotations omitted) (emphasis in original and added).  "In other words, existing precedent must

have placed the . . . constitutional question beyond debate." Perry v. Spencer, No. 12-120702016

(MPK), 2016 U.S. Dist. LEXIS 136991, *51 (D. Mass. Sept. 30, 2016) (internal quotation marks

omitted) (emphasis added).  Plaintiff bears the "heavy" burden of showing that the law was

clearly established at the time of the alleged violation. Petrello, 2017 U.S. Dist. LEXIS 40379, at

*8.  To meet his burden, Plaintiff must

> [i]dentify controlling authority or a robust consensus of persuasive authority such
> that any reasonable official in the defendant's position would have known that the
> challenged conduct is illegal in the particular circumstances that he or she faced --
> then existing precedent, in other words, must have placed the statutory or
> constitutional question beyond debate.

Id. (internal quotation marks omitted).

As noted above, Defendants were presented with a situation where an individual (1) had threatened to harm himself, (2) had ingested pills or appeared to ingest pills in front of his wife and at least one of his children and made at least one ominous statement about not getting up, (3) was in a potentially volatile state of mind as a result of continuing arguments with his spouse about divorce, and (4) had ready access to multiple firearms.  "[W]here the purpose [of defendant emergency responders] is to render solicited aid in an emergency rather than to enforce the law, punish, deter, or incarcerate there is no clearly established constitutional liability under the Fourth Amendment."  Estate of Barnwell v. Grisby, 681 F. App'x 435, 440  (6th Cir. 2017) (internal quotation marks omitted); see also Sutterfield, 751 F.3d at 551 (noting the "lack of clarity" in Fourth Amendment case law as to the appropriate legal framework that should be applied to warrantless intrusions motivated by purposes other than law enforcement evidence-gathering).  Both Sutherland and Arden held that individual officers were entitled to qualified immunity when seizing firearms from suicidal individuals during a police welfare check. Sutherland, 751 F.3d at 572-79; Arden, 622 F. App'x at 710-11.  A "reasonable police officer might have thought, upon discovery of [a] gun [in a residence during a welfare check] that he was authorized by his community caretaking function to seize the gun for safekeeping." Sutherland, 751 F.3d at 578; see also Arden, 622 F. App'x at 710-11 (finding no authority clearly establishing that firearms may not be constitutionally removed from the house of a suicidal homeowner).  The individual Defendants are entitled to qualified immunity.

## 4.  The Individual Defendants Are Also Entitled to Qualified Immunity on State Law Claims

Plaintiff's conversion and RIFA claims are grounded in Defendants' seizure of his firearms.  As a result, the individual Defendants are also entitled to qualified immunity with respect to these state law claims similar to the qualified immunity under § 1983.  See Hatch v.

Town of Middletown, 311 F.3d 83, 89-90 (1st Cir. 2002) (citing Pontbriand v. Sundlun, 699

A.2d 856, 867 (R.I. 1997) and Ensey v. Culhane, 727 A.2d 687, 690 (R.I. 1999)).  "Pontbriand

and Ensey reflect Rhode Island's recognition of a qualified immunity defense under state law

analogous to the federal doctrine established by the United States Supreme Court in Harlow, 457

U.S. at 818, cited with approval in both Rhode Island decisions, and routinely applied in § 1983

cases."  Hatch, 311 F.3d at 90.  Furthermore, because the individual Defendants are immune

from suit, so too is the City.  See Morales v. Town of Johnston, 895 A.2d 721, 728-29 (R.I.

2006) (where high school soccer coaches have statutory immunity from suit, school district

cannot be held liable based upon same conduct); see also DiQuinzio v. Panciera Lease Co., 612

A.2d 40, 43 (R.I. 1992) (because the operator of the vehicle was immune from suit pursuant to

the exclusivity provision of the Workers' Compensation Act, R.I Gen. Laws § 28-29-20, there

could be no cause of action against the vehicle's owner); Gray v. Derderian, 400 F. Supp. 2d 415,

424 (D.R.I. 2005) (no "liability can be charged to the [municipality], based on the doctrine of

respondeat superior, if the [municipality's] agent or employee is immune from prosecution");

Calhoun v. City of Providence, 120 R.I. 619, 630, 390 A.2d 350, 356 (1978) ("if the agent is not

liable for his conduct, the principal cannot be responsible").

