UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| JASON A. RICHER, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | C.A. No. 15-162-JJM-PAS |
| JASON PARMELEE as the Finance Director of | : | |
| THE TOWN OF NORTH SMITHFIELD, et al. | : | |
| Defendants | | |

**PLAINTIFF'S OBJECTION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Defendants' motion for summary judgment depends on both issues of disputed fact and misunderstandings of the applicable law.

ISSUES OF DISPUTED FACT[1]

Plaintiff incorporates by reference the summary of the facts set forth in his motion for summary judgment as well as his Statement of Undisputed Facts filed in support of that motion and the Statement of Additional Undisputed Facts filed in opposition to Defendants' motion for summary judgment. Plaintiff will refer to those specific facts here and throughout this Objection as SUF ___. Plaintiff has served his responses to Defendants' Statement of Undisputed Facts and he disputes in whole or part the following of Defendants' facts: 15, 18, 19, 22, 23, 26, 27, 29, 30, 31, 32, 35, 38, 39, 40, 41, 42, 44, 45, 47, and 55.

---

[1] The parties have filed cross motions for summary judgment supported by statements of undisputed fact. They have agreed that for purposes of responding to each other's motions, and to reduce confusion, they may use the statements of fact they filed in support of their motions in opposition to the other side's motion. Moreover, to the extent the parties designate additional facts in opposition to the other sides motion, they will number those additional facts beginning with the last fact set forth in their own statement of facts. Accordingly, there will be one set of facts by Plaintiff and one set of facts by Defendants.

ADDITIONAL UNDISPUTED FACTS AND SUMMARY OF FACTS

Plaintiff incorporates by reference his Statement of Undisputed Facts.  He will cite to the facts set forth by reference to the numbered paragraphs in the Statement, e.g. (SUF 1).  Plaintiff will include here a summary of those Undisputed Facts.

Plaintiff Jason Richer has no history of criminal conduct or domestic violence of any kind.  (SUF 3). Before September 28, 2008, Plaintiff has never attempted suicide or threatened suicide.  (SUF 4).  Mr. Richer legally owns three firearms:  a Remington 1100 shotgun which he obtained in 1979, a .22 caliber bolt action rifle obtained in 1982, and a Thompson Center .50 caliber black powder muzzleloader obtained in 1993. (SUF 5).  He has never misused those firearms. (SUF 3).

Defendants are the Town of North Smithfield, Rhode Island, the Chief of its Police Department, Steven Reynolds, and several members of the North Smithfield Police Department ("NSPD"):  Officer Tim Lafferty, Officer Stephen Riccitelli, Officer Greg Landry, Officer Russell Amato, and Officer Mark Bergeron.[2]

On September 28, 2008, Mr. Richer was married to his now ex-wife Tracy Richer ("Tracy"). (SUF 1). She wanted a divorce which was a frequent source of arguments between the

---

[2]Reynolds, Lafferty, Riccitelli, Landry, Amato, and Bergeron, collectively are the "Individual Defendants."  Officer Amato has retired from the NSPD.  The ranks of the police officers other than Chief Reynolds have changed since 2008.  For the sake of consistency, Plaintiff may refer to them as "Officer."  This designation indicates no disrespect to their present or former ranks.

Plaintiff also named Officer Glenn Lamoureux as a defendant in the belief that he was one of the officers involved.  However, during discovery, Plaintiff learned that the 24-officer NSPD also had two officers whose last name is Lamoreaux, including Michael, who was an officer in training with Officer Amato at the relevant time.  Michael Lamoreaux is no longer with the NSPD and has no recollection of the subject events.  Officer Glenn Lamoureux had no involvement in the subject events.  Accordingly, Plaintiff stipulates to dismissal of his claims against Officer Glenn Lamoureux.

Richers. (SUF 30).  On September 28, 2008, the Richers had an argument during which Jason put pills in his mouth because he was tired of Tracy threatening to commit suicide when he would not consent to a divorce and he wanted to "turn the tables" on her. (SUF 33). Tracy called 911 in the belief that he had put "a handful" of pills in his mouth in a genuine attempt to harm himself. (SUF 35). However, Jason had put into his mouth only his regular doses of his prescription medications and then he spit them out into a trash can.  (SUF 34, 38, 39).

Jason had inadvertently tape-recorded the argument.  (SUF 112).  During Tracy's "911" call, he told her that he had only put his regular prescription medications into his mouth and then spit out the pills.  (SUF  113). Specifically, beginning at 59:49 of the tape recording, there are the following statements:

Tracy Richer (to Jason): "Did you swallow those pills?"

Jason Richer (to Tracy): "No, they're all prescription pills and I'm taking them all for a f*cking reason."

Tracy Richer: "You did not swallow them?"

Tracy Richer (on the phone): "He's got prescriptions for all kinds of stuff.  He's just telling me now that he's taking his regular dose of prescription."

(SUF 113).  Officers Riccitelli, Landry, and Bergeron responded to the Richer household as did the North Smithfield Rescue, including Lieutenant David Mowry.  (SUF 39, 42).

Jason explained what had happened to both the North Smithfield police and rescue officers. (SUF 37). Tracy heard Jason explain to the police. (SUF 40). The North Smithfield rescue confirmed that Jason had only put four pills into his mouth and then spit them into the trash can.  (SUF 39).  Either the NSPD or the North Smithfield Rescue told Tracy this.  (SUF 114).

Defendants acknowledge that they should consider the possibility that a person involved in a "verbal domestic" dispute may misrepresent what had occurred.  (SUF 115).  Moreover, the NSPD has found out "lots of times" that supposed threats of suicide are not credible.  (SUF 116). Further, Defendants acknowledge that they should have considered Jason's version of events before making any decision.  (SUF 78).   Jason denied being suicidal and showed the pills in the trash can to Defendants.  (SUF 19).  The Incident Report says Officer Bergeron spoke to Jason but it does not include Jason's version of events.  (SUF 42). Officer Bergeron does not remember what Jason said and does not remember what he told Officer Riccitelli or Officer Landry.  (SUF 45).  Nonetheless, the NSPD insisted that Jason go to Landmark Medical Center for a psychological evaluation and they seized his three firearms for "safekeeping" without obtaining his consent or a court order or warrant for either action.  (SUF 60, 62, 63).  The total time elapsed between when Officer Landry arrived on the scene and when Jason left in the North Smithfield rescue was 12 minutes.  (SUF 64).

Officers Riccitelli and Landry said they would make the same decision regardless of Jason's versions of events.  (SUF 117, 120).  Officer Riccitelli claimed that the "key" to the decision was the statement of the Richer's then six-year old son.  (SUF 119).[3]  He based his decision to have Jason taken for a psychological evaluation on his "experience."  (SUF 121). However, he cannot recall any other experience he has had when he went to a house for a domestic disturbance and somebody allegedly threatened suicide by taking pills.  (SUF 122).

Chief Reynolds takes the position that Defendants could have been investigating a crime. (SUF 18).  Other Defendants state there was no crime and no criminal investigation.  (SUF 66). Officer Lafferty was involved in Mr. Richer's efforts to get back his firearms.  (SUF 104).

---

[3] None of the Richers' sons have been deposed in the case.

Defendants' custom and practice was to require persons whose firearms had been seized to

obtain a court order mandating the return of the firearms.  Despite Mr. Richer's repeated efforts

to obtain his firearms, Defendants did not return them until he filed this lawsuit. (SUF 106, 108).

Then, they returned them without a court order.  (SUF 108).

Defendants justify their actions based on the purported consent of Tracy Richer or

"exigent circumstances" or the "community caretaking function" ("CCF") and the "totality of the

circumstances." (SUF 67). However, Defendants cannot identify any legal authority, or written

policy, or formal training respecting the CCF that authorizes their actions.  (SUF 16, 19, 20, 21,

68, 70-72, 79-80, 84, 96). Similarly, Defendants cannot identify any specific set of factors that

constitute the "totality of circumstances" to be considered in making such decisions. (SUF 78,

79). Rather, Defendants acknowledge that NSPD officers make ad hoc decisions based on their

individual experiences.  (SUF 85).  Defendants' justification boils down to the fact that they

were told by the police dispatcher that Mr. Richer had made an allegedly suicidal statement and

that they did not want to be held liable if they failed to take such steps. (SUF 93, 106).