### D.  Equal Protection – Count V

In count V of the Complaint, Plaintiff alleges that Defendants have violated his right to

equal protection of the laws by maintaining and enforcing a set of customs, practices and policies

depriving Plaintiff of his lawfully obtained weapons.[7]  ECF No. 50 at ¶ 78.  Plaintiff alleges that

by maintaining a custom, policy or practice of requiring lawful weapon owners, but not other

---

[7] Plaintiff brings his equal protection claim pursuant to the Fourteenth Amendment and Article 1 Section 2 of the
Rhode Island Constitution.  Rhode Island courts have found that the Rhode Island Constitution's equal protection
standards are coterminous with its federal counterpart.  Rhode Island Depositors Econ. Prot. Corp. v. Brown, 659
A.2d 95, 100 (R.I. 1995).

property owners, to engage in formal litigation to recover their seized property, Defendants have denied Plaintiff the equal protection of the laws.  Id. at ¶ 56.

"The Equal Protection Clause prohibits selective enforcement based upon an unjustifiable standard such as race, religion, or other arbitrary classification."  B & B Coastal Enters. v. Demers, 276 F. Supp. 3d 155, 171 (D. Me. 2003) (citation omitted).  Plaintiff alleges a disparate treatment Equal Protection claim.  ECF No. 50 at ¶ 56.  To set forth a disparate treatment claim, Plaintiff must show that he was subjected to differential treatment, as compared with similarly situated persons, on the basis of a protected class.  See Williams v. Pennridge Sch. Dist., Civ. A. No. 15-4163, 2016 U.S. Dist. LEXIS 150216, at *34-35 (E.D. Pa. Oct. 31, 2016).  The essence of the claim is that state actors intentionally discriminated against a plaintiff because of his membership in a protected class.  See Freeman v. Town of Hudson, 714 F.3d 29, 38 (1st Cir. 2013).  Thus, the plaintiff "must identify his [or her] putative comparators to make out a threshold case of disparate treatment."  Harrington v. City of Attleboro, 172 F. Supp. 3d 337, 346 (D. Mass. 2016).

If no suspect class or fundamental right is at issue (i.e., a "class of one" claim), a plaintiff must nonetheless identify peer comparators, and allege facts to establish that he was "intentionally treated differently from others who were similarly situated without a rational basis and the difference was 'due to malicious or bad faith intent on the part of the defendants to injure. . . .'"  Pollard v. Georgetown Sch. Dist., 132 F. Supp. 3d 208, 223 (D. Mass. 2015) (quoting Priolo v. Town of Kingston, 839 F. Supp. 2d 454, 460 (D. Mass. 2012) (further citation omitted)). In a "class of one" claim, "proof of a similarly situated, but differently treated, comparator is essential."  See Snyder v. Gaudet, 756 F.3d 30, 34 (1st Cir. 2014) (citation omitted).

Plaintiff has not alleged that he is a member of a protected class.  As a result, it appears that Plaintiff alleges a "class of one" equal protection claim.  Plaintiff must show an extremely high degree of similarity between  himself and those to whom he seeks comparison.  <u>Freeman</u>, 714 F.3d at 38.  Plaintiff must show that he "engaged in the same activity . . . without such distinguishing or mitigating circumstances as would render the comparison inutile."  <u>Cordi-Allen v. Conlon</u>, 494 F.3d 245, 251 (1st Cir. 2007).  Plaintiff alleges that he is similarly situated to "other property owners" not required to engage in formal litigation to recover their seized property.  <u>See</u> ECF No. 50 at ¶ 56.  "The law of equal protection requires more than superficial similarity . . . ."  <u>Perfect Puppy Inc. v. City of East Providence</u>, 98 F. Supp. 3d 408, 419 (D.R.I. 2015), <u>aff'd</u>, 807 F.3d 415 (1st Cir. 2015).