Defendants' unwritten policy of seizing firearms for safekeeping and requiring allegedly suicidal

people to have psychological evaluations is an ongoing practice.  (SUF 109, 110).

Mr. Richer was neither at acute nor imminent risk of suicide on September 28, 2008.

(SUF 97).  The NSPD officers were inadequately trained to reasonably screen for Mr. Richer's

risk of suicide on September 28, 2008.  (Id.). The NSPD officers were inadequately trained

and/or failed to follow basic policies in place to interview and assess Mr. Richer on that night.

(Id.).  The NSPD officers made no independent evaluation of Mr. Richer's mental health and risk

for suicide, relying solely on secondary reports of what he did and said.  (Id.).  The NSPD

officers lacked any reasonable criteria by which they could evaluate either Mr. Richer's risk for

suicide, mental status or degree of psychiatric crisis necessitating a recommendation for further evaluation at a hospital emergency department.  (Id.).  The NSPD officers did not apply or rely upon appropriate criteria or reasonable and standard police procedures in determining that Mr. Richer's firearms needed to be confiscated on September 28, 2008.  (Id.).

ISSUES OF LAW

Defendants' motion fails to recognize what may be significant differences between federal and state law.  To the contrary, Defendants mistakenly assume Plaintiff's rights under the Second and Fourth Amendments are the same as Plaintiff's rights under Art. 1, Sections 2 and 6 of the Rhode Island Constitution.  (Defendants' Memorandum, p. 13, nn. 6 and 7).  However, based on Rhode Island Supreme Court decisions, this assumption is incorrect. These are the issues of law:

1. Plaintiff's claims are not barred by any statute of limitations because Defendants' actions constituted continuing violations that tolled the running of any applicable statutes.

2. Plaintiff has a claim for damages under the Rhode Island Firearms Act and under the Rhode Island Mental Health Law/Act;

3. Under Rhode Island constitutional law, Plaintiff has an "absolute right" to keep arms in his house;

4. The Second Amendment protects Plaintiff's right to keep specific firearms in his home;

5. The Rhode Island Supreme Court has said that Art. 1, Sec. 6 of the Rhode Island Constitution can provide broader protections than the Fourth Amendment;

6. Defendants violated Plaintiff's constitutional protections against unreasonable searches and seizures;

7.  The Community Caretaking Function does not pertain here where neither state law nor "sound police procedures" provide for its application;

8.  Defendants are not entitled to qualified immunity where Plaintiff's rights were well-established under state and federal law;

9.  Defendants converted Plaintiff's firearms;

10. Defendants are not entitled to state law immunity;

11. Plaintiff's claim for injunctive relief is not speculative.

**ARGUMENT**

I.    **PLAINTIFF'S CLAIMS ARE NOT BARRED BY ANY STATUTE OF LIMITATIONS BECAUSE DEFENDANTS' ACTIONS CONSTITUTE CONTINUING VIOLATIONS THAT TOLL THE RUNNING OF ANY SUCH STATUTE**

Plaintiff argued in his second motion for summary judgment that Defendants' actions constitute "continuing violations" that toll the statute of limitations on his claims under the Fourth Amendment.  (ECF Doc. No. 77 ("Plaintiff's Second MSJ Memorandum"), pp. 9-13). Plaintiff incorporates that argument here by reference.

Plaintiff submits that the same argument applies to Defendants' argument that the three-year statute of limitations set forth in R.I.Gen.L.§ 9-1-25 governs Plaintiff's conversion claim against the Town of North Smithfield, as well as his other claims under state law.  This Court has applied the "continuing violation" doctrine to civil rights claims arising under Rhode Island state law.  Rathbun v. Autozone, Inc., 253 F.Supp.2d 226, 231 (D.R.I. 2003).  Similarly, Justice Gibney has applied the doctrine to a consumer claim.  Keough v. Pawtucket Postal Employees Credit Union, No. C.A. 93-2968, 1993 WL 853854 at *4 (R.I.Super. Oct. 14, 1993).  Here, Plaintiff made repeated efforts to get the Town to return his firearms to him.  The Town

repeatedly refused until he filed this lawsuit.   Plaintiff submits that the Court should apply the continuing violation doctrine to all his state law claims against the Town.

## II.   RHODE ISLAND LAW PROVIDES A DAMAGES REMEDY TO VICTIMS OF CRIMES INCLUDING THE FIREARMS ACT AND THE MENTAL HEALTH LAW

Rhode Island constitutional provisions and statutes provide a damages remedy to persons injured by violations of criminal statutes, including the Rhode Island Firearms Act, R.I.Gen.L. § 11-47-1, et seq., ("RIFA"), and the Mental Health Law. R.I.Gen.L. § 40.1-5-1, et seq. ("RIMHL") (collectively, "the Acts").  The constitutional provisions include Art. 1, Sec. 5 which reads, in part: "Every person within this state ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which may be received in one's person, property or character."  R.I.Const., Art. 1, Sec. 5.   Similarly, Article 1, Sec. 23 states in relevant part: "A victim of a crime…shall be entitled to receive, from the perpetrator of the crime, financial compensation for any injury or loss caused by the perpetration of the crime…" (emphasis added). R.I.Const., Art. 1, Sec. 23.

The General Assembly has effectuated these provisions through R.I.Gen.L. § 9-1-2, which provides, *inter alia*:

> Whenever any person shall suffer any injury to his person, reputation or estate by reason of the commission of any crime or offense, he or she may recover his or her damages for the injury in a civil action against the offender and it shall not be any defense to such action that no criminal complaint for the crim or offense has been made…

R.I.Gen.L. § 9-1-2.  Notably, the statute contains no exceptions.

Rhode Island courts have held or noted that this statute provides a civil claim for damages in a variety of circumstances in which the defendant's conduct constituted a crime, regardless of whether defendant was charged or convicted, including: forgery, Western Reserve

8

Life Assur. Co. of Ohio v. Caramadre, 847 F.Supp.2d 329 (D.R.I. 2012); involuntary manslaughter, Gray v. Derderian, 400 F.Supp.2d 415 (D.R.I. 2005); assault and battery, Iacampo v. Hasbro, 929 F.Supp. 562 (D.R.I. 1996); illegal drug testing, Goddard v. APG Security_RI, LLC, 134 A.3d 173, 174 (R.I. 2016); damage to a historic stone wall, Morabit v. Hoag, 80 A.3d 1 (R.I. 2013); wrongful death, Tyre v. Swain, 946 A.2d 1189 (R.I. 2008); invasion of privacy and wiretapping, Cady v. IMC Mortgage Co., 862 A.2d 202 (R.I. 2004); extortion, Mello v. DaLomba, 798 A.2d 405 (R.I. 2002); conversion, Ludwig v. Kowal, 419 A.2d 297, 303 (R.I. 1980) (Weisberger, J.); embezzlement, DaCosta v. Rose, 70 R.I. 163, 37 A.2d 794 (1944); larceny of corporate opportunity and by false pretenses, Baris v. Steinlage, C.A. 99-1302, 2003 WL 23195568 at *28 (R.I.Super. Dec. 12, 2003) (Savage, J.); larceny by false pretenses, Rhode Island Hospital Trust National Bank v. Ellman, P.C. 87-0501, 1988 WL 1017221 at *2 (R.I.Super. Apr. 5, 1988); perjury, Chernov v. Schein, No. 85-2577, 1986 WL 716027 at *1 (R.I.Super. Apr. 24, 1986).

Here, both the RIFA and the RIMHL contain provisions making violations of the Acts criminal.  R.I.Gen.L. § 11-47-26, and § 40.1-5-38, respectively.  Nothing in those Acts exempts them from the civil damages remedy provided by § 9-1-2.  Indeed, Justice Weisberg has said of the RIMHL: "The failure of public officials to apply promptly for required judicial authorization to commit or retain involuntary patients may give rise to civil liability in the even that such a patient should be wrongfully deprived of his liberty."  In re Doe, 440 A.2d 712, 716 (R.I. 1982). Accordingly, Plaintiff has a damages remedy for the violation of those two Acts.