Plaintiff's generalized comparison to "other property owners" does not meet the similarly situated standard.  <u>Freeman</u>, 714 F.3d 29.  Plaintiff has not identified an appropriate comparator; as a result, his equal protection claim fails.  In addition, Plaintiff has not alleged a malicious or bad faith intent to injure.  <u>Pollard</u>, 132 F. Supp. 3d at 223.  The malicious/bad faith standard is an "exceptionally deferential one" that is "very high" and must be "scrupulously met."  <u>Walsh v. Town of Lakeville</u>, 431 F. Supp. 2d 134, 145 (D. Mass. 2006).  The record is absent any fact or facts that would support a claim that Defendants engaged in an "orchestrated and spiteful effort to 'get'" Plaintiff.  <u>Id.</u> at 146.  Plaintiff's Equal Protection Claim fails as a matter of law.

### E.  Rhode Island Mental Health Law – Count VI

### 1.  Plaintiff's Claim Fails Because It is Based on a Faulty Legal Foundation

In Count VI of the Complaint, Plaintiff alleges that Defendants violated the Rhode Island Mental Health Law, R.I. Gen. Laws § 40.1-5-1 <u>et</u> <u>seq.</u>  Plaintiff alleges that Defendants did not obtain certification from a physician that Plaintiff was in need of immediate care and treatment

or make an application for emergency certification of Plaintiff to a mental health facility.  See ECF No. 50 at ¶¶ 81-82; R.I. Gen. Laws §§ 40.1-5-7 and 40.1-5-8.  Instead, Plaintiff alleges that Defendants "insisted" that Plaintiff go to "Landmark Medical Center . . . for an evaluation." ECF No. 50 at ¶ 83.  As a result, Plaintiff contends that by "insisting" Plaintiff be medically evaluated, certain unidentified Defendants conspired unlawfully to attempt to cause Plaintiff to be *admitted* to a medical facility.  See ECF No. 50 at ¶ 84; see also R.I. Gen. Laws § 40.1-5-38. Plaintiff concludes that, as result of this conspiracy to attempt to cause Plaintiff to be admitted to a medical facility, Defendants have violated the Rhode Island Mental Health Law and thus committed a crime.  ECF No. 50 at ¶ 84-85.  Plaintiff, again, apparently recognizing that the Rhode Island Mental Health Law does not provide him with a private right of action, argues that R.I. Gen. Laws § 9-1-2 provides him with that right.  ECF No. 50 at ¶ 86.

Assuming for the sake of argument that a NSPD officer insisted that Plaintiff be transported to the hospital to be evaluated – transporting Plaintiff to the hospital was more than reasonable under the circumstances.  Mrs. Richer informed the NSPD or the NSR that she wanted Plaintiff medically evaluated.  At the time, Mrs. Richer, Plaintiff's spouse, had contacted 911, and was concerned about his physical wellbeing.  Mrs. Richer was concerned because she did not know the amount or type of pills that Plaintiff purportedly took and wanted to ensure that Plaintiff had not harmed himself by taking the pills.  Moreover, Plaintiff did not execute the NSR form refusing treatment.

Notwithstanding the reasonableness of Plaintiff's transport, Plaintiff's claim is based upon a faulty legal foundation.  As noted above, Plaintiff brings his claim via R.I. Gen Laws § 9-1-2.  R.I. General Laws § 9-1-2 provides that when a person suffers "any injury to his person, reputation, or estate by reason of the commission of any crime or offense, he or she may recover

his or her damages for the injury in a <u>civil action</u> against the <u>offender</u>."   R.I. Gen. Laws § 9-1-2

(emphasis added).   Section 9-1-2 is an enabling act that allows a person allegedly injured as a

result of a crime "a right of action where none existed at common law." <u>Mello v. DaLomba</u>, 798