In its 2016 Decision, Richer v. Parmelee, 189 F.Supp. 334 (D.R.I. 2016) (the "2016 Richer Decision"), the Court cited a single Superior Court decision, decided in 1981, for the proposition that the Rhode Island Firearms Act, does not provide a damages remedy for its

violation, <u>Galipeau v. State</u>, No. 77-574, 1981 WL 390927 (R.I.Super. Mar. 12, 1981)

("<u>Galipeau</u>").  With due respect to the author of the <u>Galipeau</u> decision, it is not applicable here

for a variety of reasons.  First, the <u>Galipeau</u> Court did <u>not</u> decide that there was no damages

remedy available under RIFA.  The Court did not even address that issue, nor did it even

mention § 9-1-2.  (Indeed, it could not because the General Assembly adopted § 9-1-2 in 1984,

some three years later).  Instead, the Court dismissed plaintiff's federal civil rights claim finding

that defendants had acted in good faith.  <u>Id.</u> at *2.  It then held that plaintiff was entitled to return

of the firearm under RIFA.  <u>Id.</u> at *3.  Second, even if the <u>Galipeau</u> Court had held was no

damages remedy for a criminal violation of the RIFA, that decision was overturned by the

enactment of § 9-1-2 in 1984 and of Art. 1, Sec. 23 of the Rhode Island Constitution in 1986: "A

victim of a crime…shall be entitled to receive, from the perpetrator of the crime, financial

compensation…"  R.I.Const., Art. 1, Sec. 23.

Defendants make a meritless argument that they did not violate the Rhode Island Mental

Health Law because they only attempted to get Plaintiff committed for mental health reasons, but

did not succeed.  (Defendants' Memorandum, pp. 33-37).  As an initial matter, the RIMHL

states:

> Any person who knowingly and willfully <u>conspires</u> with any other person
> unlawfully to improperly cause to be admitted or certified to any facility, any
> person not covered by the provisions of this chapter, shall on conviction therefor,
> be fined not exceeding five thousand dollars ($5,000) or imprisoned not
> exceeding five (5) years at the discretion of the court. (emphasis added).

R.I.Gen.L § 40.1-5-38.  Under Rhode Island law, a criminal conspiracy is complete once the

conspirators agree to commit the crime. <u>State v. Romano</u>, 456 A.2d 746, 757 (R.I. 193).  In

<u>Romano</u>, the Court said:

> [O]nce two or more individuals have agreed to commit an unlawful act, the crime
> of conspiracy is complete.  No further action in furtherance of the conspiracy need

occur.  This is of no consequence whether the agreement is successfully or substantially effectuated.

Id. citing State v. Ahmadjian, 438 A.2d 1070, 1084-85 (R.I. 1981).  It is not necessary that the conspirators actually commit the crime they are conspiring to commit.  Romano, 456 A.2d at 757.  Thus, it is sufficient here that Defendants agreed to do acts that violate RIMHL.  It is not disputed that Defendants agreed to send Plaintiff to the hospital for a psychological evaluation.  (SUF 53, 63, 94-95).  It is legally irrelevant whether Plaintiff was actually admitted.

Further, Defendants cite dictum in the footnote of a Superior Court decision as the only authority for their argument that it is not a crime to attempt unsuccessfully to violate the RIMHL (or, perhaps, RIFA).  State v. Lopez, P1/2014-0822 AG, at p. 6, n.6 (R.I.Super. Sept. 15, 2015).  As an initial matter, Plaintiff notes that case did not address either Act or a defendant's civil claims for violation of it.

Nonetheless, the Rhode Island Supreme Court has that a criminal statute prohibits an attempt to violate it even if the statute does not expressly refer to an attempt.  See, State v. Gonsalves, 476 A.2d 108, 111 (R.I. 1984); State v. Latraverse, 443 A.2d 890, 895-96 (R.I. 1982).  In Gonsalves, defendant argued he could not be convicted of unlawful use of a credit card where the language of the statute did not refer to an unsuccessful attempt.  The Supreme Court said:

> Although legislative intent is primarily sought from the language used in the statute, we must look to the statutory purpose.  This court should not adopt a construction that would defeat the evident purpose of the statute.  [citation omitted].  Although penal statutes are to be strictly construed, they should not be interpreted in a manner that would thwart a clear legislative intent.  [citation omitted].  Moreover, we will not attribute to the Legislature a meaningless or absurd result.  [citation omitted].  It is clear from a reading of the statute that the Legislature intended to prohibit the unlawful use of a credit card with intent to defraud even where that intent is unsuccessful.

476 A.2d at 111.

Here, it is clear that the General Assembly intended to criminalize an effort to commit a person for mental health reasons without an appropriate court order even if the attempt was unsuccessful. It does not matter that the hospital personnel who examined Plaintiff concluded, correctly, that he was not suicidal. Defendants' interpretation of the statute is non-sensical. It would make them criminally liable only if the hospital personnel had agreed with them (without an appropriate court order). Defendants did everything they could to violate the statute. The fact that the hospital personnel properly determined that Plaintiff was not a threat to his own well-being does not, and should not, excuse Defendants' attempt to violate the statute.

Similarly, it is clear that the General Assembly made criminal any violation of the RIFA. R.I.Gen.L. § 11-47-26. And, here, there is no doubt that Defendants seized Plaintiff's firearms. Moreover, none of the grounds for which a person can be deprived of the possession of his firearms apply. R.I.Gen.L. § 11-47-5, 11-47-6. (SUF 2-3). The only arguable one would be if Plaintiff had been found mentally incompetent, R.I.Gen.L. § 11-47-6, but he was not. (SUF 2).

Plaintiff notes the Defendant Town of North Smithfield's argument that it cannot be a criminal offender, as a matter of law. (Defendant's Memorandum, p. 8, 34-35, nn. 3, 8). However, it is well-settled that local governments can be prosecuted for the violation of criminal statutes in Rhode Island and elsewhere. See, State v. Town of Cumberland, 6 R.I. 496 (1860); see also, Stuart P. Green, "The Criminal Prosecution of Local Governments," 72 North Carolina L. Rev. 1197 (1994) (and cases cited therein). In State v. Town of Cumberland, the State of Rhode Island prosecuted the Town for failing to maintain a highway in the Town and a jury returned a guilty verdict. The trial court denied a motion for a new trial and the Supreme Court affirmed. 6 R.I. at 498-99. Moreover, there are federal cases in which it is clear that municipality can be a "person" and can be convicted of violating federal criminal statutes. See,

e.g., <u>United States v. Little Rock Sewer Comm.</u>, 460 F.Supp. 6 (E.D.Ark. 1978) (criminal prosecution for violation of federal environmental statute).  Accordingly, the Town of North Smithfield can be deemed an offender of the RIFA and the RIMHL.

Defendant cites a quote to <u>City of Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247, 261 (1981), that "[m]unipal corporations can not…do a criminal act or a willful and malicious wrong."  (Defendants' Memorandum, p. 8).  The quote, however, is actually from an 1877 Missouri case, <u>Hunt v. City of Boorville</u>, 65 Mo. 620 (1877), which is quoted in the Supreme Court decision.  That may be the law in Missouri but it is not the law here, nor is it the law in many other jurisdictions.  See Stuart P. Green, "The Criminal Prosecution of Local Governments," 72 North Carolina L. Rev. 1197 (1994) (and cases cited therein).  Moreover, federal law often considers municipalities as a "person."  <u>Id.</u> at pp. 1215-1221.  Similarly, the Supreme Court has made clear that municipalities are persons subject to civil liability under civil rights laws (which is the point of Plaintiff's lawsuit).  <u>Monell v. Department of Social Services</u>, 436 U.S. 65 (1978).