A.2d 405, 411 (R.I. 2002).   "Section 9-1-2 creates a new right of action in that a victim can bring

an action for damages for injuries even if no criminal complaint for the crime or offense has been

filed." <u>Lyons v. Scituate</u>, 554 A.2d 1034, 1036 (R.I. 1989).   To establish liability under § 9-1-2,

Plaintiff must "first establish that [D]efendant engaged in <u>criminal activity</u>." <u>Zarrella v. Minn.</u>

<u>Mut. Life Ins. Co.</u>, 824 A.2d 1249, 1261 (R.I. 2003) (emphasis added); <u>see also</u> <u>Willis v. Omar</u>,

954 A.2d 126, 131 (R.I. 2008) (Section 9-1-2 "imposes civil liability for injuries resulting from a

criminal act").[8]

Plaintiff relies upon R.I. Gen Laws § 40.1-5-38 for the premise that certain unnamed

Defendants committed a crime.   Plaintiff claims that certain unnamed Defendants conspired to

attempt to admit him into a medical or mental health facility.   ECF No. 50 at ¶¶ 84-85.   R.I. Gen.

Laws § 40.1-5-38 provides that any

> person who knowingly and willfully conspires with any other person unlawfully
> to improperly <u>cause to be admitted or certified to any facility</u>, any person not
> covered by the provisions of this chapter, shall on conviction thereof, be fined not
> exceeding five thousand dollars ($5,000) or imprisoned not exceeding five (5)
> years at the discretion of the court.

R.I. Gen. Laws § 40.1-5-38 (emphasis added).   When construing a statute, the court must be

guided by the plain and ordinary meaning of unambiguous language.   <u>Walden v. City of</u>

<u>Providence</u>, 596 F.3d 38 (1st Cir. 2010).   The statutory scheme prohibits "persons" from

unlawfully conspiring to improperly "<u>cause</u> [an individual] to be admitted or certified" to a

facility.   R.I. Gen. Laws § 40.1-5-38.   It is undisputed that (1) Defendants did not make an

---

[8] Defendants incorporate by reference their argument from footnote 3 above, and aver again that the Town cannot
commit a crime or be an offender under § 9-1-2, thus summary judgment must be granted on this claim in so far as
Plaintiff brings it against the City.   Moreover, § 40.1-5-38 does not apply to the City as it is not a "person."

application for a medical certification; (2) Defendants did not request that Plaintiff be admitted into a facility; and (3) Plaintiff was not admitted into a facility.  Thus, Defendants did not violate the statute.

Furthermore, Rhode Island does not have an "over-arching" criminal "attempt" statute. State v. Lopez, P1 2014-0822 AG, 2105 R.I. Super LEXIS 119, at *10 n.6 (R.I. Super. Ct. Sept. 15, 2015).  Unless the statutory scheme provides that an "attempt" is a crime – an attempt to commit the purported crime is not a cognizable offense.  See id.  When the General Assembly has intended to criminalize attempts – it has "said so explicitly." Id.  Since, the Rhode Island General Assembly has not specifically provided that a purported *attempt* to cause an individual to be admitted into a mental health facility is crime, Plaintiff's theory of recovery fails at the starting gate.

Furthermore, at the time of the incident, Rhode Island Gen. Laws § 40.1-5-7 provided that

> [a]ny physician, who after examining a person, has reason to believe that the person is in need of immediate care and treatment, and is one whose continued unsupervised presence in the community would create an imminent likelihood of serious harm by reason of mental disability, may apply at a facility for the emergency certification of the person thereto.
>
> . . . .
>
> In the event that no physician is available, a . . . police officer who believes the person to be in need of immediate care and treatment, and one whose continued unsupervised presence in the community would create an imminent likelihood of serious harm by reason of mental disability, may make the application for emergency certification to a facility.