Finally, Defendant's argument that the Town cannot violate § 9-1-2 because that argument only applies to individuals is meritless. The statute provides for a cause of action against "the offender."  R.I.Gen.L. § 9-1-2.  Black's Law Dictionary says the word "offender" is "[c]ommonly used in statutes to indicate <u>[a] person</u> implicated in the commission of a crime…" (emphasis added).  <u>Black's Law Dictionary, 4th Ed.</u>, p. 1232 (West Publishing 1951).  At common law, a "person" includes artificial persons such as municipalities. <u>Id.</u>, p. 1300, citing <u>Lancaster Co. v. Trimble</u>, 34 Neb. 752, 52 N.W. 711 (1892); see also, <u>Roma Construction Co., Inc. v. aRusso</u>, 906 F.Supp. 78, 83 (D.R.I. 1995), rev'd on other grds, 96 F.3d 566 (1st Cir. 1996) (municipalities may be considered "persons" under federal civil rights statute).  Similarly, under

Rhode Island's laws of statutory construction, a "person" includes "bodies politic."  R.I.Gen.L. § 43-3-6.  Since a municipality is a person and it can violate a criminal statute, it can be an offender.

### III.   PLAINTIFF HAS AN ABSOLUTE RIGHT TO KEEP FIREARMS IN HIS HOME

Under Rhode Island constitutional law, at least, Plaintiff has an "absolute right" to keep arms in his house.  Mosby v. Devine, 851 A.2d. 1031, 1043 n. 7 (R.I. 2004) ("[O]ne has an absolute right to keep firearms in one's home or place of business.").  To Plaintiff's knowledge, the Rhode Island Supreme Court has not defined an absolute right but legal commentators and other courts have done so.  Black's Law Dictionary says a property right that is absolute "gives to the person in whom it inheres the uncontrolled dominion over the object at all times and for all purposes."  Black's Law Dictionary (4th ed.), p. 1487 (West Publ. 1951).  Blackstone says that there are "absolute" and "relative" individual rights: "[A]bsolute, which are such as appertain and belong to particular men, merely as individuals or single persons; relative, which are incident to them as members of society, and standing in various relations to each other."  1 Blackstone's Commentaries on the Laws of England, 123 (1765).

Thus, an absolute right is one that applies specifically to Plaintiff and that State cannot limit so long as holder of the right is competent to exercise his right and does not expressly waive it.  The Arkansas Supreme Court has said: "An absolute right has been defined as one that 'give to the person in whom it inheres the uncontrolled dominion over the object at all times and for all purposes.' The absolute right to nonsuit may not be denied by the trial court."  White v. Perry, 348 Ark. 675, 681, 74 S.W.3d 628, 631 (2002), quoting, Black's Law Dictionary 1324 (6th ed. 1990); Marin v. State, 851 S.W.2d 275, 278-80 (Tex.Crim.App. 1993), overruled on other grds, Cain v. State, 947 S.W.2d 262 (Tex.Crim.App. 1997) (holding that absolute rights are

rights that can be lost, if at all, only through express waiver); see also, Salinas v. Texas, 570 U.S. 178, 184 (2013)("[A] criminal defendant has an 'absolute right not to testify.'"); Perry v. Leeke, 488 U.S. 272, 281 (1989) (a criminal defendant who becomes a witness "has an absolute right [to consult with his lawyer] before he begins to testify."); State v. Sampson, 24 A.2d 1131, 1140 (R.I. 2011), quoting State v. Moran, 605 A.2d 494 (R.I.1992) (a defendant in a criminal trial has an "absolute right to waive trial by jury which right" which "is subject only to the procedural requirement that a trial justice determine that the defendant understands and accepts the consequences of executing a waiver.").

By comparison, a fundamental right that is not absolute is one upon which the State can impose reasonable restrictions.  See, Buck v. Davis, 137 S.Ct. 759, 773 (2017) ("A state prisoner whose petition for a writ of habeas corpus denied by a federal district court does not enjoy an absolute right to appeal."); Commodity Futures Trading Commission v. Shor, 478 U.S. 833, 848 (1986) ("Article III does not confer on litigants an absolute right to the plenary consideration of every nature of claim by an Article III court.");  Cool Moose Party v. State of Rhode Island, 6 F.Supp.2d 116, 119-20 (D.R.I. 1998) (the right to vote and the right to associate for political purposes are not absolute but are subject to time, place and manner restrictions).

The United State Supreme Court has not addressed whether the Second Amendment provides an absolute right to keep firearms in the home, though the First Circuit has recently confirmed that the possession of firearms in the home is a "core Second Amendment right." Gould v. Morgan, 907 F.3d 659, 671-72 (1st Cir. 2018).  The Court said:

> The home is where families reside, where people keep their most valuable possessions, and where they are the most vulnerable (especially while asleep at night).  Police may not be able to respond to calls for help quickly, so an individual within the four walls of his own house may need to provide for the protection of himself and his family in case of emergency.  Lastly—but surely not

least—the availability of firearms inside the home implicates the safety only of those who live or visit there, not the general public.

Id.

Even if Plaintiff's rights under the Second Amendment are not as strong as his rights under Article 1, Sec. 2 of the Rhode Island Constitution, then this Court should recognize the difference. Here, Plaintiff never waived his absolute right to keep firearms in his house. Accordingly, Defendants could not seize his firearms in these circumstances.

## IV.    DEFENDANTS' VIOLATED PLAINTIFF'S SECOND AMENDMENT RIGHTS

Defendants argue that they did not violate the Second Amendment because it does not protect a right to specific firearms, only a right to have firearms, generally, and they did not bar Plaintiff from acquiring other firearms.  (Defendants' Memorandum, pp. 9-11).  This Court made the same point in its 2016 Richer Decision.  189 F.Supp.3d at 342-43.

Plaintiff incorporates by reference the arguments it made in his memorandum in support of his first Motion for Partial Summary Judgment.  (ECF Doc. No. 12-1, pp. 18-28).  Other federal courts have recognized that the Second Amendment protects persons not only against a complete bar of access to firearms but also against unreasonable time, place and manner restrictions on firearm possession.  Heller v. District of Columbia, 801 F.3d 264, 280-81 (D.C.Cir. 2015) (striking down firearm regulations including a requirement that firearms be inspected and a limitation on the number of purchases per 30-day period); Jackson v. City and County of San Francisco, 746 F.3d 953, 961 (9th Cir. 2014) (analogizing Second Amendment rights to First Amendment rights).

Defendants' position that they can seize specific firearms so long as they do not bar Plaintiff from obtaining other firearms is an unreasonable time, place, or manner restriction.  For example, Plaintiff may not be barred from possessing firearms, even for a short period, because

Defendants have an unfounded concern that he has psychological issues.  See Tyler v. Hillsdale County Sheriffs Department, 837 F.3d 678, 699 (6th Cir. 2015) (holding that a federal statute prohibiting possession of firearms by a person who had ever been committed to a mental institution must be analyzed under intermediate scrutiny); Keyes v. Sessions, 282 F.Supp.3d 858, 878 (M.D.Penn. 2017) (striking down as unconstitutionally applied to plaintiff the same federal statute addressed in Tyler).[4]

In addition, Plaintiff also notes Judge Elrod's dissenting opinion rejecting the argument that the Second Amendment does not protect specific firearms.  Houston v. City of New Orleans, 675 F.3d 441 (5th Cir. 2012), opinion withdrawn and superceded on rehearing, 682 F.3d 361 (5th Cir. 2012).  Judge Elrod relies in part on the dissent of former Judge, now Supreme Court Justice, Kavanaugh, in Heller v. Dist. of Columbia, 670 F.3d 1244, 1271 (D.C.Cir. 2011).  Judge Elrod highlights both that the Supreme Court has made clear that the Second Amendment is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees," 675 F.3d at 450, citing McDonald v. City of Chicago, 130 S.Ct. 3020 (2010), and that interpreting the Second Amendment requires "an exhaustive historical analysis.  675 F.3d at 449, quoting, Heller v. District of Columbia, 554 U.S. 570, 626 (2008).  None of the cases holding that the Second Amendment only protects a general right to keep firearms--instead of a right to specific,

---

[4] Plaintiff notes that on January 22, 2019, the Supreme Court granted certiorari on a petition presenting the question: "Whether New York City's ban on transporting a licensed, locked and unloaded handgun to a home or shooting range outside city limits is consistent with the Second Amendment, the Commerce Clause and the constitutional right to travel." Opinion below, New York State Rifle & Pistol Association Inc. v. City of New York, New York, 883 F.3d 45 (2nd Cir. 2018).

traditional firearms--recognize the Supreme Court's directives in this area.  675 F.3d at 405-51 and n. 4.  None of those cases provide any historical analysis supporting those holdings.