R.I. Gen. Laws § 40.1-5-7(a)(1) (emphasis added) (2008).  When construing a statute, the court must be guided by the plain and ordinary meaning of unambiguous language.  Walden, 596 F.3d 68.  Plaintiff employs the term "insisted" as a means to find applicability of the Mental Health

statutory scheme.  No Defendant made an application for emergency certification or admission to a medical facility.  Furthermore, in this instance, a physician was not available on scene.  After being transported to a physician who could evaluate Plaintiff, that physician examined Plaintiff and determined that Plaintiff was not a person in need of immediate care and treatment and determined that admission was not appropriate under the circumstances.  Even assuming that Defendants somehow "insisted" that Plaintiff be transported to the hospital for an evaluation, that "insistence" is not a violation of the statutory scheme.

### 2.  Even If the Rhode Island Mental Health Law Applies, the Claim is Out of Time

The Court, however, need not get entangled in a Rhode Island Mental Health Law analysis.  Section 9-1-2 does not create a distinct cause of action for determining a statute of limitations.  Lyons, 554 A.2d 1034.  Courts look to the nature of the underlying claim to determine the statute of limitations.  Id.  Plaintiff's claim is, in essence, that Defendants forced him to be transported to the hospital.  The nature of Plaintiff's claim is thus that Defendants falsely imprisoned him.  False imprisonment is a personal injury action; Rhode Island's 3 year statute of limitations applies to false imprisonment claims.  Salvato v. Tourism & Development Corp., P.C. No. 83-3394, 1985 R.I. Super LEXIS 192 (R.I. Super. Ct. Oct. 11, 1985); Klunder v. Trustees and Fellows of the College or University, C.A. No. 10-41- ML, 2012 U.S. Dist. LEXIS 167779 (D.R.I. Nov. 27, 2012), aff'd, 778 F.3d 24 (1st Cir. 2015).  As noted above, the incident occurred in September of 2008.  Plaintiff brought suit in 2015.  Assuming for the sake of argument that Plaintiff has a claim pursuant to R.I. Gen. Laws § 9-1-2, it is out of time.  See generally id.; see also  R.I. Gen. Laws § 9-1-14(b); § 9-1-25 (claim against municipality).

It is respectfully submitted that the Court grant Defendants' motion for summary judgment on Count VI of Plaintiff's complaint.

## F.  Conversion – Count VII

In Count VII of the Complaint, Plaintiff alleges that Defendants converted his weapons. The "gravamen of an action for conversion lies in the defendant's taking the plaintiff's personalty without consent and exercising dominion and control over it inconsistent with the plaintiff's right to possession."  <u>Montecalvo v. Mandarelli</u>, 682 A.2d 918, 928 (R.I. 1996) (internal quotation marks omitted).  The focus of a court's examination in a conversion claim is "whether [a] defendant has appropriated <u>to his own use</u> the chattel of another without the latter's permission and without legal right."  <u>Terrien v. Joseph</u>, 73 R.I. 112, 115, 53 A.2d 923, 925 (1947).

### 1.  Defendants Had A Legal Right to Plaintiff's Guns

Defendants had a "legal right" to Plaintiff's guns; they seized them pursuant to the community caretaking function.  <u>See</u> Section V C above and <u>Terrien</u>, 73 R.I. at 115, 53 A.2d at 925 (conversion is based on the premise that s defendant did not have a legal right to property). The record reflect does not reflect that Plaintiff made a request to return his property to any of the named individual Defendants except Lafferty and Reynolds.  Because Plaintiff made no demand to the remaining Defendants, Plaintiff's conversion claim against these Defendants fails. <u>See</u> <u>generally</u> <u>Terrien</u>, 53 A.2d at 925 (demand by owner required before an action in conversion can be brought against an individual who obtained property rightfully).

### 2.  No Individual Defendant Seized Plaintiff's Guns For His Own Use

The Court's focus on a conversion claim is whether a defendant has "appropriated [another individual's property] <u>to his own use</u>. . . ."  <u>Terrien</u>, 73 R.I. at 115, 53 A.2d at 925 (emphasis added).  No individual Defendant used Plaintiff's weapons for their own personal use. Thus, the claim against the individual Defendants fail.  <u>See</u> <u>id.</u>; <u>see also</u>  <u>Holzemer v. City of</u>

Memphis, No. 06-2436, 2008 U.S. Dist. LEXIS 123878, *79 (W.D. Tenn. Dec. 31, 2008) (a "claim for conversion will not stand against a government employee where the alleged conversion was not done for the employee's benefit").