Judge Elrod particularly criticizes the argument that the Second Amendment should be applied differently than other personal rights protected in the Bill of Rights:

> [A]n equivalent *per se* exception for particular exercises of the right at stake (so long as other exercises of that right are permitted) would be intolerable.  Consider, for example, a court holding that the Free Speech Clause affords no protection against the government preventing the publication of a particular editorial in the *New York Times* because there are plenty of other newspapers that might publish the piece.  Or consider a court holding that the Fourth Amendment is inapplicable to the seizure of a specific automobile so long as the government does not prevent the owner from borrowing, renting or purchasing a replacement vehicle.

Id. at 450.  As Judge Elrod notes:

> [T]he Supreme Court has expressly rejected this sort of reasoning in the First Amendment context: "'[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.'"  Southeastern Promotion, Ltd. v. Conrad, 420 U.S. 546, 556, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (quoting Schneider v. State of New Jersy, Town of Irvington, 308 U.S. 147, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939)).  Heller itself rejected a strikingly similar argument: "It is no answer to say…that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed."  554 US. At 629, 128 S.Ct 2783, see also, Heller, at 1289, [citation omitted] ("[T]hat's a bit like saying books can be banned because people can always read newspapers.").

Id. at 450 n. 2.  Similarly, as Judge Elrod commented, the Eighth Circuit has said: "We do not foreclose the possibility that some plaintiff could show that a state actor violated the Second Amendment by depriving an individual of a specific firearm."  Walters v. Wolf, 660 F.3d 307, 318 (8th Cir. 2011).

This is just such a case.  Defendants specifically seized firearms, not to prevent Plaintiff from committing some harm generally, but to protect themselves from perceived liability and public criticism.  If Plaintiff's possession of guns generally was a threat to public safety, then it was incumbent on Defendants to take such steps as the law permitted to prevent him from having

any guns.  Defendants did not do that.  Instead, they merely seized Plaintiff's firearms and refused to return those specific guns.  This is a specific effort to deprive Plaintiff from keeping those specific guns in his home without a legitimate basis.  There can be no clearer situation appropriate for the application of the Second Amendment.

## V.   RHODE ISLAND'S CONSTITUTION PROVIDES EVEN STRONGER PROTECTIONS AGAINST UNREASONABLE SEARCHES AND SEIZURES THAN THE FOURTH AMENDMENT

The Rhode Island provision provides Rhode Island citizens a "double barreled source of protection which safeguards their privacy from unauthorized and unwarranted intrusions…" State v. von Bulow, 475 A.2d 995, 1019 (R.I. 1984), quoting State v. Sitko, 460 A.2d 1, 2 (R.I. 1983).  "This dual safeguard flows directly from the United States Supreme Court's explicit acknowledgement of the 'right of state courts, as final interpreters of state law, 'to impose higher standards on searches and seizures than [those] required by the Federal Constitution,' even if the state constitution provision is similar to the Fourth Amendment."  Id., quoting State v. Benoit, 417 A.2d 895, 899 (1980) (quoting Cooper v. California, 386 U.S. 58, 62 (1967)).

The Rhode Island Supreme Court has specifically held on several occasions that Art. 1, Sec. 6 provides stronger protections against searches and seizures than the Fourth Amendment. Pimental v. Department of Transportation, 561 A.2d 1348, 1352-53 (R.I. 1989) (finding that drunk driving roadblocks violate the right of privacy under the R.I. Constitution); State v. von Bulow, 475 A2d 995, 1019-20 (R.I. 1984) (holding that a warrantless search of defendant's private bag in his home violated the Rhode Island Constitution); State v. Maloof, 114 R.I. 380, 333 A.2d 676, 681 (1975) (affirming the suppression of evidence obtained through wiretaps authorized with improper orders).

Moreover, the Rhode Island Supreme Court has repeatedly distinguished between searches and seizures in the home as compared to in an automobile or elsewhere because people have strong rights of privacy in their homes:

- "The warrant requirement serves to guard the privacy and sanctity of the home from "zealous" police officers "thrust[ing] themselves into a home" while ardently "engaged in the often competitive enterprise of ferreting out crime."   State v. Terzian, 162 A.3d 1230, 1239 (R.I. 2017), quoting Johnson v. United States, 333 U.S. 10, 13 (1948).

- "An individual's right to privacy in his home is rooted in the clear language of the Fourth Amendment: "The right of the people to be secure in their * * * houses * * * shall not be violated * * *."  State v. Gonzalez, 136 A.3d 1131, 1146 (R.I. 2016).

- "Casas had a reasonable expectation of privacy with respect to both 224 Amherst Street and his home. The evidence disclosed that defendant's wife was an owner of the Amherst Street building, and defendant collected rents and made repairs."  State v. Casas, 900 A.2d 1120, 1130 (R.I. 2006).[5]

Moreover, the Rhode Island Supreme Court has repeatedly relied on the United States Supreme Court's precedent that are most protective of a person's right of privacy in his or her home. See, e.g. State v. Terzian, supra, citing Johnson v. United States, supra; State v. Gonzalez, supra, citing Payton v. New York, 445 U.S. 573 (1980).

Indeed, in 1980, the General Assembly recognized the right of privacy by creating a cause of action for violation of that right, which includes "[t]he right to be secure from

---

[5] By contrast, the Court has found there is not a reasonable expectation of privacy in other circumstances. See, e.g., State v. Patino, 93 A.3d 40 (R.I. 2014) (no reasonable expectation of privacy in text messages); State v. Bertram, 591 A.2d 14, 20-21 (R.I. 1991) (defendant had no reasonable expectation of privacy in automobile his wife leased).

unreasonable intrusion upon one's physical solitude or seclusion."  R.I.Gen.L. § 9-1-38.1(a)(1);

DaPonte v. Ocean State Job Lot, Inc., 21 A.3d 248, 252 (R.I. 2011), citing Swerdlick v. Koch,

721 A.2d 849, 857 (R.I. 1998) ("Swerdlick stand unequivocally for the proposition that a

person's private residence is of the species of 'something that is entitled to be private or would

be expected to be private.'").

 In Gonzalez, the defendant moved to suppress evidence respecting his statement about

the location of a gun the police were questioning him about and certain evidence derived from a

search of his residence including a handgun case, a magazine, and a receipt for a gun purchase.

The police were investigating a shooting of another person.  The police did not obtain a warrant

to arrest Gonzalez nor a warrant to search his apartment.  They argued that they had the consent

of the defendant's mother, who also lived in the apartment, to search it and that there were

exigent circumstances.  The trial court denied the motion on the grounds that there were exigent

circumstances justifying the failure to obtain warrants because the police were attempting to

apprehend an armed suspect within hours of him allegedly shooting a person.

 The Supreme Court again quoted Johnson v. United States: "When the right of privacy

must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not

by a policeman ***."  Id. at 1146, quoting, Johnson, 333 U.S. at 14.  The Court further quoted

the United States Supreme Court:

> "In terms that apply equally to seizures of *** persons, the Fourth Amendment
> has drawn a firm line at the entrance of the house.  Absent exigent circumstances,
> that threshold may not reasonably be crossed without a warrant."  Payton [v. New
> York], 445 U.S. [573], 590 (1980).  Therefore "searches and seizures inside a
> home without a warrant are presumptively unreasonable."  Id. at 586.  Moreover,
> this Court has recognized that fundamental principle, stating that "[t]he Fourth
> Amendment generally prohibits the warrantless entry of a person's home, whether
> to make an arrest or to search for specific objects."  [State v.] Linde, 876 A.2d
> [1115], 1124 [(R.I. 20050], (quoting Illinois v. Rodriguez, 497 U.S. 177, 181
> (1990)).