It is respectfully submitted that the court grant Defendants' motion for summary judgment on Count VII of the Complaint.

### 3.  The Claim Against Defendants Fails Because the Individual Defendants Are Entitled to State Law Immunity

Last, as noted above, because the individual Defendants are entitled to state law immunity on this claim, the claim fails as to all Defendants.  See Section V C 4 above.

### 4.  The Claim Against the Town is Out of Time

A cause of action in conversion accrues at the time a defendant takes possession and exercises dominion over the property.  Fuscerallo v. Industrial National Corporation, 117 R.I. 558, 368 A.2d 1227 (1977).  Defendants seized Plaintiff's weapons on September 28, 2008. Plaintiff filed suit in 2015.  The statute of limitations on Plaintiff's conversion claim against the Town expired in 2011.  See R.I. Gen. Laws § 9-1-25 (tort claim against a municipality must be brought within three years of the accrual of the claim).[9]

It is respectfully submitted that the court grant Defendants' motion for summary judgment on Count VII of the Complaint.

### G.  Plaintiff's Request Equitable Relief Is Wholly Speculative

Plaintiff also requests declaratory and injunctive relief.  In the Court's decision on Plaintiff's motion for partial summary judgment, the Court held that Plaintiff's request for declaratory and injunctive relief was "moot, because his weapons have been returned."  Richer,

---

[9] Moreover, because Plaintiff's "allegations concern the behavior of police officers while performing a police function, [his] tort claim is barred by Rhode Island's public duty doctrine."  Haptonstahal v. Pawtucket Police Department, C.A. No. 18-184 WES, 2018 U.S. Dist. LEXIS 186997, at *6 (D.R.I. Nov. 1, 2018).

189 F. Supp. 3d at 344 n. 15.  The Court held that Plaintiff "does not have standing to sue for [equitable relief] [a]bsent a sufficient likelihood that he will again be wronged in a similar way. . . ." Id. (citing City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983)).

Standing is a "threshold question" in every federal case and requires the court to consider "whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf."  American Postal Workers Union v. Frank, 968 F.2d 1373, 1374 (1st Cir. 1992) (internal quotation marks omitted) (emphasis in original).  In order to meet the standing requirement, Plaintiff must show, inter alia, a "real and immediate" injury.  Id. at 1375.  Past exposure to harm will not confer equitable relief standing "absent a sufficient likelihood that [Plaintiff] will again be wronged in a similar way." Id. at 1376 (internal quotation marks and citation omitted).  Plaintiff must show that he is "realistically threatened by a repetition of his experience" of September 28, 2008.  Id. (internal quotation marks omitted).  In order to meet the standing requirement, it is submitted that Plaintiff must show that he will again be despondent and he will again make a threat to harm himself and that a North Smithfield Police Officer will seize and retain his weapons.  See generally id.

Plaintiff's claim for equitable relief fails at the outset.  Plaintiff admits that he likes life very much and would never harm himself.  SUF at ¶ 50.  As a result, Plaintiff cannot show that he is "realistically threatened by a repetition" of the August 21, 2015 experience.  American Postal Workers, 968 F.2d at 1376.  Thus, Plaintiff's claim for equitable relief fails as a matter of law.

Moreover, the First Circuit rejected the argument that equitable relief would be appropriate if a plaintiff was faced with a practice that was a "routine, daily procedure

implemented as a matter of policy . . . ."  Id. at 1377.  "Nothing in the relevant caselaw suggests that guaranteed repetition of the injury to <u>someone</u> lessens the need for a <u>particularized dispute</u> between the plaintiff and defendant."  Id. at 1377 (emphasis in original and added).  "Abstract injury is not enough.  The plaintiff must show that he has <u>sustained or is immediately in danger of sustaining</u> some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both <u>real and immediate</u>, not conjectural or hypothetical."  Stewart v. McGinnis, 5 F.3d 1031, 1037 (7th Cir. 1993) (internal quotation marks omitted) (emphasis added).