136 A.3d at 1146-47).[6]  The Court said, with respect to the exigency of the circumstances, "[w]hen an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant."  Id. at 1151, quoting Welsh v. Wisconsin, 446 U.S. 740, 751 (1984).  Further, exigent circumstances require that there be a compelling need for immediate action and "no time to secure a warrant."  Id. at 1152, quoting United States v. Adams, 621 F.2d 41, 45 (1st Cir. 1980).  The Court found there was no exigent circumstance.  Id. at 1154.

Here, four police officers responded to Plaintiff's house.  They were in control of the situation.  Plaintiff was not holding his firearms, nor was he even near them.  Even assuming the circumstances justified a seizure of Plaintiff's firearms and of Plaintiff himself, for a psychological evaluation, there was no reason why one or more officers could not have retained control of the situation while the others obtained warrants or court orders authorizing the seizures.  In short, there were no exigent circumstances that justified these seizures without appropriate court orders.

Defendants rely on non-Rhode Island case law to support their argument that the mere possibility that a person may be suicidal justifies police who seize that person, require him to have a psychological evaluation, and seize his firearms for safekeeping, all without a court order.  However, Rhode Island statutes, including the RIMHL, the RIFA, and the Warrant Statute, R.I.Gen.L. § 12-5-1, et seq., reinforced by the Rhode Island Supreme Court's decisions, refute that argument.  Even if state or local governments elsewhere authorize these kind of police actions, Rhode Island does not.

---

[6] The Court first found that the mother's consent to a search of the apartment was not voluntary. 136 A.3d at 1150.

Under the Fourth Amendment, there were no exigent circumstances here that excuse Defendants' failure to obtain a court order.  See Taylor v. Farmer, 13 F.3d 117, 121 (9th Cir. 1993) (no exigent circumstances where plaintiff was a "physically unimposing woman in her forties" and the police failed to exercise an appropriate level of care in their investigation).

## VI.   DEFENDANTS VIOLATED PLAINTIFF'S FOURTH AMENDMENT RIGHTS AGAINST UNREASONABLE SEARCHES AND SEIZURES

Plaintiff moved for summary judgment on his claims under the Fourth Amendment and Art. 1, Sec. 6 of the Rhode Island Constitution that Defendants violated his rights against unreasonable searches and seizures.    Plaintiff incorporates those arguments here by reference. (Plaintiff's Second MSJ Memorandum, pp. 14-32).

It appears that Defendants argue that they are not required to obtain a court order before certifying a person for a psychological evaluation.  (Defendants' Memorandum, p. 33-37). However, the statute provides for such action only if "no physician is available" to certify that a person's "continued unsupervised presence in the community would create an imminent likelihood of harm by reason of mental disability."  R.I.Gen.L. § 40.1-5-7(a).  Defendants made no effort to consult with any medical professionals before requiring plaintiff to have a psychological evaluation.  (SUF 2, 64, 72).  Further, Defendants are not qualified to diagnose mental illness.  (SUF 22).  Accordingly, the statute requires police to obtain a court order. R.I.Gen.L. §§ 40.1-5-7(e), 40.1-5-8.

In any event, it is clear that the Fourth Amendment applies to such certifications and, accordingly, a court order is required, barring exigent circumstances.  (Plaintiff's Second MSJ Memorandum, pp. 14, 23-28).  There were no such circumstances here.  The Court should interpret the RIMHL to avoid a constitutional issue.  See, I.N.S. v. St. Cyr, 533 U.S. 289, 299-300 (2001); Hometown Properties, Inc. v. Fleming, 680 A.2d 56, 60 (R.I. 1996).  Accordingly, it

should interpret the Act to require the police who wish to require a psychological evaluation to obtain a court order.

## VII.   THE COMMUNITY CARETAKING FUNCTION DOES NOT APPLY HERE WHERE NEITHER RHODE ISLAND LAW NOR SOUND POLICE PROCEDURE SUPPORT ITS APPLICATION

Plaintiff has moved for summary judgment with respect to Defendants' assertion of the community caretaking function.  (Plaintiff's MSJ Memorandum, pp. 37-49).  Plaintiff incorporates those arguments by reference here.

Defendants argue that their actions in seizing Plaintiff and his firearms are a reasonable exercise of their community caretaking function.  For example, Defendants' argue that they did not violate Plaintiff's Second Amendment rights because they "only" seized specific firearms in his possession; they did not prevent him from obtaining other firearms.  However, this simply proves that Defendants' seizure of Plaintiff's "traditional" firearms was irrational and cannot be justified under either a Fourth Amendment or Fourteenth Amendment analysis.  Defendants' argument acknowledges that Plaintiff, who was supposedly an imminent threat to himself and perhaps others, could have purchased or obtained other firearms immediately after the seizure and used them on himself or others, and Defendants did nothing to stop that.  Defendants' argument simply proves the obvious:  the seizure of Plaintiff's firearms was not a legitimate law enforcement or community safety action; it was undertaken only to insulate themselves from legal liability and public criticism.  This justification is entitled to no constitutional respect.

More importantly, the Supreme Court has made clear that the application of the community caretaking function depends on "state law and sound police procedures." Cady v. Dombrowski, 413 U.S. 447, 433 (1973).   As set forth here and in Plaintiff's summary judgment motion, Rhode Island law strictly limits the use of the community caretaking function.  The RIMHL requires

police to obtain a court order before requiring a person to have a psychological evaluation. R.I.Gen.L. §§ 40.1-5-7(e), 40.1-5-8.  In particular, the police must show that the person presents a "imminent" threat of harm to himself or others.  R.I.Gen.L. § 40.1-5-7(a).  The Rhode Island has carefully limited the meaning of "imminent threat." <u>State v. Urena</u>, 899 A.2d 1281, 1290 (R.I. 2006) (affirming rejection of "battered woman" defense where there was no evidence the victim "was about to inflict death or serious bodily injury upon" defendant).  The RIFA specifically defines the circumstances under which the police can deny a person possession of a firearm. R.I.Gen.L. § 11-47-5, 11-47-6.  The Rhode Island Supreme Court has strictly enforced these statutes.

Further, Defendants' own General Orders and training demonstrate that no sound police procedure supported their seizure of Plaintiff and his firearms.  Those GOs set forth Defendants' police procedures.  (SUF 14).  There is no GO authorizing the seizure of persons and firearms in these circumstances.  (SUF 19). To the contrary, Defendants' GOs state they are not qualified to diagnose mental illness and that in such circumstances they should follow RIMHL.  (SUF 22, 25). That Act requires them to obtain a court order to compel a psychological evaluation.  R.I.Gen.L. §§ 40.1-5-7(e), 40.1-5-8.  The GOs set forth when exigent circumstances exist that permit police to seize people and property without court orders in a criminal context.  (GO 100.20, Part IV(B), (F), SUF 17, Ex. H).  Defendants claim that the exigent circumstances were that plaintiff put pills in his mouth and said he was not going to wake up. (Landry depo., pp. 105-06).  However, they knew by the time they seized Mr. Richer and his firearms that he was not suicidal and had not attempted suicide.  (SUF 20, 50-51). Rather, they made their decision to protect themselves from liability and criticism.  (SUF 93, 106).  In essence, Defendants argue that Plaintiff has fewer

constitutional and legal protections than he would have had in a criminal investigation. That argument is logically absurd and legally unfounded.

Defendants cite non-Rhode Island cases for a "expansive" interpretation of the community caretaking function. However, those cases overlook that the Fourth Amendment and Art. 1, Sec. 6 apply to non-criminal circumstances, as well. (Plaintiff's Second MSJ Memorandum, p. 14). Otherwise, the community caretaking function would become the exception that overwhelms the rule. See, Matthew C. Shapiro, "The Road to Fourth Amendment Erosion is Paved With Good Intentions: Examining Why Florida Should Limit the Community Caretaker Exception," 6 FIU L. Rev. 351 (2010-2011); Michael R. Dimino, Sr., "Police Paternalism: Community Caretaking, Assistance Searches, and Fourth Amendment Reasonableness," 66 Wash. & Lee L. Rev. 1485 (2009). Moreover, a person's right of privacy in his home is just as strong in the non-criminal circumstance as it is in the criminal context. (Plaintiff's Second MSJ Memorandum, pp. 15-16, 23, 30 33-34). The federal and Rhode Island Constitutions do not give police carte blanche to barge into any domestic situation to rectify any perceived threat of harm no matter how unlikely. (Id.). Yet, that is precisely the authority Defendants claim, here. That purported authority violates the federal and state Constitutions.