In <u>Altman v. Kelly</u>, 28 F. Supp. 2d 50 (D. Mass. 1998), the plaintiff was arrested for disorderly conduct in connection with his participation at a political rally.  Id.  The plaintiff alleged that two district attorneys failed to dismiss the disorderly conduct charge against him in order to retaliate against the plaintiff for exercising his constitutional rights.  Id. at 52.  The plaintiff sought declaratory relief declaring certain state statutes and the conduct of the defendants to be unconstitutional and an injunction against any attempt to enforce the purported unconstitutional laws.  Id.  The court dismissed the plaintiff's complaint with respect to the claim for equitable relief because the plaintiff did not have the proper standing to assert the requested relief.  Id. at 54.  "[P]ast injury suffered by a litigant, while sufficient to give that litigant standing to bring an action for <u>damages</u>, is an <u>insufficient predicate for equitable relief</u>."  Id. at 54 (emphasis in original and emphasis added).

In <u>Altman</u>, the plaintiff argued that the district attorney maintained policies and/or customs that were unconstitutional and, as a result, a threat of future violations existed.  Id.  Notwithstanding the plaintiff's custom/policy argument, the <u>Altman</u> court held that the plaintiff had not met the standing requirement.  Id.  The court held that the plaintiff had "not credibly

alleged that <u>he</u> will sometime in the future exercise <u>his</u> rights to free speech at a political rally in such a manner that <u>he</u> will again be arrested for disorderly conduct and that the District Attorney will again attempt to wrongfully prosecute <u>him</u> for such conduct." <u>Id.</u> (emphasis in original).

In <u>Taylor v. Humphries</u>, 402 F. Supp. 2d 840 (W.D. Mich. 2005), <u>aff'd</u>, 502 F.3d 452 (6th Cir. 2007), the plaintiff requested injunctive relief based on his allegation that a state Department of Natural Resources maintained a custom or practice that was unconstitutional. <u>Id.</u> at 851.  The court determined that, at best, the plaintiff had shown that he was subject to a single instance of allegedly unconstitutional activity and that he *could* be subject to a future injury. <u>Id.</u> The court concluded, however, that the plaintiff had not shown anything more that a speculative threat of repeated injury. <u>Id.</u>  "[W]ithout any evidence of a threat of repeated injury, [the plaintiff] is no more entitled to an injunction than any other homeowner in the State . . . who asserts nothing more than a certain law enforcement practice is unconstitutional." <u>Id.</u>

It is submitted that the basis of Plaintiff's claim for equitable relief is unequivocally speculative.  Because Plaintiff lacks the proper standing to bring a claim for equitable relief in his matter, it is respectfully submitted that the Court grant Defendants' motion for summary judgment on Plaintiff's equitable relief claim.

## VI.  Conclusion

Based on the arguments as outlined above, it is respectfully submitted that the Court grant Defendants' motion for summary judgment on counts I, II, III, V, VI, and VII of the complaint.

Defendants,
By their attorneys,


/s/ Marc DeSisto
Marc DeSisto, Esq. (#2757)
Patrick K. Cunningham, Esq. (#4749)
DeSisto Law LLC
60 Ship Street
Providence, RI 02903
401-272-4442
marc@desistolaw.com
patrick@desistolaw.com


## CERTIFICATION OF SERVICE

I hereby certify that the within document has been electronically filed with the Court on this 17th day of December 2018 and is available for viewing and downloading from the ECF system.

Thomas W. Lyons, Esq.
tlyons@straussfactor.com

Rhiannon S. Huffman, Esq.
rhuffman@straussfactor.com


/s/ Marc DeSisto
Marc DeSisto