**VIII. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY WHERE PLAINTIFF'S RIGHTS WERE CLEARLY ESTABLISHED UNDER FEDERAL AND STATE LAW**

Plaintiff moved for summary judgment on Defendants' affirmative defense of qualified immunity. (Plaintiff's Second MSJ Memorandum, pp. 49-52). Plaintiff incorporates those

arguments here by reference.  In short, Rhode Island's statutes and Supreme Court case law, as well as Defendants' own GOs, clearly establish Plaintiff's rights.[7]

The "clearly established" step addresses "whether the state of the law at the time of the putative violation afforded the defendant fair warning that his or her conduct was unconstitutional." Limone v. Condon, 372 F.3d 39, 45 (1st Cir. 2004), citing Hope v. Pelzer, 536 U.S. 730, 741(2002). The Supreme Court has said: "[A] constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." Hope v. Pelzer, 536 U.S. at 740, quoting, Anderson v. Creighton, 483 U.S. 635, 640 (1987); Young v. City of Providence, 396 F.Supp.2d 125, 134 (D.R.I. 2005) (Smith, J.). Here, the case law clearly established that Defendants could not seize Plaintiff or his property from his home without a court order, in the absence of exigent circumstances.  (Plaintiff's Second MSJ Memorandum, pp. 14-20, 23-26).  There were no exigent circumstances and Defendants did not obtain a court order.

Moreover, a state statute or regulation may provide evidence of the state of the law even if it is ignored by state officials.  Hope v. Pelzer, 536 U.S. at 744.  Here, the RIMHL and the RIFA clearly constrain Defendants' authority to seize persons or firearms.  The RIMHL sets forth specific requirements as to when and how a person can compelled to submit to a

_____

[7] In a footnote, Defendants claim Defendants Reynolds and Lafferty are entitled to summary judgment on certain counts simply because they "were not at the scene nor were they consulted by officers at the scene." (Defendants' Memorandum, p. 7 n. 1).  However, it is well-established that police supervisors can be liable under § 1983 for a failure to train and to supervise adequately.  See, City of Canton v. Harris, 489 U.S. 378, 380 (1989); Seekamp v. Michaud, 109 F.3d 802, 808 (1st Cir. 1997); Camilo-Robles v. Hoyos, 151 F.3d 1, 6 (1st Cir. 1988).  Defendant Reynolds is the chief of the NSPD.  (Defendants' SUF 2).  Here, the police officers on scene claim they were carrying out unwritten NSPD policy, in violation of state and federal laws and their own GOs.  That is clearly a failure to supervise and to train.

27

psychological evaluation.  R.I.Gen.L. §§ 40.1-5-7, 40.1-5-8.  The RIFA sets forth specific

reasons why and when a person can be deprived of the possession of his firearm. R.I.Gen.L. §§

11-47-5, 11-47-6, 11-47-7, 11-47-33, etc.  None of those circumstances existed here.

Similarly, Plaintiff submits that Defendants' GOs also provide evidence of clearly

established law. See Healy v. James, 408 U.S. 169, 189 (1972) (citing to the College's "Student

Bill of Rights" as providing substantive rights consistent with constitutional requirements);

Andrews v. City of West Branch, Iowa, 454 F.3d 914, 919 (8th Cir. 2006) (state statute and local

regulation respecting animal control are clearly established law respecting police officer's claim

of qualified immunity for shooting plaintiff's dog); Suarez Cestero v. Pagan Rosa, 198

F.Supp.2d 73, 95 (D.P.R. 2002) (police regulations in police manual constitute clearly

established law respecting qualified immunity); Pew v. Scopino, 904 F.Supp. 18, 27 (D.Me.

1995) (National Guard orders respecting minimum flying altitudes constitute clearly established

law regarding Guard helicopter flyovers of private residences).  Here, Defendants' GOs show it

was not appropriate for them to require Plaintiff to have a psychological evaluation and to seize

his firearms without a court order.  (SUF 17, Ex. H; SUF 22, Ex. 1; SUF 27, Ex. J).

It was well-established in 2008 that, absent genuinely exigent circumstances, police could

not seize a person in his home without a court order.  (Plaintiff's Second MSJ Memorandum, pp.

14-20, 23-26).  Similarly, it was well-established that police could not seize a person's property

from his home without a court order, absent genuinely exigent circumstances.  (Id.).  There were

no genuinely exigent circumstances here.

Here, Defendants claim their authority under the community caretaking function

("CCF").  (SUF 67).  However, Chief Reynolds said he is not familiar with the CCF.  (Id.).

Defendants' GOs do not set forth the CCF.  (SUF 68-70).  No Defendant has received any formal

training on the CCF.  (SUF 71).  No Defendant can identify any statute authorizing the CCF.

(SUF 72).  Defendants have only vague, inconsistent views of the CCF.  (SUF 73-76).  The

NSPD has no written guidelines or factors to consider when it may act pursuant to the CCF.

(SUF 84).  Rather, the NSPD applies the CCF pursuant to individual officers' idiosyncratic

experiences.  (SUF 121-122).

     Here, the NSPD officer who spoke with Plaintiff does not know if any symptoms of

mental illness set forth in the NSPD GO applied to Plaintiff.  (SUF 46).  The NSPD made no

valid factual determination that Plaintiff had attempted suicide.  (SUF 48-52).  No NSPD officer

made a determination of the likelihood of Plaintiff using his firearms to harm himself or others.

(SUF 58-59, 88-89).  In fact, Plaintiff was not at acute or imminent risk of suicide.  (SUF 97).

Instead, Defendants seized Mr. Richer's firearms and required him to have a psychological

evaluation without an adequate basis.  (SUF 97).  They made these decisions within 12 minutes

of arriving at the Richer's house.  (SUF 64).  In this case, Defendants assert qualified immunity

not to protect themselves where the law was genuinely unsettled, but to cover up legally

unjustified and factually unwarranted abuses of their power, solely to protect themselves from

liability and criticism.  (SUF 93, 106).  The Court should not countenance this effort.

     Further, Defendants are also not entitled to qualified immunity where they have insurance

coverage for Plaintiff's claims against them.  Richardson v. McKnight, 521 U.S. 399 (1997).  In

Richardson, the Supreme Court said that employees of a private prison which had a contract to

house state prisoners did not have qualified immunity.  The defendants argued they were entitled

to qualified immunity because they were performing a state function, i.e. operating a prison for

prisoners convicted of violating state criminal statutes.  Among various reasons the Court

provided for denying qualified immunity to those defendants was they had insurance to cover

their individual liability.  "The insurance increases the likelihood of employee indemnification and to that extent reduces the employment-discouraging fear of unwarranted liability potential applicants face." Id. at 411.  Here, Defendants are insured through the Rhode Island Interlocal Risk Management Trust.  www.ritrust.com.  They have no need for qualified immunity.

Moreover, the doctrine itself has come under increasing criticism in recent years.  See, e.g., Ziglar v. Abbasi, 137 S.Ct. 1843, 1869 (2017) (Thomas, J., concurring, but urging the Supreme Court to reconsider its qualified immunity jurisprudence in the appropriate case); Joanna Schwartz, "The Case Against Qualified Immunity," 93 Notre Dame L. Rev. 1797 (2018); William Baude, "Is Qualified Immunity Unlawful?," 106 Cal. L. Rev. 45 (2018).  As argued by Defendants, and others, qualified immunity is essentially the same as the "one-bite" rule for dog owners,[8] i.e., so long as the owner is not specifically aware of his dog's dangerous propensities, he is not liable for its first bite.  Defendants argue that until there is a case on point stating that what they did was illegal, they can do it.  However, we should expect a higher standard of behavior for our government officials than we expect of pit bulls.  There is abundant law, both statutory and judicial, indicating that Defendants' actions were unlawful.  Plaintiff submits that the Rhode Island Supreme Court would not apply qualified immunity in these circumstances.

## IX.    DEFENDANTS CONVERTED PLAINTIFF'S FIREARMS

Plaintiff argued in his motion for partial summary judgment that Defendants had converted his firearms. (Plaintiff's MSJ Memorandum, pp. 36-37).  Plaintiff incorporates those arguments here by reference.

Defendants cite Terrien v. Joseph, 73 R.I. 112, 53 A.2d 923 (1947), but that case actually supports Plaintiff's claim because the defendant was found liable for conversion.  The decision

---

[8] See, DuBois v. Quilitzch, 21 A.3d 375, 381 (R.I. 2011).

does distinguish between when a person rightfully acquires possession of another person's property and when his initial possession is not rightful.  In the former circumstance, the owner must make a demand for the return of the property as a prerequisite for a conversion action; in the latter, he does not.  Here, for reasons previously argued, Defendants' seizure of Plaintiff's firearms was not rightful.  Accordingly, no demand was necessary.  Nonetheless, Plaintiff made multiple demands for the return of his firearms.  (SUF 105-06: Richer Second MSJ Affidavit, ¶ 7, Exhibit X to Plaintiff's Statement of Additional Undisputed Facts).

The individual Defendants also claim that they are not liable for conversion where their seizure of the firearms was not for their personal benefit.  However, Rhode Island law does not require that seizure be for the defendant's personal benefit.  Rather, Defendants are liable if they exercised dominion over the property inconsistent with Plaintiff's rights.  Narragansett Electric Co. v. Carbone, 898 A.2d 87, 97 (R.I. 2006); Case v. Bogosian, KC-1992-0763, 1996 WL 936944 at *7 (R.I.Super. June 14, 1996) (Gibney, J.) (holding that the Town of West Greenwich could be liable for conversion of plaintiff's automobile).  They certainly did that.

Plaintiff cites a federal case based on Tennessee law for the proposition that an individual police officer is not liable for conversion if he does not personally benefit from the seizure.  Holzemer v. City of Memphis, No. 06-2436, 2008 WL 8954888 (Dec. 31, 2008).  However, Plaintiff relies on Rhode Island law as well as the cases cited in his summary judgment motion applying Massachusetts law and finding police officers liable for conversion in analogous circumstances.  (Plaintiff's Memorandum, p. 32).

## X.     DEFENDANTS ARE NOT ENTITLED TO STATE LAW IMMUNITY

Plaintiff argued in his motions for partial summary judgment that Defendants were not entitled to other "statutory and common law immunity" under state law.  (Plaintiff's Second MSJ Memorandum, pp. 45-49).  Plaintiff incorporates those arguments here by reference.

In addition, Plaintiff also notes that the Rhode Island Supreme Court has never expressly adopted and applied the doctrine of qualified immunity.  Rather, it has discussed the doctrine, but it has never held that a defendant who had violated a person's constitutional rights was entitled to qualified immunity because the rights were not clearly established.  See, e.g. Fabrizio v. City of Providence, 104 A.3d 1289, 1293 (R.I. 2014) (stating there was no need to consider qualified immunity where there was no constitutional violation); Monahan v. Girouard, 911 A.3d 666, 673-74 (R.I. 2006) (same); Ensey v. Culhane, 727 A.3d 687, 690-91 (R.I. 1999) (Weisberger, J.) ("In light of the pleadings in this case, however, we need not reach the issue of qualified immunity."); Pontbriand v. Sundlun, 699 A.2d 856, 867 (R.I. 1997) ("However, as the issue [of qualified immunity] was neither extensively briefed nor reached by the trial justice below, we are of the opinion that the determination whether regarding whether qualified immunity exists should be left for determination upon remand."); Salisbury v. Stone, 518 A.2d 1355, 1361, n.6 (R.I. 1986) ("Our finding that Salisbury failed to state a claim for relief under the Civil Rights Act disposes of any need to consider whether Stone, as a state official with discretionary authority, possesses, under the circumstances, qualified immunity from a civil rights suit.").

Moreover, the Rhode Island Supreme Court would not adopt qualified immunity to apply to Defendants' violations of the RIFA and the RIMHL.  Those Acts have specific immunities already.  See, R.I.Gen.L. §§ 11-47-9, 11-47-9.1 and §§ 40.1-5-40.2, 40.1-5-41, respectively.  The Rhode Island Supreme Court would not expand by judicial fiat the limited immunities the

General Assembly has already provided. See, <u>In re Proposed Town of New Shoreham Project</u>, 25 A3d 482, 511 (R.I. 2011) ("'It is not the function of this [C]ourt to rewrite or to amend statutes enacted by the General Assembly.'")  Thus, the Rhode Island Supreme Court would not apply the doctrine of qualified immunity in this case.

Plaintiff previously argued in his summary judgment motion that the public duty doctrine does not apply here because he alleges intentional torts.  (Plaintiff's Memorandum, pp. 53-54). Plaintiff incorporates those arguments by reference.  In addition, the Defendants alleged in their pleadings that the individual Defendants were not acting pursuant to NSPD custom or practice. (ECF Doc. 87, p. 1, ¶ 2).  If true, then the individual Defendants cannot claim any sovereign immunity protection.  <u>Feeney v. Napolitano</u>, 825 A.2d 1, 4-5 (R.I. 2003).

## XI.   PLAINTIFF'S CLAIM FOR INJUNCTIVE RELIEF IS NOT SPECULATIVE

Plaintiff may seek injunctive relief where he is subject to a credible threat of enforcement by Defendants.  <u>Susan B. Anthony List v. Driehus</u>, 134 S.Ct. 2334, 2395 (2014); <u>Virginia v. American Booksellers Ass'n</u>, 484 U.S. 383, 392 (1988); <u>Jamal v. Kane</u>, 96 F.Suup.2d 447, 454-57 (M.D.Penn. 2015), citing Antonin Scalia, "The Doctrine of Standing as an Essential Element of the Separation of Powers," 17 Suffolk U.L.Rev. 881, 984 (1983) ("Thus, when an individual who is the very subject of a law's requirement or prohibition seeks to challenge it, he always has standing."); <u>New Progressive Party (Partido Neuvo Progressista) v. Hernandez Colon</u>, 779 F.Supp.  646, 651-52 (D.P.R. 1991).

Here, Defendants have already seized Plaintiff, required him to have a psychological evaluation, and seized his firearms, all without court orders.  (SUF 60-61, 63).  Defendants continue to seize other people's firearms and to require other people to have psychological evaluations.  (SUF 109-110).  Defendants have not promised that they will cease these practices.

Obviously, Plaintiff remains at risk that Defendants will again seize him and his firearms without court orders and other constitutional protections.  Accordingly, he has standing and his claim for injunctive relief is not speculative.

Moreover, the deprivation of constitutional rights, even for a short time, is an irreparable injury.  Providence Firefighters Local 799 v. City of Providence, 26 F.Supp.2d 350, 355 (D.R.I. 1998) (Lagueux, J.) (holding that firefighters had standing to challenge City order that barred firefighters from commenting on fire department "matters" because "the deprivation of constitutionally-protected rights for even minimal amounts of time constitutes not only injury, but irreparable injury.").

## CONCLUSION

For the reasons set forth here, or incorporated herein by reference, the Court should deny Defendants' motion for summary judgment.

> JASON RICHER
> By his attorneys,
>
> */s/ Thomas W. Lyons*
> Thomas W. Lyons              #2946
> Rhiannon S. Huffman          #8642
> RHODE ISLAND AFFILIATE,
> AMERICAN CIVIL LIBERTIES UNION
> Strauss, Factor, Laing & Lyons
> One Davol Square, Suite 305
> Providence, RI 02903
> (401) 456-0700
> tlyons@straussfactor.com

## CERTIFICATION

I hereby certify that on January 30, 2019, a copy of the foregoing was filed and served electronically on all registered CM/ECF users through the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

> /s/ Thomas W. Lyons

34